UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

SEP 1 4 2020

CLERK. U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

IN RE APPLICATION OF
TATIANA AKHMEDOVA,

Applicant,

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782.

**SA20MC1099**

Case No. _____ **JKP**

## EX PARTE APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Applicant, Tatiana Akhmedova ("Applicant"), by and through her undersigned counsel, applies for an Order pursuant to 28 U.S.C. § 1782 to obtain discovery in the form of a subpoena to be served on Rackspace US, Inc. d/b/a Rackspace Technology ("Rackspace") for the production of relevant documents in the possession, custody, and/or control of Rackspace for the use in a pending foreign adjudicative proceeding, all for the reasons set forth in this Application; the Declaration of Anthony J. Riem, dated September 1, 2020 (the "Riem Declaration"); as well as the exhibits thereto; and the Memorandum of Law; submitted contemporaneously with this Application.

### JURISDICTION AND VENUE

Jurisdiction is proper pursuant to Title 28 United States Code Section 1782 as this Application is for discovery involving the production of documents located within the Western District of Texas, discovery relevant and important to assist Applicant in her pending foreign court proceeding.

Venue in the Western District of Texas is appropriate pursuant to Title 28 United States Code Section 1782 because the discovery is being sought from a third party, who is located within this Judicial District, along with the documents being presently in this jurisdiction. Specifically Rackspace has its headquarters at 1 Fanatical Place, City of Windcrest, San Antonio, Texas 78218.

## THE FOREIGN PROCEEDING

Applicant seeks discovery with respect to documents located in the United States and in this District for use in a foreign proceeding pending in the United Kingdom. Specifically, the pending litigation in the United Kingdom (High Court of Justice, Family Division, Case No. FD13D05340) (the "English Proceeding"), which is continuing as the judgment debt awarded in December 2016 (described further below) remains almost entirely unsatisfied. The English Proceeding now also concerns fraudulent transfers by judgment debtor Farkhad Akhmedov and his alter ego entities, Cotor Investment, S.A., Qubo 1 Establishment, Qubo 2 Establishment, Straight Establishment, and Avenger Assets Corporation, including through the transfer of assets to Temur and a number of Liechtenstein trusts in the fraudulent evasion of the English Judgments entered in Applicant's favor. Ms Akhmedova has now brought claims within these proceedings against Temur and the Liechtenstein trustee entities Counselor Trust Reg ("Counselor") and Sobaldo Establishment ("Sobaldo") (which provide trust services to a number of trusts established in Liechtenstein in furtherance of Farkhad Akhmedov's scheme) to *inter alia* set aside transfers of assets made by Farkhad Akhmedov to those parties in furtherance of his scheme of evasion. Freezing injunctions were granted by the English court against the Liechtenstein trustees (who are also subject to criminal restraint orders in Liechtenstein in aid of a money laundering investigation) in August 2019. As of July 2020, freezing injunctions and ancillary orders for disclosure (including a turnover order) were also issued by the English Court against Temur. The discovery

obtained here will be used to supplement discovery sought in the English Proceeding relating to Temur's role (and the role of the Liechtenstein trustees, with whom Temur communicated) in the ongoing fraud, as more information is gathered to demonstrate that Farkhad has continued to use various third parties to transfer, hide, secrete and otherwise violate numerous court orders including a disclosure order and turnover order issued by the High Court of England and Wales.

## RELEVANT FACTS

The facts giving rise to this Application are set forth in detail in the Riem Declaration, as well as the exhibits thereto. According to the declaration, the dispute and pending foreign litigation can be briefly summarized as follows:

## I.     The English Money Judgments and the Debtors' Fraudulent Transfer of Assets

Applicant has obtained two English money judgments rendered by English Court in favor of the Applicant. One against Farkhad, Cotor Investment, S.A. ("Cotor"), Qubo 1 Establishment ("Qubo 1"), Qubo 2 Establishment ("Qubo 2"), jointly and severally, in the amount of GBP 350,000,000 plus interest and certain running adjustments (the "Cash Award"), of which £224,430,508 was designated by the English court as maintenance (the remaining GBP £125,569,492  hereinafter referred to as the "Initial Money Judgment"); and the second against Straight Establishment in the amount of $478,278,000 plus interest and certain running adjustments (the "Straight Money Judgment").  The Cash Award (including the Initial Money Judgment) was awarded in December 2016 following an eight-day Financial Remedy Hearing conducted in the Family Division of the English High Court in connection with the divorce of Applicant Ms. Akhmedova and Farkhad Akhmedov.  The Straight Money Judgment was awarded by the English Court in March 2018 following Ms Akhmedova's applications against Straight Establishment and Avenger Assets Corporation ("Avenger Assets").

3

Applicant issued a divorce petition in London on October 24, 2013.  Ms. Akhmedova was granted a *decree nisi*, stating that the English Court saw no reason why the couple could not divorce, on December 2, 2015.  The *decree nisi* was made absolute on December 15, 2016.  An eight-day financial remedy hearing was heard in the Family Division of the English High Court in November and December 2016.  The purpose of the Financial Remedy Hearing was to establish the value of the couple's assets and to decide how to divide that value and provide maintenance for Ms. Akhmedova in a final distribution.

However, on November 30, 2016 (the second day of the trial in England) a luxury yacht, the M/Y LUNA, beneficially owned by Farkhad via corporate shell (the "Vessel"), was transferred from its corporate owner, Avenger Assets, to another entity, Stern Management Corporation at the instruction of Farkhad and facilitated by his agents some of which are located in this District.  One day later, on December 1, 2016, the Vessel was again transferred at the instruction of Farkhad from Stern Management Corporation to Qubo 2 with the assistance of Farkhad's agents located within this District.  Later, Qubo 2 was found by the English Court to be the alter ego of Farkhad.

At the conclusion of the Financial Remedy Hearing on December 15, 2016, the English Court awarded Ms. Akhmedova an amount equal to £453,576,152 against Farkhad, including the Cash Award of GBP £350,000,000 (approximately US $466.6 million).  Farkhad was ordered by the English Court to pay the Cash Award by January 6, 2017.  Riem Decl. Exs. 1 & 2.

On December 20, 2016 the English Court also found that transfers of a 1) modern art collection and 2) the assets of Cotor,[1] to entities in Liechtenstein, including Qubo 1 and Qubo 2 "was simply the latest part of [Farkhad's] attempts to avoid his liabilities by purporting to transfer his assets to a new jurisdiction and thereby making enforcement more difficult."  The English

---

[1] In 2012, Farkhad sold his interest in ZAO Northgas, a Russian oil company, for US $1.375 billion.  Following the sale, Farkhad transferred the sale proceeds to Cotor.  Ex. 1 ¶ 77.

Court set aside these transfers on the basis that Qubo 1 and Qubo 2 "are no more than ciphers and the alter ego of [Farkhad]" and made the Qubo entities liable for the judgment debt together with Farkhad. Riem Decl. Ex. 2 ¶¶ 11(g)-(h), 12.

Farkhad has not voluntarily satisfied any portion of the Judgment Debt or Cash Award, including the Initial Money Judgment, and is currently in contempt of Court for breaching the terms of the Freezing Order. He has instead continued to engage in a pattern of deception aimed at concealing his assets and frustrating Ms. Akhmedova in her efforts to enforce her rights as a UK judgment creditor.

On March 8, 2017, in disregard of the English Judgment (under which Qubo 2 was liable on the judgment debt together with Farkhad) and pending proceedings in the Liechtenstein Court, Qubo 2 transferred the Vessel to Straight Establishment. Straight Establishment is another Liechtenstein entity, which is operated from the same address as Qubo 2. Straight Establishment is the current registered owner of the LUNA and as of August 8, 2018 Straight Establishment and its agents have been permanently enjoined from further transferring ownership, control or possession of the LUNA by the High Court of the Marshall Islands.

On March 21, 2018, the English Court issued an order against Defendants Straight Establishment and Avenger Assets (the "March 21 Order"). The English Court found that Straight Establishment was an alter ego of Farkhad and served as his nominee. The English Court found that assets held and previously held in Straight Establishment's name, as well as assets held and previously held in Avenger Asset's name, beneficially belonged to Farkhad, including the Vessel which had been fraudulently transferred by Farkhad several times during the English proceedings.

Also on March 21, 2108, the English Court declared "with immediate effect that Applicant is the legal and beneficial owner of the Vessel," and ordered Farkhad and Straight Establishment

to transfer title to Ms. Akhmedova within seven days. The English Court ordered that if the title transfer was not effected within seven days, Straight Establishment would be concurrently liable to Ms. Akhmedova for a liquidated cash sum of $487,278,000 (the "Straight Money Judgment," attached hereto as Exhibit 3). The English Court also extended the Freezing Order to apply to Straight Establishment and Avenger Assets, and specifically applied to prohibit the "removal, disposal, charging and/or diminution in value" of the Vessel.

## II.     The English Proceedings Against Temur Akhmedov

On 15 November 2019, Applicant filed in the ongoing English Proceeding, an application seeking to add as an additional, tenth respondent, Temur Akhmedov to the English Proceeding. Temur was joined to the proceedings by the order of Mrs. Justice Knowles dated January 20, 2020.

By order of Justice Knowles dated June 19, 2020, as amended by consent (the "Disclosure Order"), Temur was required to provide standard disclosure and inspection of documents by July 17, 2020 and was also required to provide responses to Applicant's Request for Further Information ("RFI").

On July 17, 2020, the Applicant sought and obtained against an *ex parte* without notice Worldwide Freezing Order with ancillary asset disclosure against Temur (the "WFO"). Also on July 17, 2020, the Temur provided disclosure and responses to the RFI pursuant to the Disclosure Order. Inspection of a limited number of documents was provided on July 17, 2020, with inspection of the majority of documents being provided on July 20, 2020.

Temur's disclosure statement reveals that he has previously held a wide variety of relevant documents but (on his own case) has systematically destroyed his documents since January 2018. In fact, aside from his UBS bank statements, Temur had disclosed only two documents created between April 2016 and July 20, 2020. Although Temur seeks to justify this destruction as justified

by "security reasons", it appears likely that such destruction has in fact taken place in order to frustrate Tatiana's claims against him.

Based on Temur's acts, on July 20, 2020, Applicant applied for an order for delivery up of Temur's Electronic Devices, Mobile Communication Services and Cloud Accounts and for such Electronic Devices, Mobile Communication Services and Cloud Accounts to be imaged by an independent forensic IT expert with a view to such images being reviewed by Temur's solicitors for the purposes of verifying and, if appropriate, securing compliance with Temur's obligation to give disclosure in accordance with the Disclosure Order.  Riem Decl. Ex. 4.

As further set forth in the Riem Declaration, submitted herewith, Temur's disclosure gives rise to serious concerns that he has failed to comply with his disclosure obligations and/or has destroyed relevant documents in the English Proceedings.  Riem Decl. ¶¶ 22-41.

Based upon information obtained to-date from various third party sources obtained through subpoena and otherwise, it is believed that the discovery target here, Rackspace, is used by Temur, and for the hosting and/or archiving of his email accounts subject to the English Disclosure Order, including accounts related to the Vessel M/Y LUNA (which Temur assists his father, judgment debtor Farkhad Akhmedov in controlling and managing).  Riem Decl. ¶¶42-46.

## REQUEST FOR DISCOVERY ASSISTANCE

Applicant  respectfully requests that the Court provide discovery assistance with respect to the foreign proceeding in the United Kingdom.  Applicant requests that Rackspace, the discovery subject, who is present in the Western District of Texas, be directed to provide discovery, described below, for use in the pending foreign proceeding.  As more specifically described in Applicant's Memorandum of Law in Support of an Application for Discovery Pursuant to 28 U.S.C. § 1782, assistance is appropriate here because: (i) the discovery subject "resides" at or is "found" in this

District; (ii) Applicant is an "interested person" (as a party to the foreign proceeding); and (iii) the foreign proceeding is pending before a "foreign or international tribunal," and the information obtained will be for use in and in support of further adjudication in the foreign proceeding.

WHEREFORE, pursuant to 28 U.S.C. § 1782, Applicant requests that this Court enter an Order:

1)   Authorizing Applicant to issue and serve subpoenas on Rackspace US, Inc. d/b/a Rackspace Technology for the production of the following documents:

    a)   All documents in the possession and control of Rackspace concerning cloud services and/or archiving of information provided with respect to email accounts maintained by the Vessel M/Y Luna, including but not limited to the following email accounts:

        i)   captain@my-luna.com

        ii)   chiefofficer@my-luna.com

        iii)   chiefengineer@my-luna.com

        iv)   Any other email address containing "@my-luna.com"

    b)   All documents in the possession or control of Rackspace concerning cloud services and/or archiving of information provided in connection with Great Circle Systems or Triton Technical with respect to the Vessel M/Y Luna;

    c)   All documents in the possession or control of Rackspace concerning cloud services and/or archiving of information provided for any email accounts maintained by Farkhad Akhmedov or Temur Akhmedov, including but not limited to Farkhad@akhmedov.net, Temur@akhmedov.net and temur@stecapital.net.

2)      Ordering Rackspace to produce the documents requested in the subpoena on an expedited basis, within fourteen (14) days of service of the subpoena;

3)      Ordering Rackspace to preserve documents and evidence, electronic or otherwise, in its possession, custody or control that contain information potentially relevant to the subject matter of the Applicant's document request;

4)      Ordering that Rackspace shall maintain the confidentiality of the fact and content of the Applicant's discovery efforts, except as necessary to seek advice of counsel, who are to be similarly restrained;

5)      Providing that notice of the discovery authorized by this Order need not be provided to any of the individuals named as a party in the foreign proceedings until such time as the documents sought pursuant to this Court's order granting discovery is obtained by Applicant; and

6)      Retaining jurisdiction over the matter for the purpose of enforcement and assessing any supplemental request for discovery assistance that may be requested by Applicant.

****

In summary, based on the reasons set forth in this Application; the Declaration of Anthony J. Riem, dated September 7, 2020; as well as the exhibits thereto; and the Memorandum of Law; Applicant clearly meets the requirements of 28 U.S.C. § 1782, and this Application for the Order should be granted.

Dated:   September 8, 2020

Respectfully submitted,

HOLLAND & KNIGHT LLP

Julia M. Haines
State Bar. No. 08710800
Fed ID No. 00765
1100 Louisiana Street, Suite 4300
Houston, Texas 77002
Telephone:  (713) 821-7000
Email:  julia.haines@hklaw.com

James H. Power (*pro hac vice* forthcoming)
State Bar No. 24026397
Fed ID No. 433050
31 West 52nd Street
New York, New York 10019
Telephone:  (212) 513-3494
Facsimile:  (212) 385-9010
Email:  james.power@hklaw.com

*Attorneys for Tatiana Akhmedova*

10

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

IN RE APPLICATION OF
TATIANA AKHMEDOVA,

            Applicant,

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782.

Case No.

## DECLARATION OF ANTHONY J. RIEM IN SUPPORT OF
## *EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

I, ANTHONY J. RIEM, declare under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1.     I am a partner of the law firm PCB Litigation LLP in London, United Kingdom. I am Applicant Tatiana Akhmedova's ("Ms. Akhmedova's", or "Applicant's") legal representative in respect of proceedings before the Courts of English and Wales, including proceedings filed by Applicant against her former husband Farkhad Akhmedov ("Farkhad"), against his alter ego entities and against their son, Temur Akhmedov ("Temur").

2.     I make this Declaration in support of the application of Ms. Akhmedova, to the U.S. District Court for the Western District of Texas under 28 U.S.C. § 1782 (the "1782 Application") seeking discovery with respect to documents located in the United States and in this judicial district in the possession or control of an entity called Rackspace US, Inc. d/b/a Rackspace Technologies ("Rackspace") for use in pending litigation in the United Kingdom (High Court of Justice, Family Division, Case No. FD13D05340) (the "English Proceeding"), which is continuing as the judgment

debt awarded in December 2016 (described further below) remains almost entirely unsatisfied. The English Proceeding now also concerns fraudulent transfers by judgment debtor Farkhad Akhmedov and his alter ego entities, Cotor Investment, S.A., Qubo 1 Establishment, Qubo 2 Establishment, Straight Establishment, and Avenger Assets Corporation, including through the transfer of assets to Temur and a number of Liechtenstein trusts in the fraudulent evasion of the English Judgments entered in Applicant's favor.  Ms Akhmedova has now brought claims within these proceedings against Temur and the Liechtenstein trustee entities Counselor Trust Reg ("Counselor") and Sobaldo Establishment ("Sobaldo") (which provide trust services to a number of trusts established in Liechtenstein in furtherance of Farkhad Akhmedov's scheme) to *inter alia* set aside transfers of assets made by Farkhad Akhmedov to those parties in furtherance of his scheme of evasion.    Freezing injunctions were granted by the English court against the Liechtenstein trustees (who are also subject to criminal restraint orders in Liechtenstein in aid of a money laundering investigation) in August 2019.   As of July 2020, freezing injunctions and ancillary orders for disclosure (including a turnover order) were also issued by the English Court against Temur.  The discovery obtained here will be used to supplement discovery sought in the English Proceeding relating to Temur's role (and the role of the Liechtenstein trustees, with whom Temur communicated) in the ongoing fraud, as more information is gathered to demonstrate that Farkhad has continued to use various third parties to transfer, hide, secrete and otherwise violate numerous court orders including a disclosure order and turnover order issued by the High Court of England and Wales.

3.      I am fully authorized to make this Declaration by Ms. Akhmedova.  I am fully familiar with the facts of the English Proceeding listed above as well as the various foreign proceedings between Ms. Akhmedova and Farkhad around the world.  Unless stated otherwise,

the statements herein are based on my personal knowledge from my involvement in Ms. Akhmedova's case, as well as my review of relevant documents in connection with proceedings pending in the United Kingdom.

### The Parties and Basic Facts

4.      The Family Division of the High Court of Justice in London (the "English Court") has awarded the Applicant an amount equal to £453,576,152 ("Judgment Debt") against Farkhad and his alter ego companies.

5.      Applicant has obtained two English money judgments rendered by English Court in favor of the Applicant.  One against Farkhad, Cotor Investment, S.A. ("Cotor"), Qubo 1 Establishment ("Qubo 1"), Qubo 2 Establishment ("Qubo 2"), jointly and severally, in the amount of GBP 350,000,000 plus interest and certain running adjustments (the "Cash Award"), of which £224,430,508 was designated by the English court as maintenance (the remaining GBP £125,569,492 hereinafter referred to as the "Initial Money Judgment"); and the second against Straight Establishment in the amount of $478,278,000 plus interest and certain running adjustments (the "Straight Money Judgment").  The Cash Award (including the Initial Money Judgment) was awarded in December 2016 following an eight-day Financial Remedy Hearing conducted in the Family Division of the English High Court in connection with the divorce of Applicant Ms. Akhmedova and Farkhad Akhmedov.  The Straight Money Judgment was awarded by the English Court in March 2018 following Ms Akhmedova's applications against Straight Establishment and Avenger Assets Corporation ("Avenger Assets").

6.      Applicant issued a divorce petition in London on October 24, 2013.  Ms. Akhmedova was granted a *decree nisi*, stating that the English Court saw no reason why the couple could not divorce, on December 2, 2015.  The *decree nisi* was made absolute on December 15,

2016.  An eight-day financial remedy hearing was heard in the Family Division of the English High Court in November and December 2016.  The purpose of the Financial Remedy Hearing was to establish the value of the couple's assets and to decide how to divide that value and provide maintenance for Ms. Akhmedova in a final distribution.

7.      However, on November 30, 2016 (the second day of the trial in England) a luxury yacht, the M/Y LUNA, beneficially owned by Farkhad via corporate shell (the "Vessel"), was transferred from its corporate owner, Avenger Assets, to another entity, Stern Management Corporation at the instruction of Farkhad and facilitated by his agents some of which are located in this District.  One day later, on December 1, 2016, the Vessel was again transferred at the instruction of Farkhad from Stern Management Corporation to Qubo 2 with the assistance of Farkhad's agents located within this District.  Later, Qubo 2 was found by the English Court to be the alter ego of Farkhad.

8.      At the conclusion of the Financial Remedy Hearing on December 15, 2016, the English Court awarded Ms. Akhmedova an amount equal to £453,576,152 against Farkhad, including the Cash Award of GBP £350,000,000 (approximately US $466.6 million).  Farkhad was ordered by the English Court to pay the Cash Award by January 6, 2017.  A true and correct copy of the Judgment and Financial Remedy Order are attached hereto as Exhibits 1 and 2, respectively.

9.      On December 20, 2016 the English Court issued a freezing order (the "Freezing Order") preventing Farkhad and the other judgment debtors from dealing with his assets (whether in or outside England and Wales), and ordering him to make financial disclosure of his assets.

1357207 v.1

10.     On December 20, 2016 the English Court also found that transfers of a 1) modern art collection and 2) the assets of Cotor,[1] to entities in Liechtenstein, including Qubo 1 and Qubo 2 "was simply the latest part of [Farkhad's] attempts to avoid his liabilities by purporting to transfer his assets to a new jurisdiction and thereby making enforcement more difficult." The English Court set aside these transfers on the basis that Qubo 1 and Qubo 2 "are no more than ciphers and the alter ego of [Farkhad]" and made the Qubo entities liable for the judgment debt together with Farkhad. Ex. 2 ¶¶ 11(g)-(h), 12.

11.     Farkhad has not voluntarily satisfied any portion of the Judgment Debt or Cash Award, including the Initial Money Judgment, and is currently in contempt of Court for breaching the terms of the Freezing Order. He has instead continued to engage in a pattern of deception aimed at concealing his assets and frustrating Ms. Akhmedova in her efforts to enforce her rights as a UK judgment creditor.

12.     On March 8, 2017, in disregard of the English Judgment (under which Qubo 2 was liable on the judgment debt together with Farkhad) and pending proceedings in the Liechtenstein Court, Qubo 2 transferred the Vessel to Straight Establishment. Straight Establishment is another Liechtenstein entity, which is operated from the same address as Qubo 2. Straight Establishment is the current registered owner of the LUNA and as of August 8, 2018 Straight Establishment and its agents have been permanently enjoined from further transferring ownership, control or possession of the LUNA by the High Court of the Marshall Islands.

13.     On March 21, 2018, the English Court issued an order against Defendants Straight Establishment and Avenger Assets (the "March 21 Order"). The English Court found that Straight Establishment was an alter ego of Farkhad and served as his nominee. The English Court found

---

[1] In 2012, Farkhad sold his interest in ZAO Northgas, a Russian oil company, for US $1.375 billion. Following the sale, Farkhad transferred the sale proceeds to Cotor. Ex. 1 ¶ 77.

that assets held and previously held in Straight Establishment's name, as well as assets held and previously held in Avenger Asset's name, beneficially belonged to Farkhad, including the Vessel which had been fraudulently transferred by Farkhad several times during the English proceedings.

14.     Also on March 21, 2108, the English Court declared "with immediate effect that Applicant is the legal and beneficial owner of the Vessel," and ordered Farkhad and Straight Establishment to transfer title to Ms. Akhmedova within seven days.  The English Court ordered that if the title transfer was not effected within seven days, Straight Establishment would be concurrently liable to Ms. Akhmedova for a liquidated cash sum of $487,278,000 (the "Straight Money Judgment," attached hereto as Exhibit 3).  The English Court also extended the Freezing Order to apply to Straight Establishment and Avenger Assets, and specifically applied to prohibit the "removal, disposal, charging and/or diminution in value" of the Vessel.

I.      **The English Proceedings Against Temur Akhmedov**

15.     On 15 November 2019, Applicant filed in the ongoing English Proceeding, an application seeking to add as an additional, tenth respondent, Temur Akhmedov to the English Proceeding. Temur was joined to the proceedings by the order of Mrs. Justice Knowles dated January 20, 2020.

16.     By order of Justice Knowles dated June 19, 2020, as amended by consent (the "Disclosure Order"), Temur was required to provide standard disclosure and inspection of documents by July 17, 2020 and was also required to provide responses to Applicant's Request for Further Information ("RFI").

17.     On July 17, 2020, the Applicant sought and obtained against an *ex parte* without notice Worldwide Freezing Order with ancillary asset disclosure against Temur (the "WFO").

18.     Also on July 17, 2020, the Temur provided disclosure and responses to the RFI pursuant to the Disclosure Order.  Inspection of a limited number of documents was provided on July 17, 2020, with inspection of the majority of documents being provided on July 20, 2020.

19.     Temur's disclosure statement reveals that he has previously held a wide variety of relevant documents but (on his own case) has systematically destroyed his documents since January 2018.  In fact, aside from his UBS bank statements, Temur had disclosed only two documents created between April 2016 and July 20, 2020.  Although Temur seeks to justify this destruction as justified by "security reasons", it appears likely that such destruction has in fact taken place in order to frustrate Tatiana's claims against him.

20.     Based on Temur's acts, on July 20, 2020, Applicant applied for an order for delivery up of Temur's Electronic Devices, Mobile Communication Services and Cloud Accounts and for such Electronic Devices, Mobile Communication Services and Cloud Accounts to be imaged by an independent forensic IT expert with a view to such images being reviewed by Temur's solicitors for the purposes of verifying and, if appropriate, securing compliance with Temur's obligation to give disclosure in accordance with the Disclosure Order.  A true and correct copy of the Application Notice submitted to the English Court is attached hereto as Exhibit 4.

21.     In support of the July 20, 2020 Application, a witness statement in my name and signed by me was also filed.  Attached hereto as Exhibit 5 is a true and correct copy of the witness statement of Anthony J. Riem dated July 20, 2020.

22.     As discussed in the witness statement, Temur's disclosure gives rise to serious concerns that he has failed to comply with his disclosure obligations and/or has destroyed relevant documents in the English Proceedings.  In particular, in a document submitted by Temur, he expressly states that a number of documents which ought to be disclosed are no longer in his

control because they were stored on "mobile devices, on computers and/or on solid-state drives, to which I no longer have access by reason that they have been destroyed". It is also said that "Increasingly, since January 2018 on professional advice, I have adopted a practice of periodically destroying mobile devices and computer storage for security reasons". The same is said in respect of communications contained on "electronic storage". Accordingly, it appears to be Temur's case that he has destroyed virtually every document which is relevant to these proceedings created since 1 March 2016. Ex. 5 ¶ 10(b).

23.     I suggested to the English Court at that time that it is implausible to suggest that all of Temur's documents from March 2016 have, on a regular basis, been completely obliterated (which appears to follow from the disclosure Temur has given). This would mean, amongst other things, that Temur has permanently deleted all such documents (without keeping any record, even in a secure environment) and that he cannot retrieve them even for his own legitimate purposes. I suggested that it is not credible that any person could operate in a way that means that they have no access to any documents or information relating to past dealings. Ex. 5 ¶ 10(d).

24.     To the contrary, there is compelling evidence that Temur had not in fact routinely destroyed the documents over the previous years but that the deletions are recent (and, it must be inferred, triggered by a desire to avoid giving disclosure in the English Proceedings). For example:

> a. When the application for disclosure was heard by the court in May 2020, and the court was considering the appropriate scope of disclosure to be ordered, Temur's counsel did not advise the court that he held no documents because they had all already been destroyed.
>
> b. As I explain in (Ex. 5) at ¶ 11d, Temur disclosed two emails sent to him (at his personal Gmail account) dated October 2013. Temur has since produced

the native copies of these emails as forwarded by him to his solicitors. It is now apparent that these were forwarded from Temur's khyshen@gmail.com account to Mr Harper of HFC in January 2020. On Temur's case, these emails ought not to exist because they would have been the subject of routine destruction. But they undeniably did exist as of 19 January 2020. Temur is now forced into the absurd position that "he had expected to find [those emails] on his PC, and believes that they are stored on it, but so far has not found them". There is an overwhelming inference that Temur did hold his emails as of 19 January 2020 but either (a) is lying about no longer holding them, or (b) has destroyed them since that date.

c.  As I explain in ¶31 below, when independent forensic experts appointed by the English Court attempted to access Temur's email account, hosted by Google, at temur@stecapital.net on 14 August 2020, Google presented a message advising that the account had been *"recently deleted"*. This message had not appeared when attempts were made to access the account less than 2 weeks earlier. It therefore appears that Temur has been setting about deleting his email accounts in response to the orders of the English Court.

25.     In addition to Temur's express statements that *prima facie* disclosable documents have been destroyed, there are further obvious gaps and inconsistencies in his disclosure as set forth in my witness statement (Ex. 5) at ¶ 11.

26.     Based on the submission made to the English Court, the Court issued an Order on July 23, 2020 directing that Temur shall by July 27, 2020 deliver up his electronic devices

1357207 v.1

including all usernames, passwords and pin numbers for access to Temur's electronic devices, cloud accounts and mobile communications services. Temur was also directed to cooperate with the independent IT forensic expert Aon to access, decrypt and examine the relevant data. A true and correct copy of the English Order dated July 23, 2020 is attached hereto as Exhibit 6.

27.     However, Temur failed to provide access to any of his Cloud Accounts or Mobile Communication Services (as defined by the order) and failed to deliver up any of his Electronic Devices. In summary:

<u>Cloud Accounts and Mobile Communication Services</u>

28.     Temur was required to provide by noon on 27 July 2020 a list verified by statement of truth "of all Cloud Accounts and Mobile Communication Services used by him since 1 January 2013, identifying the applicable user-name, e-mail address or telephone number for each such service". Temur provided a statement dated 28 July 2020 identifying the following Cloud Accounts and Mobile Communication Services used since 1 January 2013:

    a.   Email accounts:

        (i)     temur@akhmedov.net

        (ii)    temur@stecapital.net

        (iii)   khyshen@gmail.com

        (iv)   temur.akhmedov1993@gmail.com

    b.   Phone numbers:

        (i)     +447795973199

        (ii)    +447554021056

        (iii)   +447900434912

        (iv)    +19543283389

       (v)    +447739961849

       (vi)   +12022270009

       (vii)  +447833305807

  c.  Communication services

  d.  Signal – registered to *5807 number above

  e.  Telegram – registered to *3199 number above

  f.  Instagram – usernames: sexy_temur123456789 and ttxx____

  g.  iMessage – registered to *3199 number above

  h.  Whatsapp - registered to 077959731991

29.    Temur was then required by paragraph 8(b) to provide Aon with "all PIN numbers, user-names, email addresses, combinations, passwords, security verification codes and any other item or piece of information (including, without limitation, authorisations to third party service providers) which may be necessary to give access to the Electronic Devices, Cloud Accounts or Mobile Communication Services".

30.    However, Aon was unable to access <u>any</u> of the accounts listed above using the credentials provided by Temur.  In particular, for three of the four email accounts Aon received messages from the service providers reporting that the password provided was incorrect.

31.    On 14 August 2020, Alex Campbell (of Aon) contacted Temur to undertake Google's account recovery process with him for each of his four Google accounts. This was unsuccessful for each account due *inter alia* to Temur claiming not to be in possession of back-up passcodes or devices registered for authentication, or even to be able to identify his mobile phone number registered with Google for recovery purposes when provided with part of the phone

number. I note in particular that in relation to the temur@stecapital.net account, Mr. Campbell summarised as follows (emphasis added):

> *When entering the email address 'temur[at]stecapital.net' into the Google login page and pressing next, we would expect to be presented with a screen containing a password prompt.*
> *Instead, we were presented with a screen stating that "This account was recently deleted and may be recoverable. Click Next to attempt to restore this account."*
> *[...]*
> *Notably, when we attempted to access the 'temur[at]stecapital.net' email account on 7th August 2020 using credentials supplied by Mr. Akhmedov, we were not presented with the "This account was recently deleted..." message. Instead, we were prompted to enter a password for the account, which when entered, was unsuccessful. This suggests that the 'temur[at]stecapital.net' account was deleted sometime between 7th August 2020 when we attempted to access the account, and our call today...*

32.     Aon advised that this email account and its data might still be recoverable if steps were taken promptly and so Mr. Campbell has sought further assistance from Temur. However, Temur is refusing to cooperate. Aon is concerned that a delay in accessing the temur@stecapital.net account risks the account becoming unrecoverable and the data lost.

*Electronic Devices*

33.     Pursuant to paragraphs 9(a) and 9(b) of the 23 July 2020 Order Temur was required to provide his desktop PC (which he said had been taken to Turkey by a friend) to Aon by 31 July 2020 and the rest of the Electronic Devices as defined by the order (which were said to be with him in France) by the earlier date of 28 July 2020.

34.     However, Temur deliberately delayed in sending his Electronic Devices other than the desktop PC (i.e. the devices already within his possession in France) until 28 July 2020, causing inevitable breach of the paragraph 9(b) deadline. The delay was apparently explained by the fact that, he claimed, he had chosen to recover his desktop PC from Turkey to France, before sending all of his devices together. He offered no explanation for why he had chosen to breach the court's order by not sending his other Electronic Devices immediately so that they would arrive by the

deadline fixed by the court. This result of his actions was that Temur sent all of the Electronic Devices in one package (said to contain an Apple iPhone telephone, an Apple Mac book, a personal desktop computer with solid state drive storage, and an Apple watch).

35.     On 31 July 2020 DHL (the courier service engaged by Temur) confirmed that their systems showed that a package (with waybill No. 8981637814) had been collected by DHL from Temur's address in France on 13:09pm on 28 July 2020.  However, they noted that they had no "scans" on their system showing any progress after collection.  On 7 August 2020 DHL advised Aon that its warehouse CCTV footage did not show the package being delivered to the warehouse, and that the warehouse has been searched and the package has not been located.  Following that investigation, DHL advised that it considered the package to have been lost with the reason unknown.  On 14 August 2020 DHL advised Aon that it was planning to lodge a complaint with the police following the loss of the shipment.

36.     Whilst Temur blames DHL for this situation, it is a remarkable coincidence (particularly after all of Temur's devices were supposedly combined into a single package, even though that required a breach of the court's order).  Accordingly, all Temur's Electronic Devices (including the PC) are currently missing.

*2019 iPhone Image*

37.     On 31 July 2020, Temur served an updated List of documents (N265) explaining that he had searched for electronic documents on a digital image of his mobile telephone and laptop computer created in November 2019. He failed to produce the image to Aon on 28 July 2020, instead telling Aon on that date that he did not know where it was. Three days later, on 31 July 2020 Temur's solicitors said that "[t]he image taken of our client's iPhone in November 2019

(when he became aware of this proceedings) is not caught by the terms of the Forensic Examination Order. However, our client will in any event produce it to Aon."

38.      Despite this, Temur did not provide any image to Aon and Ms. Akhmedova was therefore forced to apply to Court for a further order for delivery up.  By the Order of Mrs. Justice Knowles dated 10 August 2020 Temur was ordered to deliver up the digital image of his mobile telephone and laptop computer created in November 2019 to Aon by 12 August 2020.  A true and correct copy of the English Order dated August 10, 2020 is attached hereto as Exhibit 7.

39.      I understand that an image of the iPhone was eventually provided to Aon on 14 August 2020 and is being analysed.  Despite stating in his updated List of documents (N265) dated 31 July 2020 that he had searched a "digital image of my mobile telephone and laptop computer, created in November 2019", Temur now says that a digital image of his laptop was never obtained, and that he therefore cannot deliver up a copy.

*Google Mandates*

40.      The terms of the Order of Mrs. Justice Knowles dated 10 August 2020 also provided that Temur would "forthwith execute by hand and deliver to the Applicant's solicitors a mandate for each of his email accounts in the form attached in the Schedule to this Order authorising and directing Google (and associated companies) to provide Aon with access to and/or with copies of the Tenth Respondent's accounts and any emails, documents, other electronic data and metadata held on those accounts.  The Tenth Respondent shall provide such further assistance and execute such further documents as may reasonably be required to give effect to the mandates."

41.      Temur failed to execute the mandates provided and on 24 August 2020 Ms. Akhmedova applied for an order that the mandates be provided by 4pm on 26 August 2020. That order was granted by Mrs. Justice Knowles on 26 August 2020.  Temur did not comply with that

order. A true and correct copy of the English Order dated August 26, 2020 is attached hereto as Exhibit 8.

42.     Copies of the mandates signed by Temur were eventually provided on 3 September 2020. I note however that Temur remains in breach of his obligations at paragraphs 8(b) and (c) of the English Order dated August 26, 2020 requiring him to (i) provide complete answers to Aon's questions dated 14 July 2020 (in relation to matters set out at paragraphs 31-32 above), and (ii) to produce his unredacted UBS bank statements for January 2014 to 31 December 2018.

### Additional Information Obtained in the United States

43.     In response to a subpoena served in Florida arising out of a New York judgment in Applicant's favor, documents were recently produced by from Great Circle Systems ("Great Circle"), an entity which provided email hosting and IT services to the Vessel from January 2015 through February 2019.

44.     Great Circle disclosed that upon termination of its contractual relationship with the Vessel in February 2019, the captain of the Vessel requested that Great Circle delete the mailboxes held for the Vessel, and purge the email server once the Vessel's new service provider took over the email hosting services. A true and correct copy of the email instructing Great Circle to delete the Vessel's email archive is attached hereto as Exhibit 9.

45.     Given past evidence of Temur's role in the control and management of the Vessel, it is believed that the Vessel's captain was likely instructed by Temur and/or Farkhad to direct the deletion of documents.

46.     Great Circle has further advised that its email hosting provider at that time was Rackspace, and that Rackspace may have archived the deleted records.

47.     This information is consistent with the known use by Temur of Rackspace to host and/or archive his personal email data as well.  Accordingly, it is believed that information relevant to the English Proceeding can be obtained from Rackspace in this jurisdiction.

### Applicant's Request for Discovery Pursuant to 28 USC § 1782

1)      Under the circumstances, the following categories of evidence will be relevant, important and useful to Ms. Akhmedova's adjudication of the English proceedings against Temur Akhmedov as set forth above, all of which evidence is located in the United States in the possession and control of Rackspace:

a)      All documents in the possession and control of Rackspace concerning email hosting services and/or archiving of electronic data related to email accounts maintained by the Vessel M/Y Luna, including but not limited to the following email accounts:

  i)     captain@my-luna.com

  ii)    chiefofficer@my-luna.com

  iii)   chiefengineer@my-luna.com

  iv)    Any other email address containing "@my-luna.com"

b)      All documents in the possession or control of Rackspace concerning email hosting services and/or archiving of electronic data in connection with third party vendors Great Circle Systems or Triton Technical with respect to the Vessel M/Y Luna;

c)      All documents in the possession or control of Rackspace concerning email hosting services and/or archiving of electronic data for any email accounts maintained by Farkhad Akhmedov or Temur Akhmedov, including but not limited to Farkhad@akhmedov.net, Temur@akhmedov.net and temur@stecapital.net.

1357207 v.1

48.     Upon information and belief, Rackspace has control and access to all of the above information within this District.

49.     None of the information requested has been made available to Applicant and is not available to Applicant within the United Kingdom, as Rackspace does not maintain a principal place of business and cannot be served there.  The company's headquarters is located in this District.  Nor would granting the assistance requested by Ms. Akhmedova offend any foreign jurisdiction or constitute a circumvention of foreign proof-gathering rules.  There is no English rule of evidence that would prevent discovery obtained under 28 U.S.C. § 1782 being used in the English proceedings.

50.     Under the circumstances, evidence that will be relevant to Ms. Akhmedova's entitlement to relief in the English proceedings is not available in United Kingdom but is located in the United States in this District.

51.     As such, Applicant respectfully requests the Court grant her request for discovery pursuant to 28 U.S.C. § 1782.

I declare under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief

Dated:          London, United Kingdom
                September _7_, 2020

                                        _____
                                                  Anthony J. Riem

# EXHIBIT 1



Neutral Citation Number: [2016] EWHC 3234 (Fam)

Case No: FD13D05340

IN THE HIGH COURT OF JUSTICE
FAMILY DIVISION

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 15/12/2016

Before :

MR JUSTICE HADDON-CAVE
- - - - - - - - - - - - - - - - - - - - -
Between :

| TATIANA AKHMEDOVA | Applicant |
| - and - | |
| FARKHAD AKHMEDOV | Respondent |
| WOODBLADE LTD | 2nd Respondent |
| COTOR INVESTMENT SA | 3rd Respondent |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

Mr Nigel Dyer QC, Mr Dakis Hagen and Mr Henry Clayton of Counsel (instructed by
Payne Hicks Beach) for the Applicant
The Respondents were not present or represented

Hearing dates: 29 and 30 November 2016, 2, 5, and 15 December 2016
- - - - - - - - - - - - - - - - - - - - -

## Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

..............................

MR JUSTICE HADDON-CAVE

This judgment was delivered in private.   The judge has given leave for this version of the
judgment to be published on condition that (irrespective of what is contained in the judgment)
in any published version of the judgment the anonymity of the children and members of their
family must be strictly preserved.   All persons, including representatives of the media, must
ensure that this condition is strictly complied with.   Failure to do so will be a contempt of
court.

Mr Justice Haddon-Cave:

INTRODUCTION

1.  The Applicant, Mrs Tatiana Akhmedova ("W"), applies for financial orders ancillary to her divorce from the Respondent, Mr Farkhad Akhmedov ("H").

2.  The 2nd Respondent ("Woodblade") is a Cypriot registered company and the trustee of a Bermudian trust, the Akhmedov 2013 Discretionary Trust ("the Trust"). H is the sole director of Woodblade. The 3rd Respondent, Cotor Investment SA, ("Cotor") is a Panamanian company which H contends is within the Trust. Cotor is said to hold the bulk of the wealth in this case. Woodblade and Cotor were joined to these proceedings by order of Mr Justice Moor on 25th October 2016.

3.  W's divorce petition was issued on 24th October 2013. H initially sought a stay of W's divorce proceedings on *forum non conveniens* grounds, in favour of a divorce petition that he had issued in Moscow in February 2014. Subsequently, H withdrew his application for a stay and by letter from his solicitors, Sears Tooth, dated 18th June 2015, submitted to the jurisdiction. W's petition has since proceeded as an uncontested suit. A Decree Nisi was granted on 2nd December 2015.

*Respondents' non-appearance at the trial*

4.  A trial of this matter commenced before me in the Queen's Building at the Royal Courts of Justice on 28th November 2016. None of the Respondents appeared or were represented at any stage during the trial. In particular, H failed to appear at the trial in person in breach of orders made by the Court on 27th November 2015, 11th April 2015 and 25th October 2016 (and a promise by Leading Counsel at the Pre-Trial Review hearing on the latter date).

5.  On 15th November 2016, H's long-standing matrimonial solicitors, Sears Tooth, wrote to W's solicitors, Payne Hicks Beach ("PHB"), informing them that they had come off the record. On 21st November 2016, PHB, wrote to Sears Tooth inquiring whether H intended to play any part in the trial but received no reply. H has never, in fact, appeared in person at any hearing during these matrimonial proceedings. H was ordered to attend the Financial Dispute Resolution hearing on 11th April 2015, but shortly before the hearing, informed the Court that he had lost his passport containing his English visa. He attended by video-link from his yacht, *M/Y Luna*, from the Caribbean.

6.  Woodblade and Cotor have played no part in the trial and have at no stage acknowledged or responded to the proceeding or the case made against them by W.

7.  I am satisfied that service of these proceedings and notice of the trial was properly effected on H, Woodblade and Cotor (see further below).

*Breach of orders*

8. H is presently in breach of numerous Court orders. In particular, H has failed to comply with the following Orders of the Court:

    (1) Holman J's Orders made on 18th May 2016 ordering H: (i) to provide documents and reports in his possession concerning the historic value of Northgas, and any written offers to buy the business; (ii) to allow the jointly instructed valuer, Savills, access to the properties in Russia; (iii) to provide his open settlement offer; (iv) to comply with the orders compelling his personal attendance for the duration of the trial.

    (2) Moor J's Order made at the Pre-Trial Review ("PTR") on 25th October 2016: (i) to provide a written reply to W's trust Case (paragraph 8); (ii) to provide up-dating disclosure (paragraph 10); (iii) to pay the cost of the chattels valuation (paragraph 13); (iv) to pay the costs order (paragraph 21); and (v) to comply with previous orders compelling his (and W's) personal attendance for the duration of the trial (paragraph 18).

*W's representation*

9. W has been represented throughout the trial by Mr Dyer QC, Mr Hagen and Mr Clayton of Counsel, for whose assistance I am grateful. Counsel are instructed by W's solicitors, The Baroness Shackleton and Mr Ian Connell of PHB.

## BACKGROUND

10. H was born on 15th September 1955 in Azerbaijan, which was then part of the Soviet Union (and is now aged 61). W was born on 26th July 1972 in Hungary and grew up in Russia (and is now aged 44).

11. W and H met in 1989 when she studying in Moscow. W was aged 17 at the time and H was aged 34. H had been married twice before. H and W married on 29th July 1993 in Moscow when W was pregnant with her elder son, Temur.

12. In 1993, H and W moved to London. They lived in Hampstead at 3 Elm Walk, which H had purchased. Temur was born in London in September 1993. In 1994, H bought a holiday property in France, *Villa le Cottage* at St Jean Cap Ferrat. In June 1996, their younger son, Edgar, was born in Monaco. In September 1996, H purchased *Somerton House* at St George's Hill in Surrey and the family moved there.

13. H worked in London as an oil and gas trader and began to travel a great deal. H became very successful in pursuing business interests in the gas sector in Russia through a Russian company called ZAO Northgas ("Northgas"). In November 2012, H sold his shares in Northgas for US$1.375 billion.

14. W has been a housewife and mother throughout the marriage. W was a 'hands-on' mother who cared for and brought up the boys herself in Surrey, without the assistance of a nanny. W also helped to care for H's child from his first marriage, Anna, who came over to live and go to school in England. The boys were educated in various

private day schools in Surrey. Their secondary education was at Cranleigh School, where they were day-boys. They went to university in London. Temur (now aged 23) and Edgar (now aged 20) are both British citizens. The boys have visited Russia but have never lived there. In 2013, H bought Temur and Edgar flats in London at the One Hyde Park development costing £29 million and £7.2 million respectively.

15.   W still lives in the former matrimonial home, *Somerton House*. It was transferred by H into her sole name in 2013. She was granted Indefinite Leave to Remain in the UK in 1994 and became a British citizen on 27th October 2000. H also has Indefinite Leave to Remain in the UK.

16.   I set out my detailed findings of fact below.

*W's case*

17.   W contends that the total net marital wealth in this case is just over £1 billion, *i.e.* £1,092,334,626 to be precise (see the attached Schedule of Assets). W contends that the entire wealth in this case is matrimonial in character, that is to say that this wealth was acquired and built up during the long marriage by the parties' equal contributions to the welfare of the family, and which should be subject to the sharing principle (see further below).

*Respondent's case*

18.   The non-appearance of H and the 2nd and 3rd Respondent at the trial has meant that the Court has not had the benefit of hearing any evidence or submissions from them. The reason for H's sudden decision, two weeks before the trial, no longer to contest the proceedings is unclear. It may be that, following Moor J's order on 25th October 2016 joining Woodblade and Cotor and requiring disclosure, H felt that he had no real answer to W's claim.

19.   The Court has studied the documents and witness statements previously lodged by H. The Court has also had the assistance of Mr Dyer QC, Mr Hagen and Mr Clayton in identifying points which H, Woodblade and Cotor might have made if they had appeared at the trial. There would appear to be five principal contentions which might be made, in particular by H, in defence of W's claim. First, that H was wealthy before the parties married in 1993. Second, that H made a special contribution to the creation of the wealth through his work with Northgas. Third, that the marriage broke down in 1999 or 2004, *i.e.* well before he sold the Northgas shares. Fourth, that the value of the assets at that time was far below that asserted by W and, in particular, the Northgas shares were unsaleable or worthless. Fifth, that, in any event, the majority of assets were held in trusts of which H is a mere discretionary beneficiary.

8

MR JUSTICE HADDON-CAVE
Approved Judgment

Akhmedova v Akmedov and ors

## ISSUES

20. The issues in the case and the structure of this judgment can be summarised as follows:

### THE LAW

#### DEPARTURE POINTS:
(1) Was there pre-marital wealth?
(2) When did the parties separate?
(3) Did H make a special or stellar contribution?

#### COMPUTATION OF THE MARITAL ASSETS:
(4) What is the value of the available assets?
(5) What are the trust issues?

#### DISTRIBUTION:
(6) What is a fair division of the marital assets?

#### ANCILLARY MATTERS:
(7) Service
(8) Lugano Convention

### CONCLUSION AND ORDER

## THE LAW

21. I direct myself in relation to the relevant law as regards financial remedy claims which I summarise below.

22. The power to make ancillary financial orders in a divorce is statutory and is contained in sections 23-25 of the Matrimonial Causes Act 1973 ("MCA 1973"). For convenience, I set out the key provisions:

> "23. *Financial provision orders in connection with divorce proceedings, etc.*
>
> *(1) On granting a decree of divorce, a decree of nullity of marriage or a decree of judicial separation or at any time thereafter (whether, in the case of a decree of divorce or of nullity of marriage, before or after the decree is made absolute), the court may make any one or more of the following orders, that is to say—*
>
> *(a) an order that either party to the marriage shall make to the other such periodical payments, for such term, as may be specified in the order;*
>
> *(b) an order that either party to the marriage shall secure to the other to the satisfaction of the court such periodical payments, for such term, as may be so specified;*
>
> *(c) an order that either party to the marriage shall pay to the other such lump sum or sums as may be so specified;*

9

(d) an order that a party to the marriage shall make to such person as may be specified in the order for the benefit of a child of the family, or to such a child, such periodical payments, for such term, as may be so specified;

(e) an order that a party to the marriage shall secure to such person as may be so specified for the benefit of such a child, or to such a child, to the satisfaction of the court, such periodical payments, for such term, as may be so specified;

(f) an order that a party to the marriage shall pay to such person as may be so specified for the benefit of such a child, or to such a child, such lump sum as may be so specified;

subject, however, in the case of an order under paragraph (d), (e) or (f) above, to the restrictions imposed by section 29(1) and (3) below on the making of financial provision orders in favour of children who have attained the age of eighteen."

"24. Property adjustment orders in connection with divorce proceedings, etc.

(1) On granting a decree of divorce, a decree of nullity of marriage or a decree of judicial separation or at any time thereafter (whether, in the case of a decree of divorce or of nullity of marriage, before or after the decree is made absolute), the court may make any one or more of the following orders, that is to say—

(a) an order that a party to the marriage shall transfer to the other party, to any child of the family or to such person as may be specified in the order for the benefit of such a child such property as may be so specified, being property to which the first-mentioned party is entitled, either in possession or reversion;

(b) an order that a settlement of such property as may be so specified, being property to which a party to the marriage is so entitled, be made to the satisfaction of the court for the benefit of the other party to the marriage and of the children of the family or either or any of them;

(c) an order varying for the benefit of the parties to the marriage and of the children of the family or either or any of them any ante-nuptial or post-nuptial settlement (including such a settlement made by will or codicil) made on the parties to the marriage ,other than one in the form of a pension arrangement (within the meaning of section 25D below);

(d) an order extinguishing or reducing the interest of either of the parties to the marriage under any such settlement , other than one in the form of a pension arrangement (within the meaning of section 25D below);

subject, however, in the case of an order under paragraph (a) above, to the restrictions imposed by section 29(1) and (3) below on the making of orders for a transfer of property in favour of children who have attained the age of eighteen.

*(2) The court may make an order under subsection (1)(c) above notwithstanding that there are no children of the family.*

*(3) Without prejudice to the power to give a direction under section 30 below for the settlement of an instrument by conveyancing counsel, where an order is made under this section on or after granting a decree of divorce or nullity of marriage, neither the order nor any settlement made in pursuance of the order shall take effect unless the decree has been made absolute."*

*"25. Matters to which court is to have regard in deciding how to exercise its powers under ss. 23, 24 and 24A.*

*(1) It shall be the duty of the court in deciding whether to exercise its powers under section 23, 24 , 24A or 24B above and, if so, in what manner, to have regard to all the circumstances of the case, first consideration being given to the welfare while a minor of any child of the family who has not attained the age of eighteen.*

*(2) As regards the exercise of the powers of the court under section 23(1)(a), (b) or (c), 24 , 24A or 24B above in relation to a party to the marriage, the court shall in particular have regard to the following matters—*

*(a) the income, earning capacity, property and other financial resources which each of the parties to the marriage has or is likely to have in the foreseeable future, including in the case of earning capacity any increase in that capacity which it would in the opinion of the court be reasonable to expect a party to the marriage to take steps to acquire;*

*(b) the financial needs, obligations and responsibilities which each of the parties to the marriage has or is likely to have in the foreseeable future;*

*(c) the standard of living enjoyed by the family before the breakdown of the marriage;*

*(d) the age of each party to the marriage and the duration of the marriage;*

*(e) any physical or mental disability of either of the parties to the marriage;*

*(f) the contributions which each of the parties has made or is likely in the foreseeable future to make to the welfare of the family, including any contribution by looking after the home or caring for the family;*

*(g) the conduct of each of the parties, if that conduct is such that it would in the opinion of the court be inequitable to disregard it;*

*(h) in the case of proceedings for divorce or nullity of marriage, the value to each of the parties to the marriage of any benefit . . which, by reason of the dissolution or annulment of the marriage, that party will lose the chance of acquiring."*

23.   In exercising its wide discretionary powers, the Court must have regard to all the circumstances of the case as well as certain particular matters.  In addition to giving

first consideration to any minor child of the family who has not attained the age of 18, the Court must have regard in particular to: (i) the parties' resources, (ii) the parties' needs, (iii) standard of living enjoyed by the family before the breakdown of the marriage, (iv) the age of each party and duration of the marriage, (v) disabilities, (vi) contributions which each of the parties has made or is likely in the foreseeable future to make to the welfare of the family, including any contribution by looking after the home or caring for the family, (vii) conduct of each of the parties, if that conduct is such that it would in the opinion of the court be inequitable to disregard it, and (viii) benefits lost by reason of dissolution of the marriage, *e.g.* pension rights, death-in-service, insurance cover.

24. In practice, there are two stages to the analysis: (a) Computation, *i.e.* assessing the available resources (by reference to a Schedule of Assets); and (b) Distribution, *i.e.* determining each party's share, and the form the orders will take (*e.g.* lump sum and/or property transfer).

*Computation – General principles*

25. A computation of a party's resources includes not only assets beneficially owned by the party, but assets which he or she is likely to receive from a third party (*e.g.* a trustee) if he or she asked for them. Thus, the legal question is: if a discretionary beneficiary were to request the trustee to advance the whole or part of the capital to him, would the trustee would be likely to do so now or in the foreseeable future? (known as "the *Charman* test") (see *Charman v Charman* [2006] 1 WLR 1053 at [12]).

26. The question is not one of control of resources; it is one of access to them. As Lewison J explained in *Whaley v Whaley* [2011] EWCA Civ 617 at [113]:

> "...[A] discretionary beneficiary has no proprietary interest in the fund. But under s 25 of the 1973 Act the court looks at resources; not just at ownership. Thus whether a beneficiary under a discretionary trust has a proprietary interest is not relevant. The resource must be one that is 'likely' to be available. This is the origin of the likelihood test. No judge can make a positive finding about the future: the best that can be done is to assess the likelihood. What is relevant is the likelihood of the trust funds or part of it being made available to him, either by income or capital distributions. If the husband were to ask the trustees to advance him capital, would the trustees be likely to do so: Charman v Charman [2005] EWCA Civ 1606, [2006] 2 FLR 422; A v A [2007] EWHC 99 (Fam), [2007] 2 FLR 467? The question is not one of control of resources: it is one of access to them."

*Distribution – General principles*

27. The general principles applicable to distribution can be summarised as follows (in the light of *White v. White* [2000] 2 FLR 981, *Miller v. Miller, Mcfarlane v. Mcfarlane* [2006] 1 FLR and *Charman v Charman (No. 4)* [2007] 2 FLR 1246):

(1)   In deciding how the assets should be distributed, the court's overall objective is *"fairness"* (per Lord Nicholls in *White* at [983]).

(2)   The concept of *"fairness"* is not to be applied in an overly subjective way, but must be checked against 'the yardstick of equality': *"As a general guide, equality should be departed from only if, and to the extent that, there is good reason for doing so"* (per Lord Nicholls in *White* at [989]; and see *In Charman (No 4)* at [65]).

(3)   There is no place for discrimination between husband and wife and their respective roles: *"If, in their different spheres, each contributed equally to the family, then in principle it matters not which of them earned the money and built up the assets"* (per Lord Nicholls in *White* at [989]).

(4)   The rationale for the equal sharing is not largesse but logic: *"Each party to a marriage is entitled to a fair share of the available property"* (per Lord Nicholls in *Miller; McFarlane* at [9]).

(5)   In conducting its enquiry into the parties' assets, the Court will consider whether the assets represent matrimonial property, or non-matrimonial property (*i.e.* the product of the parties' common endeavour during the marriage or from sources external to the marriage). .

(6)   The principle of sharing applies to all the parties' property, but, to the extent that their property is non-matrimonial, *"there is likely to be better reason for departure from the principle of equality"* (see *In Charman (No 4)* at [66]).

(7)   The circumstances in which the Court may depart from the principle of equal 50:50 sharing may include the following (known as 'departure points'): (a) where assets pre-date the parties' marriage (*i.e.* there is non-matrimonial property); (b) the receipt of inherited property, or gifts from sources external to the marriage (*i.e.* non-matrimonial property), in both cases which are not 'mixed and mingled' with matrimonial property; (c) special or 'stellar' contributions during the marriage; (d) post-separation accrual of assets; and (e) post-separation contribution which is unmatched by the other spouse.

(8)   The date to which the marital acquest (*i.e.* the property built up during the marriage) is measured is usually the date of separation, although there will be circumstances in which post-separation accrual will be treated as matrimonial property (*e.g.* passive growth on a matrimonial asset) (per Lord Mance in *Miller;McFarlane* at [174]).

28.   The threshold for relevant *"conduct"* in s.25(2)(g) is very high (see Lord Nicolls and Lady Hale in *Miller* at [59]-[65]). Adultery is immaterial to the amount of financial provision that is ordered and does not comprise *"conduct which it would be inequitable to disregard"* within the meaning of s.25(2)(g). As Coleridge J warned in *G v. G (Financial Provision: equal division)* [2002] 2 FLR 1143:

> "... [T]he parties are not assisted to achieve compromise when they are
> encouraged by the law to indulge in a detailed and lengthy retrospective
> involving a general rummage through the attic of their marriage to discover
> relics from the past to enhance their role or diminish their spouse's."

29.  There can be difficulties with identifying how much of an asset is matrimonial and non-
     matrimonial. Passive growth does not change the character of the property, but growth
     as a result of activity during the marriage may do so. Issues may arise as to whether
     post-separation accrual could be described as 'a continuum' or 'new ventures' (per
     Roberts J in _Cooper-Hohn v. Cooper Hohn_ [2015] 1 FLR 745; and see _JL v SL_ at [42])
     (And see further below).

*Special or 'stellar' contribution*

30.  Special or 'stellar' contribution is a very narrow concept (and may not survive the
     appeal in _Gray v Work_ [2015] EWHC 834 due to be heard in February 2017). In _Gray v
     Work_, Holman J usefully distilled the following principles from _Miller_ and _Charman_:

> "(i) The characteristics or circumstances which would result in a departure
> from equality have to be of a wholly exceptional nature such that it would
> very obviously be inconsistent with the objective of achieving fairness for
> them to be ignored: per Bodey J in Lambert but quoted with obvious
> approbation by Lord Nicholls of Birkenhead in Miller at paragraph 68.
>
> (ii) Exceptional earnings are to be regarded as a factor pointing away from
> equality of division when, but only when, it would be inequitable to proceed
> otherwise (Lord Nicholls of Birkenhead in Miller at paragraph 68).
>
> (iii) Only if there is such a disparity in their respective contributions to the
> welfare of the family that it would be inequitable to disregard it should this be
> taken into account in determining their shares (Baroness Hale of Richmond,
> in Miller at paragraph 146).
>
> (iv) It is extremely important to avoid discrimination against the home-maker
> (the Court of Appeal in Charman at paragraphs 79 and 80).
>
> (v) A special contribution requires a contribution by one unmatched by the
> other (the Court of Appeal in Charman at paragraph 79).
>
> (vi) The amount of the wealth alone may be so extraordinary as to make it
> easy for the party who generated it to claim an exceptional and individual
> quality which deserves special treatment. Often, however, he or she will need
> independently to establish such a quality, whether by genius in business or
> some other field (the Court of Appeal in Charman at paragraph 80). A
> windfall is not enough.
>
> (vii) There is no identified threshold for such a claim to succeed (the Court of
> Appeal in Charman at paragraph 88)."

31.  Sir Mark Potter P observed in _Charman No.4_ at [90]) that fair allowance for special
     contribution within the sharing principle would be "_most unlikely to give rise to_

14

*percentages of division of matrimonial property further from equality than 66.6%-33.3%".*

32.   There have been only three reported cases in which a party has succeeded in arguing special contribution: *Sorrell v. Sorrell [2005] EWHC 1717*, *Charman v Charman* [2005] EWCA Civ 1606 (where it was conceded), and *Cooper-Hohn v. Cooper-Hohn* [2015] 1 FLR 745. In *Cooper-Hohn*, the wife received an award of US$530 million from the available assets of just under US$1.5 billion. The husband had generated $6 billion through his business during the marriage (of which $4.5bn had be placed in a charitable trust). The post separation accrual was $550 million (see [300]). That sum represented approximately 36% of the global resources and converted to a sterling sum of c. £330 million. The departure from equality in the husband's favour was justified by the compounding factors of the post-separation accrual of assets and his special or 'stellar' contribution.

### Needs

33.   *"Needs"* is a flexible concept. As Lord Nicholls said in *White* at [993]:

> *"In assessing financial needs, a court will have regard to a person's age, health and accustomed standard of living. The court may also have regard to the available pool of resources".*

34.   In appropriate cases, *"needs"* should be 'generously interpreted' (per Baroness Hale in *Miller; McFarlane* at [144]).

### Inferences

35.   The Court may draw appropriate inferences from silence. As Lord Sumption observed in *Prest v. Petrodel Resources Ltd* [2013] 2 FLR 732 at [45]:

> *"...[J]udges exercising family jurisdiction are entitled to draw on their experience and to take notice of the inherent probabilities when deciding what an uncommunicative husband is likely to be concealing."*

### ANALYSIS

### DEPARTURE POINTS:

(1)   WAS THERE PRE-MARITAL WEALTH?

36.   H asserts he was wealthy before his marriage to W in 1993. H's bare assertion has, however, not been supported either by any schedule of the value of his pre-marital assets or any documentary or independent evidence. The only figure H has provided is that in 1993 he paid £700,000 for the first matrimonial home in Hampstead. However, even if this is correct (and assuming no mortgage), the matrimonial home occupies a unique position and would be subsumed into this long marriage (c.f. Lord Nicholls in *Miller v. Miller* at [24]).

15

37. It is axiomatic that if a party is going to assert pre-marital assets, it is incumbent on them to prove the same by clear documentary evidence (per Mostyn J in *N v F* [2011] 2 FLR 533 at [24]). H has failed to do this and, accordingly, failed to prove any case on pre-marital assets.

### (2) WHEN DID THE PARTIES SEPARATE?

38. W contends the marriage lasted 20 years and only broke down in October 2013 (when she issued her divorce petition), and it was only after a failed attempted reconciliation in summer 2014 that the marriage finally ended in late 2014.

39. H, on the other hand, contends that the marriage ended in 1999, or at latest, in 2004. H says in his Form E that any sharing claim by W *"should be based on wealth generated at the latest up to 2004 but not thereafter"*. The significance of this issue is that it goes to whether the vast sum realised from the sale of H's Northgas shares in November 2012 (US$1.375 million) is to be included in the marital assets.

*1999/2003 hiatus*

40. The marriage clearly went through a rocky patch between 1999 and 2003. H states that the marriage broke down in 1999 when he discovered that W was having an affair with a younger man. H was angry and matters were clearly not right between them. W issued a divorce petition in London in 2003. H applied to strike out W's petition on the grounds that the marriage had already been dissolved by a Russian decree granted in the Moscow court on 18th August 2000. H produced 'official' Russian court documents to this effect. However, a search by W's lawyers of the official records in the Moscow court revealed that no such divorce proceedings existed. (This was recently confirmed for these proceedings in a Civil Evidence Act notice statement of a Moscow lawyer, Ms Alpatikova Ivanovna, served by W in support of her financial claim. This statement was not challenged by H's leading counsel at the PTR on 25th October 2016. The inference to be drawn, therefore, is that the 2000 Moscow divorce documents relied upon by H were, at all material times, forged.)

41. Shortly after this unedifying episode, however, there was a reconciliation between H and W. On 4th July 2006, H's solicitor Mr Kerman, signed a consent application to dismiss W's petition which recorded *"the parties having been reconciled"*. On 8th June 2008, Munby J dismissed W's petition by consent. District Judge MacGregor observed when dealing with the recent costs application from the stay proceedings, that H has been unable to give any real explanation for this representation to the court by his solicitor. I agree.

42. W admitted the affair but explained in her statement that the extra-marital physical relationship was not at the expense of her emotional commitment to H and their marriage. She said that marriages can survive affairs, and this marriage was one of them. She said H himself had had numerous affairs himself during the marriage (and had a child by another woman in 2013). H does not disavow that he and W had a sexual relationship between 1999 and 2004, but simply denies that they did so thereafter. (He merely stated *"After 2004 we never had any intimate relations..."*).

*2004 to 2013*

43.   H's essential argument appears to be that between 1999 (or 2004) and 2013 the parties only came together for the sake of their children. However, H has produced no valid documentary evidence to support his case on *de facto* separation, nor any witnesses, nor has he chosen to appear before the court to be cross-examined on this point.

44.   W gave evidence before me and explained the background and history of the marriage. She was a reliable and straightforward witness. I accept her evidence that, following the earlier hiatus, H and W remained married until 2013 in all senses of the word. H travelled a great deal to Russia and elsewhere on business and was non-resident in the UK for tax purposes (the Inland Revenue allowance has latterly been 90 days). However, the family base was always *Somerton House* and they regularly enjoyed family holidays at *Villa le Cottage*. They slept in the same bed when they were together, had sex, went on holiday regularly together with the boys, and shared a joint bank account. H continued to support W financially in exactly the same way as before, and to the same degree. They exchanged presents. H continued to be very generous with gifts. In 2013, for example, H purchased jewellery for her worth €400,000. H paid all the household bills and running costs of *Somerton House* and *Villa le Cottage* and paid for all their luxurious holidays. H provided W with the unrestricted use of two of his credit cards, and latterly, the use of his yacht, plane and helicopter.

45.   W has exhibited to her statements and gave evidence regarding numerous photographs taken since 2004 which show: (i) W and H together with their sons; (ii) W and H together in various social settings enjoying a normal social life (with figures such as Mr Boris Berezovsky); (iii) W and H together in affectionate poses, often on holiday together in the South of France; (iv) W and H together at H's lavish 50th birthday party in September 2005 with W giving a speech for him; (v) evidence that H continued to live at *Somerton House* where he kept an extensive wardrobe of clothes in his wardrobes in their bedroom, and various cars; (vi) H in shooting kit; and (vii) H and W in an intimate embrace in the Maldives in 2013. This latter photograph, in particular, sells the lie to H's assertion that the parties only came together for the sake of the children.

46.   In addition, W produced documentary evidence, including e-mails with architects and contractors, showing that she was actively involved in the renovation of *Villa le Cottage*, and planning their 'dream home' in Baku in Azerbaijan. An elaborate design plan was drawn up for the Baku house in August 2011 entitled *"Mr and Mrs Akhmedov Baku Residence - Presentation"*. H accepts that W was involved in the interior design of these properties. It is surprising that H would have wanted W to have been actively involved in this significant building project in his homeland if, as he contends, the marriage had ended some 7 to 12 years earlier. W was also primarily involved in choosing their art collection which includes some Mark Rothko and Yves Klein paintings worth many tens of millions of pounds ("the Modern Art Collection").

47.   In his dealings with third parties, H referred to W as *"my wife"* in *e.g.* H's emails in 2011 and 2012 to the organisers of an art fair, his solicitors, Amex, Sotheby's and

Knight Frank. H accepts that he discussed the sale of Northgas with W in 2012. Further, on his application form to Surrey Police to renew his shotgun licence in December 2012, H put *Somerton House* as his home address for the previous 5 years (*i.e.* 2007 – 2012). This assertion was certified by his English solicitor of long-standing, Mr A.D. Kerman, as being true. Mr A.D. Kerman has, until recently, been advising H in these proceedings.

48.   The fact that the parties did not spend every night under the same roof does not mean that there was not a subsisting marriage. Many married couples spend time apart. Being physically apart for much of the year does not mean that a marriage does not exist. The courts does not undertake a prurient assessment of the quality of the marriage in considering financial provision. The reason for this is obvious: there is no yardstick that can be used; there is no legal definition of what constitutes a 'normal' marriage; marriages come in all shapes and sizes; and, the law rightly does not encourage *"a general rummage through the attic"* of a marriage (per Coleridge J in *G v. G (Financial Provision: equal division)* (supra)).

*The broad picture*

49.   The broad picture is that, during the marriage, W and the children lived in Surrey and H, as an international businessman, travelled frequently for his work, principally to Russia. However, the family base was always *Somerton House* and H would return there to be with his family within the time permitted by the Revenue for non-resident taxpayers. Family holidays were always spent abroad: in the Maldives, in ski resorts, but principally in *"Villa le Cottage"*, the family holiday home in Cap Ferrat.

50.   For these reasons, on the evidence before me, I am satisfied and find as a fact that, notwithstanding the temporary hiatus described above, H and W's marriage lasted over 20 years from 1993 to October 2013 when W issued her petition; and the marriage only finally came to an end, after a failed attempt at reconciliation, in late 2014.

(3)   DID H MAKE A SPECIAL OR 'STELLAR' CONTRIBUTION?

51.   H asserted in his statement of issues that he made a special or stellar contribution to the wealth creation which would justify a departure from a 50:50 division of the assets in his favour. However, save for explaining the difficulties of doing business in Russia and the legal problems he encountered with Gazprom in holding onto his Northgas shares, H did not to explain in his statements precisely why he could be said to have made a 'stellar' contribution. It is not clear, therefore, whether this line of argument would have been pursued by H at the trial. However, *ex abundantae cautelae*, I summarise the basic facts of his business dealings as set out in his witness statement.

52.   In 1993, H acquired a 5% shareholding in a Russian company called ZAO Northgas ("Northgas") which had been granted an exploration licence from Gazprom (the Russian state-owned oil and gas monopoly) to search for natural gas in Urengoi, Western Siberia. The other shareholders were Urengoigazprom (a Gazprom subsidiary) and Bechtel (an America company). Geological reports were prepared but, before

production infrastructure could be built, in 1998 the Russian economy collapsed. Gazprom had no money and Bechtel withdrew. H, however, continued with the project, took up a rights issue and worked hard to make Northgas a success. Production began in 2001 and Northgas developed into a valuable producer of natural gas. H encountered litigation problems with Gazprom. In June 2005, H transferred 51% of the shares in Northgas to Gazprom. However, disputes with Gazprom continued. In late 2012, Gazprom permitted H to sell his shares in Northgas to a company called Novatek. The price realised was US$1.375 billion.

53. In my judgment, whilst H clearly worked very hard to create wealth out of Northgas and was resourceful, H's evidence falls far short of the exceptionality (or 'genius') last elucidated in authorities such as *Sorrell*, *Cooper Hohn* and *Gray v Work* (see above).

54. The following further points are pertinent. First, H's contribution was not 'unmatched' (to use Holman J's words in *Gray v. Work*): at the same time as H was away travelling and building up Northgas in Russia, W was 'keeping the home fires burning' at St. George's Hill, running the home and caring for the boys, as well as H's daughter in earlier years, on her own in what was then a foreign country to her. Second, this was a case of the realisation of Northgas's value built up during the previous 20 years when the marriage subsisted, not merely of fresh accrual. H at one stage sought to argue that Northgas's share were 'worthless' in 2004 because he could not sell them. This was clearly not the case because he sold 51% to Gazprom in 2005. In any event, the point is academic because it is a fact that H sold his remaining shares in Northgas to Novatek in 2012 for US$1.375 when the marriage was now subsisting. Third, W is only now seeking 41% of the assets instead of a 50:50 split, which gives some margin of appreciation (see further below).

55. For these reasons, I reject any case made by H that he made a special or 'stellar' contribution to the marital assets such as to justify a departure from the equality principle.

56. In my judgment, the present case is a paradigm example of what Lord Nicholls was talking about in *White* when he said at [989]:

> "If, in their different spheres, each contributed equally to the family, then in principle it matters not which of them earned the money and built up the assets"

Summary of findings on 'departure points'

57. For the above reasons, I find that H has failed to prove any valid reasons or 'departure points' which would justify the matrimonial property being divided other than equally 50:50. In particular, I find the following. First, that the marriage endured from 1993 until 2013 as W contends (and was not 'over' in 1999 or in 2004 as H's contends). Second, that there is no need to consider H's case on post-separation accrual because the wealth was generated during, and not after, the subsisting marriage. Third, that all the (considerable) wealth that was generated during the marriage is matrimonial property.

MR JUSTICE HADDON-CAVE
Approved Judgment

Akhmedova v Akmedov and ors

## COMPUTATION OF THE MARITAL ASSETS:

### (4)   WHAT IS THE VALUE OF THE AVAILABLE ASSETS?

58.   For convenience, before dealing with the trust issues, I shall deal with the question of the value of the assets (assuming for the moment that they form part of the marital assets available for distribution).

59.   Valuation of the assets is a relatively is straightforward task in this case.   This is because W's evidence is relatively clear and there is a lack of any countervailing evidence from H to gainsay the values that W puts forward.

60.   The total value of the assets put forward in the Schedule of Assets is £1,092,334,626. The valuation figures for the particular items in the Schedule are taken variously from property valuations (in cases where they have been obtained), agreed property values, bank balances and portfolio values. The figures relating to H and Cotor are not entirely up-to-date because no up-to-date figures or valuations have been provided by H, in breach of the disclosure order made by Moor J at the PTR on 25th October 2016. H cannot be heard to complain about W not using the most up-to-date figures, in view of his failure to comply with Moor J's order.

61.   There are no problems of liquidity: the assets are cash, or can easily be converted into cash.

62.   I am satisfied, and find, that the value of each of the available assets is as listed in the Schedule of Assets, i.e. totalling £1,092,334,626 (subject to the trust issues below).

### (5)   WHAT ARE THE TRUST ISSUES?

*H's case*

63.   H's case is that his wealth from the sale of his Northgas shares is held in the Akhmedov 2013 Discretionary Trust, which is a Bermudian trust ("the Trust"). H's case is that within the Trust structure are Panamanian, Cypriot and Isle of Man companies which each hold assets in the form of (i) a majority share in a Moscow property, (ii) the yacht *M/Y Luna*, (iii) a plane, (iv) a helicopter, (v) a modern art collection and (vi) large cash funds and investments administered by UBS in Zurich. An organogram showing the structure of the Trust, as H asserts it to be, is also annexed to this judgment.

*H's case*

64.   W's answer is four-fold:

(1)   First, Cotor is H's nominee and holds all its assets for H absolutely;

20

(2)   Second, Cotor's shares are not 'in' the Trust; there is no evidence that its bearer shares are held by the trust. But at the time that the trust was settled, Cotor had been in existence for 2 years and was not mentioned in the trust. And then in March 2015, when the other companies were included in the Trust, Cotor was not included. H was asked to show all deeds relating to Cotor but none produced showing transfer from Cotor to Woodblade. W's solicitors PHB wrote to Sears Tooth dated 14th November 2016 and asked for independent documentary evidence which confirms that Cotor is within the trust structure and said that absent such evidence *"we will be asking the Court to draw the inference that the Cotor is your client's nominee"*.

(3)   Third, the disposition of the companies which own the yacht, plane, helicopter and real property in March 2015 to the trustee should all be set aside or reversed under s.37 of the Matrimonial Causes Act 1973 and/or s.423-5 of the Insolvency Act 1986;

(4)   Fourth, in any event, whatever their corporate organisation, the so called Trust assets are all resources available to H whenever he pleases.

65.   It is convenient to deal with the fourth Trust issue (4) first.

### Trust issue (4) - Trust assets are H's "resources"

66.   I turn to W's fourth trust point, namely that whatever the corporate organisation of the so-called "Trust" assets they are *"resources"* which may be aggregated as part of the court's computation exercise.

67.   H purchased the yacht, plane and helicopter in 2014 in his name. H purchased the 115m superyacht *M/Y Luna* (formerly owned by Mr Abramovich) on 20th February 2014 for €260m (it underwent a €42m refit in 2016). He purchased a *Bombardier Global 6000* private jet on 31st March 2014 for $52.6m. H purchased an *Airbus EC 155* helicopter on 31st October 2015 for €10m. H then assigned his interest in these assets to three separate offshore companies. H assigned *M/Y Luna* to Tiffany Limited which then sold it to Avenger Assets Corporation (a Panamanian company). H assigned the *Bombardier* aircraft to Carolina Ltd (a Manx company). H assigned the *Airbus EC* helicopter to Lucy Ltd (a Manx company).

68.   It is clear that the funds for these purchases had been transferred to H's UBS private client account (CH35 0024 0240 6057 8070 R) by Cotor. H's bank statements record, for instance, a payment on 15th December 2014 of €260m to Avenger Assets Corporation, i.e. the purchase price of *M/Y Luna*.

### *Disposition to the Trust on 17th March 2015*

69.   By a Deed of Trust dated 17th March 2015 (i.e. four days before he signed his witness statement dated 21st March 2015), H purported to assign the entire issued share capital in these three offshore holding companies (Avenger Assets Corporation of Panama, Carolina Ltd and Lucy Ltd) together with a Moscow property to the Trust. It is to be

inferred that H did so because he owned these companies. I return to questions raised by this disposition (which W seeks to reverse) further below.

*Woodblade Trust Deed 2013*

70.    Woodblade is a trustee company registered in Cyprus.  The Woodblade Trust Deed dated 2nd October 2013 is a remarkable document. H is the Settlor, Principal Beneficiary and Protector.  H is also the only director of Woodblade.  H alone has the power to 'hire and fire' the Protector and the Trustees.  Woodblade does not provide trustee services to any other trust.  All the checks and balances that one would normally expect in a trust of this sort have been removed, so far as all discretionary beneficiaries are concerned.  Clause 1 appoints H as *"the Settlor"* as the Principal Beneficiary.  Clause 2 gives the Trustees absolute discretion to pay out to the Principal Beneficiary *"...to the exclusion of... the Discretionary Beneficiaries"*.  Clause 12 excludes the 'self-dealing' rule.  Clause 14 gives blanket protection to the Trustees.  Clause 15 appoints H *"the Protector"*, who is, in effect, omnipotent.  Clause 16 of the trust deed states that the trustee's discretion *"...shall only be exercisable by them with the prior or simultaneous written consent of the Protector"*.

71.    The Trust operates without any formalities. H has stated in his answers to Questionnaire that *"the Trust does not produce accounts"* and when asked for a copy of a 'letter of wishes' and correspondence between himself (in his roles as Settlor, Protector and Principal Beneficiary) and the Trustees, the Respondent replied *"none"*.

72.    Thus, the way in which the Trust is intended to operate is remarkable in its simplicity: i.e. by H, *qua* Principal Beneficiary, asking himself, *qua* sole director of Woodblade, for a distribution and then H, *qua* Protector, asking himself whether or not such a distribution should be met. The Trustees can ignore the needs of the other beneficiaries and benefit H by transferring the whole or any part of the capital to him. The Trustees (in essence H) owe no duty of care and are free from the self-dealing rule; he can pay money to himself whenever he wishes. The Trust document is not a sham in the sense of pretending to be something that it is not.  It is a remarkably candid and pellucid document which makes no pretence to be anything other than what it is, namely what is colloquially called a 'Dear me' trust for H for his lifetime.

73.    H has made no secret of the fact that he has free and unrestricted access to the Trust funds. In his Form E H stated that *"...all of my income needs are met from payments from the trust"*. He put his current income needs at $25m per annum, and future needs at £16.18m.  He also stated that *"...any [capital needs] are met from the trust"*. H has disclosed a schedule showing distributions to him in excess of US$110m between 30th June 2014 and 17th February 2016 (see below).   It is to be inferred that, if H did not have the funds in his personal bank accounts, any lump sum award in favour of W in these proceedings, would and could be paid from the Trust, just in the same way as Cotor advanced the large sums to H in 2014 to buy the yacht, plane and helicopter.

74.    The legal question as regards the Trust is as follows: If a discretionary beneficiary were to request the Trustee of the Woodblade Trust to advance the whole or part of the capital to him, would the Trustee be likely to do so now or in the foreseeable future? (c.f. *Charman v Charman* (supra).  I am satisfied that the answer on the evidence in this case is 'yes' and any funds held in the Trust can be considered to be *"financial*

22

*resources"* to H. Accordingly, I find that the so-called Trust assets are *"financial resources"* under s.25(2)(a) of the Act available to H from which H can pay W's financial award in these proceedings.

### Trust issues (1) and (2) - Cotor

75.   I turn to W's points (1) and (2) regarding Cotor.  Cotor is a Panamanian company formed in September 2011.  A recent company search shows its share capital to be 100 bearer shares and that  H is Cotor's 'President Ad Hoc' at shareholders' meetings.

76.   W contends that Cotor is H's nominee or *alter ego* and that any assets held by Cotor are held for H.  In this regard, and to aid enforcement, W is also seeking:

(1)   a declaration that Cotor is H's nominee, and the assets (the UBS portfolio and the Modern Art Collection) held in the name of Cotor belong to H;

(2)   an order that Cotor and H are jointly and severally liable to pay the lump sum of £350m; and

(3)   an order that Cotor transfers the Modern Art Collection in its name to W, and the court declares that W is the legal and beneficial owner of the Modern Art Collection.

*Analysis*

77.   The following points are pertinent.  First, H admits personally receiving $1.375 billion in November 2012 for his Northgas shares. These monies were somehow transferred into the name of Cotor.   There is no evidence, however, that H received any consideration for transferring those monies to Cotor. Moreover, Cotor has not produced any accounts or documents to explain the basis on which it came to hold these valuable assets.   It is trite law that where money is given gratuitously by A to B, absent presumption of advancement (*e.g.* parent to child), the inference is of resulting trust, *i.e.* that the legal owner of the asset holds it absolutely for the transferor.  There is, therefore, a presumption of resulting trust which it falls upon to H to rebut.  H's failure to plead a defence to this case, or to present himself to give evidence, means that the presumption remains unrebutted.  The words of Lord Sumption in *Prest* at [49] are apposite in the present case:

> *"Since no explanation has been forthcoming for the gratuitous transfer of these properties to [Cotor], there is nothing to rebut the ordinary presumption of equity that [Cotor] was not intended to acquire a beneficial interest in them."*

78.   Second, the manner in which Cotor has funded H's numerous purchases and lifestyle is redolent of Cotor merely been an open cheque book for H.  By H's own admission, Cotor (i) paid for the outgoings on *Somerton House* and *Villa le Cottage*, (ii) purchased the yacht, plane and helicopter, and (iii) transferred tens of millions of dollars direct to H (during the period 30th June 2014 to 24th March 2016, H received distributions from Cotor of US$97 million, £6.8 million, €6.4 and CHF 27k).

79.    Third, H has stated that assets in Cotor's name are within the Trust structure. However, there is no independent, documentary or contemporaneous evidence to support his assertion. Cotor was registered on 16th September 2011. The Trust was formed on 2nd October 2013. Cotor had, therefore, already existed for two years before the Trust was set up, but there is no evidence that Cotor and/or its assets were subsequently settled in the Trust. Further, there is no evidence to show that any payments by Cotor to H or on his behalf were approved by Woodblade or the Trustee. No trustee or directors' resolutions of any description have been disclosed.

80.    Fourth, as presaged above, on 17th March 2015, H assigned the entire issued share capital in Avenger Assets Corp, Carolina Ltd and Lucy Ltd to the Trust. However, Cotor was not included in this assignment.

81.    Fifth, H's treatment of Cotor mirrors his treatment of Cotor Investment Ltd, a BVI company which existed before the sale of the Northgas shares and the formation of the Woodblade Trust in 2013. In his answers to the Questionnaire, when describing his wealth in 2004, H said he had cash and securities at UBS of $78m. However, the UBS account which H was referring to as *"his"* account was, in fact, an account in the name of Cotor Investment Ltd. There is no evidence that Cotor Investment Ltd ever traded or generated any wealth of its own.  It is to be inferred that that, H considered Cotor Investment Ltd to be a mere personal depository for his cash and securities. The same inference can be drawn in respect of Cotor, which H used as his 'piggy-bank'.

82.    Sixth, it is perhaps telling that in a signed written statement dated 21st March 2015, H spoke of the Trust as being *"beneficially interested in"* art, cash and securities, *i.e.* thereby suggesting that Cotor was a mere nominee (albeit for the Trust, not H).

83.    Seventh, on 14th November 2016, W's solicitors, PHB wrote to H's then solicitors, Sears Tooth, asking them to provide independent documentary evidence which confirms that Cotor is within the Trust structure, and to explain, with documentary evidence, who has held the legal and beneficial interest in Cotor's shares from 1st January 2013 to date.  The letter concluded: *"If your client does not provide this documentation we will be asking the court to draw the inference that Cotor is your client's nominee"*. No reply has been received. In view of this silence, a reasonable adverse inference can be drawn against this *"uncommunicative husband"* (per Lord Sumption in *Prest, supra,* at [45]).

84.    For the above reasons, I find that Cotor is H's nominee and that Cotor holds all its assets absolutely for H on a 'bare' trust.

*Bare trust*

85.    The *Law Commission Report on Trusts of Land (No. 181) (1989)* defined a bare trust as follows (in paragraph 3.27):

> *"A bare trust exists where the entire beneficial interest is vested in one person and the legal estate in another. The trustee in such a case has no duties other than to obey the beneficial owner, who is, to all intent, the real owner."*

(see also *Lewin on Trusts*, Chapter 1-028)

86.   The terms 'bare trustee' and 'nominee' are often used interchangeably. In essence, a
      bare trustee and a nominee are 'nominal' title holders, holding an asset for another
      person who is the true beneficial owner for all purposes. A bare trustee is a trustee who
      is a mere repository of the trust property with no active duties to perform, and with no
      responsibilities in relation to trust property other than to preserve the property for the
      beneficiary (and the transferor of the assets). The bare trustee's duties are purely
      passive, and 'bare' or naked of active duties decreed by the settlor. In *IRC v Silverts Ltd*
      [1951] Ch D 521 at p 530 the Court of Appeal described a bare trustee of shares in a
      company as being *"a mere name or 'dummy' for the true owner"*.

*Prest v Petrodel Resources [2013]*

87.   In my view, the present case is on all fours with *Prest v Petrodel Resources* [2013]
      UKSC 34 and [2012] EWCA Civ 1395. In the Court of Appeal in *Prest*, Rimer LJ
      (with whom Patten LJ agreed) stated:

           *"[136] … If property held by a husband has been put into the name of
           someone who, on the evidence, is obviously a bare trustee for him, there will
           be no problem in holding that the beneficial ownership has not changed. As
           explained in the first sentence of the last quoted paragraph, the court will also
           not be bamboozled by the use by husbands to a like end of "shams, artificial
           devices and similar contrivances".*

88.   The Supreme Court in *Prest* confirmed the tenacity of the rule in *Salomon's* case in
      family cases, i.e. that a company is a legal entity distinct from its shareholders, and its
      assets are its own, and not those of its shareholders, even where company is owned and
      controlled by one person. The Supreme Court re-iterated that the circumstances in
      which the corporate veil could be lifted were very limited, and no special exception
      should be made for financial remedy proceedings, even in circumstances where the
      husband had misapplied the assets of his company for his own benefit. However, their
      Lordships held that the restriction on 'piercing the corporate veil' does not apply to
      circumstances in which the company is a 'bare trustee' holding assets in its name for the
      husband.  The Supreme Court took the classic 'resulting trust' route and ordered the
      companies to transfer properties registered in their names directly to the wife.

*Summary*

89.   As stated above, Cotor has not appeared in this case, nor filed any evidence from a
      director or officer, not disputed W's assertion in her Case that Cotor is H's nominee.
      Nor has H himself challenged that assertion.

90.   Against this background, in my judgment, in the light of H and Cotor's non-disclosure
      and non-cooperation in these proceedings, the Court is entitled to draw similar
      inferences as the Supreme Court did in *Prest*. As Lord Sumption articulated:

           *"[47] The judge's finding about the ownership and control of the companies
           mean that the companies' refusal to co-operate with these proceedings is a
           course ultimately adopted on the direction of the husband. It is a fair*

*inference from all these facts, taken cumulatively, that the main, if not the only, reason for the companies' failure to co-operate is to protect the London properties. That in turn suggests that proper disclosure of the facts would reveal them to have been held beneficially by the husband, as the wife has alleged".*

91.  The form of order sought by W in this case, whereby Cotor (*qua* nominee/bare trustee for H), shall pay the lump sum to W and transfer the Art Collection is in line with order made in *Prest* where the companies were found to hold the properties on trust for the uncommunicative husband, and they (*qua* nominee/ bare trustee) were ordered to transfer the properties to the wife. I shall so order.

### Trust issue (3) - W's application to set aside the March 2015 disposition

92.  W seeks an order setting aside the Deed of Trust dated 17th March 2015.

93.  The timing is telling.  The Deed of Trust dated 17th March 2015 was executed four days before H signed his first witness statement in the present proceedings.  By the Deed of Trust, H purported to assign to the Trust the entire 100% issued share capital in the three offshore holding companies (*i.e.* Avenger Assets Corporation of Panama, Carolina Ltd and Lucy Ltd) relating to the yacht, plane and helicopter.  In addition, H also assigned to Woodblade his 60% shareholding in a Cypriot company, Sumingdale Limited, which held in a  Moscow property, 9 Solyanka Street, Moscow.  (I shall refer collectively to these as "the March 2015 Companies").

94.  On the same day, 17th March 2015, H executed a document described as *"Declaration of Trust"* by which he purportedly assigned to Woodblade Ltd as Trustee of the Trust his right, title and interest of whatsoever nature in all the March 2015 Companies.  H also declared himself to be Trustee of the March 2015 Companies in favour of the Trust Woodblade Ltd and undertook to deal with the March 2015 Companies only as directed by Woodblade Ltd (a company of which, of course, he was sole director).  In my view, it is clear that H was attempting to hide the March 2015 Companies in an offshore trust because he was faced with W's imminent claims in these proceedings.  (I shall refer to this as "the March 2015 Disposition").

95.  On 21st March 2015, only four days after effecting the March 2015 Disposition, H signed a witness statement in support of his application for a stay of these (English) proceedings in favour of Russia on the grounds of *forum non conveniens*.  In his witness statement, H asserted that he was merely *"... one of a number of discretionary beneficiaries of an offshore trust which is beneficially interested in the ... assets [of the March 2015 Companies]...".*  It is clear that this was a transparent attempt to put the assets of the March 2015 Companies out of his (legal) reach and to inhibit W's ability to claim or include those assets as part of the marital asset reckoning or, at least, to make enforcement of W's claims more difficult.

*Section 37 MCA 1973*

96.  The March 2015 Disposition falls to be considered under s.37 MCA 1973.  Section 37 gives rise to a legal presumption in relation to such dispositions made within the past

Akhmedova v Akmedov and ors

three years.  In *AC v DC (No 1)* [2013] 2 FLR 1483, Mostyn J usefully summarised the operation of s.37:

> "[9] For W's application to succeed the following has to be demonstrated:
> (i) That the execution of the [disposition] was done by H with the intention of defeating her claim for financial relief. This is presumed against H, and he has to show that he did not bear that intention... The motive does not have to be the dominant motive in the transaction; if it is a subsidiary (but material) motive then that will suffice... .
> (ii) That the execution of the [disposition] had the consequence of defeating her claim. This means preventing relief being granted, or reducing the amount of any such relief, or frustrating or impeding the enforcement of any order awarding such relief...
> (iii) That the court should exercise its discretion to set aside the [disposition].
> (iv) However, ... there is an exception to the general rule that all dispositions are liable to be set aside. The disposition in favour of [the recipient] will not be set aside if it can be shown at the time it was made that,
> a) it was done for valuable consideration; and
> b) [the recipient] acted in relation to it in good faith; and
> c) [the recipient] was without notice of any intention on the part of H to defeat W's claim for financial relief.
> [10] The knowledge of [the recipient] referred to in para [9](iv)(c) above is not confined to actual knowledge but extends to constructive knowledge...
> [11] Although there is a formal legal burden on W to demonstrate the negative of the matters referred to in para [9](iv) above, I take the view that for obvious reasons (having to prove a negative; lack of knowledge) there is an evidential burden shifted to LF to establish this exception. If he does not establish all three limbs of the exception then the defence will not arise."

97.  Section 37 can operate to impugn transfers to offshore trusts (as it was in *AC v DC (No 1*, a case which involved the transfer of assets to a Manx EBT). The effect of a s.37 order is that the court declares the disposition "*void ab initio*" (see *AC v DC (No 1)* at [22]).

*Application of s.37*

98.  By reason of s.37, it is to be presumed against H that the intention of the March 2015 Disposition was to defeat or impede W's claim.  It is for H to show that the March 2015 Disposition did not bear that intention.

99.  H has, however, produced no such evidence to this effect. The assertion in his witness statement that he is only "*one of a number of discretionary beneficiaries*" is no more than that, *i.e.* an assertion. The presumption is, therefore, again unrebutted.

27

100. The March 2015 disposition would appear to be part of a wider pattern of conduct by H designed to put his assets out of the reach of W, viz. in particular the very substantial cash distributions from Cotor between June 2014 and March 2016 (see above).

101. In my view, this is a paradigm case for the application of section 37 MCA 1973. I shall order the setting aside of the March 2015 Disposition and make the appropriate declaration.

*Section 423 Insolvency Act 1986*

102. Section 37 has a sister provision under the general law, namely s.423 Insolvency Act 1986 ("IA 1986") (which also has extra-territorial effect). Since the March 2015 Disposition falls squarely within the purview of s. 37 MCA 1973, there is strictly speaking no need to rely on s. 423 IA 1986. However, it may aid enforcement if an order is also made under s. 423 Insolvency Act 1986, a provision not limited to matrimonial claims.

103. Section 423 of the Insolvency Act 1986 provides:

> "*423 Transactions defrauding creditors.*
> *(1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if—*
> *(a) he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;*
> *(b) he enters into a transaction with the other in consideration of marriage [F1or the formation of a civil partnership]; or*
> *(c) he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.*
> *(2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for—*
> *(a) restoring the position to what it would have been if the transaction had not been entered into, and*
> *(b) protecting the interests of persons who are victims of the transaction.*
> *(3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose—*
> *(a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or*
> *(b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.*
> *(4) In this section "the court" means the High Court or—*
> *(a) if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to a bankruptcy petition relating to him;*
> *(b) if that person is a body capable of being wound up under Part IV or V of this Act, any other court having jurisdiction to wind it up.*

*(5) In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as "the debtor"."*

*Application of s.423 IA 1986*

104.  Section 423 IA 1986 enables a *"victim"* to apply for an order to restore the position to what it would have been if the offending transaction had not been entered into (s. 423(2)).   A *"victim"* which means anyone prejudiced by the impugned transaction (s. 423(5)). The test is that the transaction must have been at an *"undervalue"* (s. 423(1)).

105.  The March 2015 Disposition plainly was at an undervalue.  H clearly entered into the transaction for the purpose of either: (a) putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, and/or (b) otherwise prejudicing the interests of such a person in relation to the claim which is making or may make. Thus, for the same reasons given above in relation to s.37 MCA 1973, it is to be inferred that H intended by the March 2015 Disposition, at the very least, to *"prejudice [W's]... interests in relation to the claim"*.

106.  W formally asserted a s.423 claim against H in her Case in respect of the March 2015 Disposition. H's failure to answer that claim also enables an adverse inference to be drawn against him in relation to his intention behind the disposition.

107.  The Court may make any it order it sees fit for restoring the *status quo ante* (including but not limited to those set out in s. 425 IA 1986).  W seeks an order reversing the March 2015 Disposition and vesting the shares in the March 2015 Companies in H.  I shall so order.


**DISTRIBUTION:**

**(6) WHAT IS A FAIR DISTRIBUTION OF THE MARITAL ASSETS?**

108.  I turn, finally, to the question of fair distribution of the marital assets. The total wealth in this case is £1,092,334,626 (see the attached Schedule of Assets).

109.  I find that this entire wealth is matrimonial in character, *i.e.* it was acquired and built up during the long marriage by H and W's equal contributions to the welfare of the family, and should be subject to the sharing principle (see above). There are no 'Departure Points' in this case (see above).

110.  Accordingly, I can see no reason in principle why there should not be an equal 50:50 division of the total marital assets in this case, *i.e.* £1,092,334,626.

*W's claim*

111.  W originally made an open offer under FPR 2010 of a payment of a lump sum of £350 million in a letter dated 7th April 2016 (repeated in a letter dated 14th November 2016).

This represented some 33% of the marital assets. In breach of the rules, H did not himself make an open offer. W's offer was made, no doubt, in the hope of avoiding a painful trial (in which, moreover, H was seeking to serve a statement from one of the children). W is not bound by her open offer. An unaccepted offer can be revoked.

112. In addition to a lump sum payment of £350 million (and the assets she currently holds of £10,165,162), W is now also seeking a further £93,060,990 comprising the following:

(1) The chattels situated at *Somerton House* valued at £2,479,125;

(2) The *Aston Martin Virage Vantage Coupé* motor car (registration mark W7 FTA) in Surrey valued at £350,000 (the sale proceeds of which is intended to provide a fighting fund to assist in the enforcement of the Order abroad).

(3) The modern art collection held by Cotor which has recently been valued (on a sale basis) at $112m (£89,031).

113. The total value of W's claim is now, therefore, £453,576,152. This comprises some 41.5% of the total marital assets. I find that this figure is justified in all the circumstances. I shall so order.

## ANCILLARY MATTERS:

### (7)   SERVICE

114. It is necessary to consider the question of whether or not proceedings have been properly served on the Respondents.

*Service of proceedings on H*

115. I am satisfied that H has been properly served with the up-to-date proceedings in this matter, in particular, (i) Moor J's Order dated 25th October 2016 which ordered Woodblade and Cotor be joined as parties, (ii) W's Case re the Trust, and (iii) the trial bundles and authorities.

116. H was represented at the PTR before Moor on 25th October 2016 J by Sears Tooth and Leading Counsel. H, therefore, had notice of all the terms of the Order that Moor J made on that date. The sealed PTR Order and W's Case re the Trust was served on Sears Tooth before they applied to come off the record on 9th November 2016. Sears Tooth did not received the sealed order removing them from the record until 16th November 2016. I am satisfied that H knew, or must be taken to have know, that Woodblade and Cotor had been joined as parties in these proceedings and that W was seeking declarations and orders in respect of Cotor.

117. PHB attempted to contact H directly after Sears Tooth came off the record, using an email address which the Court has previously approved for service, and one that W uses to communicate with H. The documents and authorities were sent to H on Friday 25th November 2016 before the hearing commenced on 28th November 2016 with 2 judicial

MR JUSTICE HADDON-CAVE
Approved Judgment

Akhmedova v Akhmedov and ors

reading days. H failed to respond to any letters which were sent to him or make any acknowledgement of receipt of any communications or documents.

*Service of proceedings on Woodblade and Cotor (and constructive notice)*

118. I am satisfied that Woodblade and Cotor have themselves been properly served with the up-to-date proceedings in this matter, in particular, (i) Moor J's Order dated 25th October 2016 which ordered Woodblade and Cotor be joined as parties, (ii) W's Case re the Trust, and (iii) the trial bundles and authorities.

119. FPR 2010, r.6.14, provides that any document may be served out of the jurisdiction without the permission of the court (*c.f.* the CPR 1998).

120. I am also satisfied that, Woodblade and Cotor can be taken to have had actual or constructive notice of all orders, documents and proceedings that H has been served with, and notice of joinder and the relief that sought against them by W. This follows from H's role and relationship with Woodblade and Cotor and the fact that these companies are both controlled by H, and are his *alter egos* (see above).

*Woodblade*

121. I have read and accept the statement of Mr Ian Connell, a partner of PHB, regarding service. Mr Connell explains the steps that have been taken by PHB to serve Woodblade in Cyprus by fax, email and by post variously with the PTR Order, W's Case of the Trust and W's counsels' trial opening and authorities on 26th October, 31st October, 8th November and 25th November 2016 at its registered address in Cyprus (the address of its attorneys). No response was received from Woodblade.

*Cotor*

122. FPR 2010 r. 6.43 contains general provisions regarding service out of the jurisdiction:

> "*(3) Where the applicant wishes to serve an application form, or other document, on a respondent out of the United Kingdom, it may be served by any method –*
>   *(a) provided for by –*
>   *(i) rule 6.44 (service in accordance with the Service Regulation);*
>   *(ii) rule 6.45 (service through foreign governments, judicial authorities and British Consular authorities); or*
>   *(b) permitted by the law of the country in which it is to be served.*
>   *(4) Nothing in paragraph (3) or in any court order authorises or requires any person to do anything which is contrary to the law of the country where the application form, or other document, is to be served.*"

123. Mr Connell has explained that he was unable to find an email address or a working fax number for Cotor's registered agents in Panama. He therefore sent separate letters by post to Cotor's registered agent in Panama (who changed on 30th September 2016) 26th October, 31st October, 8th November and 25th November 2016 enclosing variously the PTR Order, W's Case of the Trust and W's counsels'

31

trial opening and authorities. No response was received from Color.

124. Panama is not a signatory to the Hague Service Convention (*i.e.* the Convention on the service abroad of judicial and extra-judicial documents in civil or commercial matters signed at the Hague on 15th November 1965).

125. R.6.43(3) does not prescribe one particular method of service, by merely that *"any method"* of service is permitted by local laws. Mr Connell contacted Panamanian lawyers and sought their advice on the appropriate method of serving documents in respect of foreign proceedings on Panamanian registered parties. Their advice was that the Panamanian Judicial Code has no rules that apply to foreign proceedings, and that there is no rule under that Code that positively prevents service by post on a Panamanian company's resident agent of documents relating to the foreign proceedings. It can therefore be inferred that service by post of documents concerning foreign proceedings is permitted by, and not contrary to, the laws of Panama. Accordingly, PHB served Color by post.

126. For these reasons, I am satisfied that Color was also properly served by post with the relevant orders and documents (see above).

*Order under FPR r.6.19*

127. FPR r. 6.19 provides as follows:

> *"(1) Where it appears to the court that there is a good reason to authorise service by a method or at a place not otherwise permitted by this Part, the court may direct that service is effected by an alternative method or at an alternative place.*
>
> *(2) On an application under this rule, the court may direct that steps already taken to bring the application form to the attention of the respondent by an alternative method or at an alternative place is good service."*

128. The provisions of FPR r. 6.19(2) are similar to CPR r.6.15(2), which have been held to apply extra-territorially. In *Abela v Baadarani* [2013] 1 WLR 2043, the Supreme Court held that CPR r.6.15(2) applied both to service on foreign parties extra-territorially as it did to service on parties domestically, because *inter alia* "*such a power is to be implied generally into the rules governing service abroad*" ([20]), provided the actual method of service is not contrary to the local law ([24]). In my view, the same reasoning can be said to apply to FPR r. 6.19(2).

129. The Court has discretionary power to make a direction that service on H's solicitors of orders and documents amounts to a good alternative method of service on Color in this case. I am satisfied that it is appropriate, in all the circumstances, to make such a direction in this case, given my findings that Color is no more than H's nominee or bare trustee (see above). In my view, such a direction would serve the justice of this case.

130. Accordingly, I shall order and declare under FPR 6.19(2) that the steps already taken by W to bring these proceedings and the trial to the attention of Woodblade and Color by serving the relevant orders and documents on H through H's

solicitors in London constitute a good alternative method of service on Cotor in this case.

131. The service on Cotor on 25th October 2016 and 8th November 2016 are valid dates for the purposes of paragraph 4.4 of the prescribed annex for enforcement under the Lugano Convention

## (8)   LUGANO CONVENTION

*Enforcement under the Lugano Convention 2007*

132. W naturally wishes to be able to enforce any order which this Court makes against the Respondents. The Court is astute to ensure that its orders have effect and are obeyed.

133. W particularly wishes to be able to enforce any order which this Court makes against Cotor in Switzerland under the Lugano Convention. The Lugano Convention is, however, only concerned with maintenance and not the 'property consequences' of divorce (*Traversa v Freddi* [2011] 2 FLR 272). Accordingly, it is necessary to separate out from the award of the lump sum order those elements that constitute *"maintenance"* and those that comprise a share of the matrimonial assets. *"Maintenance"* is given a wide definition for the purpose of enforcement under the Convention (*Van den Boogaard v. Laumen* [1997] QB 759 ECJ).

*W's 'needs' and maintenance case*

134. W's 'Needs Calculation' is set out in a schedule comprising the following figures:

| | |
|---|---:|
| (1) The purchase of an English Property (Eaton Square): | £ 39,268,750 |
| (2) The purchase of a Foreign Property (Cap Ferrat): | £ 27,885,630 |
| (3) A "Duxbury Fund" to meet W's capitalised future annual living needs (£5,359,354 *per annum*): | £157,101,608 |
| (4) Outstanding Professional Costs: | £    174,520 |
| | £224,430,508 |

135. W explained that she needs a house in London close to her sons and that H had previously tried to buy a suitable property in Eaton Square. W explained that she needs a villa in Cap Ferrat in the South of France close to *Villa le Cottage* so that she can see her sons during their vacations. W explained that her future income needs are £5,359,354 *per annum* comprising (a) her future income needs in England of £3,689,975 *per annum* and (a) her future income needs abroad of €1,671,379 *per annum*) which capitalised require a Duxbury Fund of £157,101,608. The total value of W's maintenance claim is, therefore, £224,430,508.

136. In the absence of any countervailing evidence, I find that these figures are justified on the evidence before me, given the lifestyle which to which she has become accustomed during her married life and leads. It is to be noted that H puts his current income needs at US$25 million *per annum* (see above). Accordingly, for the purposes of enforcement

under the Lugano Convention, I find that W's total *"maintenance"* claim requirements amount to £224,081,468.

## CONCLUSION AND ORDER

In conclusion, for the reasons set out in this judgment, I find and hold that the Claimant, Tatiana Akhmedova's claim for ancillary financial relief succeeds in the sum of £453,576,152, comprising 41.5% of the total marital assets.

137. W already holds assets of £10,165,162 in value. I am going to order the transfer to her of the contents of Somerton House (£2,479,125), the Aston Martin (£350,000) and the Modern Art Collection (estimated value £90,581,865). Accordingly, to meet the balance, I order Farkhad Akhmedov to pay to Tatiana Akhmedova the sum of £350,000,000 (three hundred and fifty million Pounds sterling) and, for the reasons given in this judgment, Cotor shall be jointly and severally liable to pay this sum.

138. I shall hear submissions from Counsel on the form of the Order.

# EXHIBIT 2

*Financial Remedy Order*

FD 13 D 05340



# IN THE HIGH COURT OF JUSTICE
## FAMILY DIVISION

### THE MATRIMONIAL CAUSES ACT 1973

### THE MARRIAGE OF TATIANA MIKHAILOVNA AKHMEDOVA AND FARKHAD TEIMUR OGLY AKHMEDOV

AFTER hearing Nigel Dyer QC, Dakis Hagen and Henry Clayton for the applicant.The Respondent, the Second Respondent and the Third Respondent were not represented, and none of the Respondents attended the final hearing although the court is satisfied that each of the Respondents had notice of the hearing and of the Applicant's claims.

AND upon the court reading the court bundle comprising of 5 lever arch files of statements and documentary evidence, and the documents submitted by the Applicant's counsel, and taking the oral evidence of the Applicant and Anthony David Kerman on a witness summons.

ORDER MADE BY MR JUSTICE HADDON-CAVE ON 20 DECEMBER 2016 FOLLOWING THE FINAL HEARING HELD IN PRIVATE ON THE FOLLOWING DATES 28 - 30 NOVEMBER 2016, 2, 5, 15, 16 and 20 DECEMBER 2016.
IF YOU FARKHAD AKHMEDOV, AND/OR WOODBLADE LTD, COTOR INVESTMENT SA, QUBO 1 ESTABLISHMENT, QUBO 2 ESTABLISHMENT DO NOT COMPLY WITH THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND IMPRISONED OR FINED, OR YOUR ASSETS MAY BE SEIZED.

### THE PARTIES

1. The Petitioner/Applicant is Tatiana Akhmedova, who is domiciled and resident in    England.

2. The Respondent is Farkhad Akhmedov, who is domiciled and resident in Azerbaijan.

3. The Second Respondent is Woodblade Limited, a company registered in Cyprus, of which the Respondent is the only director.

4. The Third Respondent is Cotor Investment SA, a company registered in Panama.

Please address all communications for the Court to The Family Division of the High Court, 1st Mezzanine, Queen's Building, Royal Courts of Justice, Strand, London WC2A 2LL quoting the case number in the top right hand corner of this form. The Court Office is open between 10.00 a.m. and 4.30 p.m. on Mondays to Fridays.

D264

5. The Fourth Respondent is Qubo 1 Establishment, a Liechtenstein Anstalt which was registered on 21 October 2016 [under register number 0002.532.781-9] and its registered agent is Walpart Trust, Zollstrasse 2, 9490 Vaduz, Liechtenstein.

6. The Fifth Respondent is Qubo 2 Establishment, a Liechtenstein Anstalt which was registered on 21 October 2016 [under register number 0002.532.775-5] and its registered agent is Walpart Trust, Zollstrasse 2, 9490 Vaduz, Liechtenstein.

DEFINITIONS

7. "assets held in the name of the Third Respondent" includes (but is not limited to):-

   a. money and investments held in portfolio 240-139817-R001 at UBS Switzerland AG and/or UBS AG, Postfach, 8098 Zurich, or in any other portfolio in the name of the Third Respondent at UBS Switzerland AG and/or UBS AG, and in accounts at LGT Bank, in Herrengasse 12, FL-9490 Vaduz, Liechtenstein.

8. "assets held in the name of the Fourth Respondent" and "assets held in the name of the Fifth Respondent" includes (but is not limited to):-

   a. the collection of modern art which is itemised in Annex 1 to this order, and which was transferred by the Third Respondent to the Fourth Respondent on a date in and around October or November 2016, and understood to be currently held at Stabiq Treasure House, Wirtschaftspark 27, 9492, Eschen, Liechtenstein;
   b. money and investments held account(s) at LGT Bank, in Herrengasse 12, FL-9490 Vaduz, Liechtenstein.

9. "Somerton House" means the Applicant's home at Somerton House, St. George's Hill, Weybridge, Surrey KT13 0NR.

RECITALS

10. It is recorded by the court that:-

    a. Decree Nisi was made absolute on 15 December 2016.

    b. The Respondent voluntarily submitted to the jurisdiction of England and Wales (by letter dated 18 June 2015 from his solicitors Sears Tooth) in these divorce proceedings and he participated in these proceedings until 11 November 2016 when Sears Tooth came off the court record as acting for the Respondent. Since then the Respondent has played no part in the

2

proceedings and he is in contempt of court; he is in breach of various orders, including the order which directed that he must personally attend the duration of the trial commencing on 28 November 2016.

c. The Second Respondent was joined as a party to the proceedings on 25 October 2016 and there was good service of the joinder order on 25 October 2016 and of the Applicant's case on 8 November 2016. The Second Respondent has failed to participate in these proceedings.

d. The Third Respondent was joined as a party to the proceedings on 25 October 2016 and there was good service of the joinder order on 25 October 2016 and of the Applicant's case on 8 November 2016. The Third Respondent has failed to participate in these proceedings.

e. The Fourth Respondent was joined as a party to these proceedings by this order. The Fourth Respondent had constructive notice of these proceedings and of the claims made by the Applicant.

f. The Fifth Respondent was joined as a party to these proceedings by this order. The Fifth Respondent had constructive notice of these proceedings and of the claims made by the Applicant.

## DECLARATIONS

11. The court finds and DECLARES under the court's general civil and commercial jurisdiction, that:-

a. The Third Respondent is the Respondent's nominee, and the assets held and previously held in the name of the Third Respondent belong to the Respondent.

b. The Fourth Respondent is the Respondent's nominee, and the assets held in the name of the Fourth Respondent belong to the Respondent.

c. The Fifth Respondent is the Respondent's nominee, and the assets held in the name of the Fourth Respondent belong to the Respondent.

d. £224,430,508 of the lump sum ordered in paragraph 13 below amounts to maintenance for the purposes of: (i) European Council Regulation (EC no 4/2009) on jurisdiction, applicable law, recognition and enforcement of decisions and cooperation in matters relating to maintenance obligations, (ii) European Council Regulation (EC no 1215/2012) on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters and (iii) the Convention on jurisdiction and the enforcement of judgments in civil and commercial matters signed in Lugano on 30 October 2007, and the definition of maintenance as decided in *Van den Boogaard v Laumen*; ECJ 27 Feb 1997.

e. This order is final and enforceable under the Regulation and Convention set out in paragraph in d. above.

f. The purported Declaration of Trust dated 17 March 2015 (Annex 2 to this order) was a transaction (a) at an undervalue for the purposes of Insolvency Act 1986 s.423 and (b) made by the Respondent for the purpose of putting assets beyond the reach of a person who is making a

Please address all communications for the Court to The Family Division of the High Court, 1st Mezzanine, Queen's Building, Royal Courts of Justice, Strand, London WC2A 2LL quoting the case number in the top right hand corner of this form. The Court Office is open between 10.00 a.m. and 4.30 p.m. on Mondays to Fridays.

D264

3

claim against him or otherwise for prejudicing the interests of that person in relation to the claim which she is making;

g. The purported transfer of the collection of modern art which is itemised in Annex 1 to this order from the Third Respondent (Cotor Investment SA) to the Fourth Respondent (Qubo 1 Establishment) or the Fifth Respondent (Qubo 2 Establishment) was a transaction (a) at an undervalue for purposes of the Insolvency Act 1986 s. 423 and (b) made by the Respondent for the purpose of putting assets beyond the reach of a person who is making a claim against him or otherwise for prejudicing the interests of that person in relation to the claim which she is making.

h. Any purported transfer of the money and investments held in portfolio 240-139817-R001 at UBS Switzerland AG and/or UBS AG, Postfach, 8098 Zurich, or in any other portfolio formerly in the name of the Third Respondent at UBS Switzerland AG to any other entity including the Fourth Respondent (Qubo 1 Establishment) and the Fifth Respondent (Qubo 2 Establishment) was a transaction (a) at an undervalue for the purposes of the Insolvency Act 1986 s. 423 and (b) made by the Respondent for the purpose of putting assets beyond the reach of a person who is making a claim against him or otherwise for prejudicing the interests of that person in relation to the claim which she is making.

## IT IS ORDERED THAT:-

## JOINDER OF QUBO 1 AND QUBO 2

12. Qubo 1 Establishment and Qubo 2 Establishment are joined as parties to these proceedings and known as the Fourth Respondent and Fifth Respondent respectively. Liberty to the Fourth Respondent and to the Fifth Respondent apply on 7 days' notice in writing to the applicant's solicitors (Payne Hicks Beach) to be disjoined.

## LUMP SUM

13. The Respondent (Farkhad Akhmedov), or his nominees the Third Respondent (Cotor Investment SA), the Fourth Respondent (Qubo 1 Establishment) and the Fifth Respondent (Qubo 2 Establishment), shall pay to the Applicant (Tatiana Akhmedova) a lump sum of £350,000,000 (350 million pounds sterling) by 4pm on Friday 6 January 2017. The Respondent, the Third Respondent, the Fourth Respondent and the Fifth Respondent are jointly and severally liable to pay this lump sum.

14. If this lump sum is not paid in full by the due date then interest shall run at Judgment Debt rate of 8% per annum.

4

TRANSFER OF PROPERTY

15. The Respondent shall transfer forthwith to the Applicant all of his legal and beneficial interest in:-

    a. each of the chattels identified in Annex 3 to this order, and any other chattels situated at Somerton House;

    b. the Aston Martin Virage Vantage Coupe motor car registration mark W7 FTA;

and it is DECLARED that with immediate effect the Applicant is the legal and beneficial owner of each of the chattels identified in Annex 3 to this order, and any other chattels situated at Somerton House, and the Aston Martin Virage Vantage Coupe motor car registration mark W7 FTA.

16. The Third Respondent and /or the Fourth and/or Fifth Respondent shall forthwith:-

    a. transfer the legal and beneficial ownership of each picture in the collection of modern art which is itemised in Annex 1 to this order to the Applicant;

    b. exercise any rights under the custody agreement concluded with Stabiq Treasure House so that the above transfer can occur; and

    c. deliver up each picture in the collection of modern art which is itemised in Annex 1 to this order to the order of the Applicant's attorneys, Gasser Partners, Wuhrstrasse 6, 9490 Vaduz, Fürstentum, Liechtenstein

and it is DECLARED that with immediate effect the Applicant is the legal and beneficial owner of each picture in the collection of modern art which is itemised in Annex 1.

SET-ASIDE

17. The Respondent's purported declaration of trust dated 17 March 2015 (Annex 2 to this order) is hereby set aside under Matrimonial Causes Act 1973 s.37 and under s. 423 of the Insolvency Act 1986. The Respondent's beneficial interest in the shares of Avenger Assets Corporation; Carolina Ltd; Lucy Ltd; Sedeli Finance Ltd and Sunningdale Ltd as it was immediately prior to the declaration of trust dated 17 March 2015 (Annex 2 to this order) is vested in the Respondent absolutely

18. The purported transfer of the collection of modern art which is itemised in Annex 1 to this order from the Third Respondent (Cotor Investment SA) to the Fourth Respondent (Qubo 1 Establishment) and/or the Fifth Respondent (Qubo 2 Establishment) is hereby reversed under s. 423 of the Insolvency Act 1986 and an order made under s. 423(2) and s. 425(1)(a) of the Insolvency Act 1986 that the collection be vested in the Applicant with immediate effect in the manner articulated in paragraph 16 above.

Please address all communications for the Court to The Family Division of the High Court, 1st Mezzanine, Queen's Building, Royal Courts of Justice, Strand, London WC2A 2LL quoting the case number in the top right hand corner of this form. The Court Office is open between 10.00 a.m. and 4.30 p.m. on Mondays to Fridays.

D264

19. Any purported transfer of the money and investments held in portfolio 240-139817-R001 at UBS Switzerland AG and/or UBS AG, Postfach, 8098 Zurich, or in any other portfolio formerly in the name of the Third Respondent to any other entity including the Fourth Respondent (Qubo 1 Establishment) and/or the Fifth Respondent (Qubo 2 Establishment) is hereby reversed under s. 423 of the Insolvency Act 1986 and an order made under s. 423(2) and s. 425(2)(d) of the Insolvency Act 1986 that cash and securities up to the amount of £350 million be paid to the Applicant in accordance with paragraph 13 above.

## ORDER FOR SALE OF PROPERTY

20. In the event that the Respondent or the Third Respondent or Fourth Respondent or Fifth Respondent fails to discharge the costs order provided for in paragraph 29 below in full by the due date, then the Respondent's 5 Holland & Holland sporting guns identified on Annex 4 to this order and in the possession of Richard Roberts of The Hollies, Old Avenue, West Byfleet, Surrey, KT14 6A or Holland & Holland, 33 Bruton St, London W1J 6HH shall be sold by such method and in a timeframe that the Applicant's solicitors shall prescribe. The proceeds of sale, after deducting any sale costs, shall be paid to the Applicant's solicitors, Payne Hicks Beach, in part satisfaction of the costs order.

## CLEAN BREAK: CAPITAL AND INCOME

21. Upon full and complete compliance with this order, the Applicant's claims and the Respondent's claims for periodical payments orders, secured periodical payments orders, lump sum orders, property adjustment orders, pension sharing orders and pension attachment orders shall be dismissed, and neither party shall be entitled to make any further application in relation to the marriage for an order under the Matrimonial Causes Act 1973, section 23(1)(a) or (b), or be entitled on the other's death to apply for an order under the Inheritance (Provision for Family and Dependants) Act 1975, section 2.

## USE OF DOCUMENTS

22. Permission to the Applicant to rely on any documents disclosed in these proceedings in any litigation for the purpose of the enforcement of this order, or any related action claiming the financial provision made in this order, in any jurisdiction world-wide.

## SERVICE OF THIS ORDER AND THE JUDGMENT HANDED DOWN ON 15 DECEMBER 2016

23. Upon the Applicant's solicitors undertaking to use their best endeavors to obtain relief from the court in Liechtenstein as soon as possible, the Applicant's solicitors shall serve this order and the judgment on 3 January 2017 upon:-

    a. all the Respondents: by email to fla@f-fa.net;

6

b. the Second Respondent: by registered post to the registered address: Patrician Chambers, 332 Agiou Andreou Street 3035, PO Box 54543, Limassol, Cyprus; and by fax to 0035725344548; and by email to info@pavlaw.com;

c. the Third Respondent: by registered post to the address of the resident agent, Anzola Robles & Asociados, Credicorp Bank Plaza, 26th Floor, Nicanor De Obarrio Avenue, 50th Street, PO Box 0832-2325, Panama City, Republic of Panama;  and by fax to (507) 263-0006 / (507) 263-4194; and by email to info@anzolaw.net.

d. the Fourth Respondent: by official service at the address of the registered agent, Walpart Trust, Zollstrasse 2, 9490 Vaduz, Liechtenstein.

e. The Fifth Respondent: by official service at the address of the registered agent, Walpart Trust, Zollstrasse 2, 9490 Vaduz, Liechtenstein.

## LIBERTY TO APPLY

24. Liberty to apply to Haddon-Cave J to extend the time for serving this order and the judgment as provided in paragraph 23 above.

25. Liberty to apply as to timing and implementation.

26. Liberty to restore for enforcement purposes the application under section 24(1)(c) of the Matrimonial Causes Act 1973.

27. Liberty to bring any other applications for enforcement purposes under s. 37 of the Matrimonial Causes Act 1973 and/or s. 423 of the Insolvency Act 1986.

28. Liberty to apply to Mr Justice HADDON-CAVE for directions in respect of the publication, reporting and anonymisation of the judgment.

## COSTS

29. The Respondent, the Third Respondent, the Fourth Respondent and the Fifth Respondent shall pay the Applicant's costs of these proceedings on the indemnity basis, summarily assessed at £1,096,971 and to be paid by 4pm on Friday 6 January 2017. The Respondent, the Third Respondent, Fourth Respondent and Fifth Respondent are jointly and severally liable to pay these costs.

DATED 20 DECEMBER 2016
sj



Please address all communications for the Court to The Family Division of the High Court, 1st Mezzanine, Queen's Building, Royal Courts of Justice, Strand, London WC2A 2LL quoting the case number in the top right hand corner of this form. The Court Office is open between 10.00 a.m. and 4.30 p.m. on Mondays to Fridays.

D264

7

## INDEX TO ANNEXES

Annex 1 – Art collection
Annex 2 – Declaration of Trust
Annex 3 – contents/chattels schedule
Annex 4 – Holland & Holland schedule
Annex 5 – Lugano Certificate
Annex 6 – Council Regulation (EU no 4/2009) Certificate
Annex 7 – Council Regulation (EU no 1215/2012) Certificate

IN THE HIGH COURT OF JUSTICE
FAMILY DIVISION

CASE NO. FD13D05340

BETWEEN:

TATIANA MIKHAILOVNA AKHMEDOVA

Applicant

– and –

FARKHAD TEMUR OGLY AKHMEDOV

Respondent

WOODBLADE LTD

2nd Respondent

COTOR INVESTMENT SA

3rd Respondent

QUBO 1 ESTABLISHMENT

4th Respondent

QUBO 2 ESTABLISHMENT

5th Respondent

---

## ANNEX 1 TO ORDER DATED 20 DECEMBER 2016

| No. | Artist | Painting Description |
|-----|--------|----------------------|
| 1. | Klein, Yves | Untitled Blue Monochrome (IKB 271), 1960, mixed media, 50 by 50cm |
| 2. | Doig, Peter | Country-rock (wing-mirror), 1999, oil on canvas, 194.9 by 270cm |
| 3. | Warhol, Andy | Nine Multi-coloured Marilyns (Reversal Series), 1979-86, acrylic and silkscreen ink on canvas, 138 by 106.1 cm |
| 4. | Wesselmann, Tom | Bedroom Painting #49, 1983, oil on canvas, 66 by 40 5/8 in |
| 5. | Warhol, Andy | Brigitte Bardot, 1974, Acrylic and silkscreen ink on canvas, 120.6 x 120 cm |
| 6. | Klein, Yves | Untitled Anthropométrie (ANT 9), 1960, mixed media, 76 by 54 cm |
| 7. | Rothko, Mark | Untitled, 1968, acrylic on paper laid on panel, 85 by 65.6 cm |
| 8. | Rothko, Mark | Untitled (Yellow and Blue), 1954, (registered under the Mark Rothko Estate number 1218.68), oil on canvas, 242.9 x 186.7 cm |
| 9. | Klein, Yves | Accord Bleu (RE 52), 1958, Dry pigment, synthetic resin, natural sponges, 20 ½ x 53 ¾ x 3 in |
| 10. | Hirst, Damien | Kingdom of Heaven, 2006, butterflies and household glass on canvas, 243.8 by 213.4cm |
| 11. | Gursky, Andreas | Pyongyang V, 2007, c-print mounted on Plexiglas in artist's frame, ed. 1/6, framed: 307 by 219cm, image: 284.5 by 196.5cm |



Contemporary Art



Yves Klein
UNTITLED BLUE MONOGOLD
(IKB 271)
dated 1960 and dedicated *Berthe aux Familie de Yves Klein* on the verso
dry pigment and gold leaf on paper laid on canvas mounted on panel
50 by 50 cm; 19 ¾ by 19 ¾ in.

Please note that this work is accompanied by a certificate of authenticity issued by the Yves Klein Archives and recorded in the archives under IKB 271.

PROVENANCE
Galleria Blu, Milan
Galerie Blanche, Stockholm
Private Collection, Turin
Christie's, London, Contemporary Art, 27 June 1996, Lot 69
Private Swiss Collection
Sotheby's London, Contemporary Art Evening Auction, 30 June 2014, Lot 38
Acquired directly from the above by the present owner



Contemporary Art



*Peter Doig*
COUNTRY ROCK (WING-MIRROR)
signed, dated 1999 and variously inscribed on the reverse
oil on canvas
78⅞ by 270cm, 76¾ by 106¾in.

PROVENANCE
Gavin Brown's Enterprise, New York
Private Distinguished American Collection, 1999
Sotheby's, London, *Contemporary Art Evening Auction*, 30 June 2014, lot 27
Acquired directly from the above by the present owner

EXHIBITED
New York, Gavin Brown's Enterprise, *Wing-Mirror*, 1999
Vancouver, Morris and Helen Belkin Art Gallery; Ottawa, National Gallery of Canada; and Toronto, *The Power*
Plant, Peter Doig, 2001-02, p. 30, illustrated in colour
Annandale-on-Hudson, Bard College, *At Home/Not At Home*, 2010, p. 165 (text)

LITERATURE
Jerry Saltz, 'Out of the Fog', *The Village Voice*, 20 December 1999, illustrated in colour

Contemporary Art



Andy Warhol

signed and dated 78/86 on the overlap
acrylic and silkscreen ink on canvas
106 by 104.1cm.; 52½ by 41¾in.

Executed in 1977.

PROVENANCE
Galerie Bruno Bischofberger, Zürich
Private Collection, Germany
Sale: Christie's, New York, *Contemporary Art*, 3 May 1995, Lot 46
Private Collection
Sotheby's, London, *Contemporary Art Evening Auction*, 30 June 2004, Lot 43
Acquired directly from the above by the present owner

EXHIBITED
Cologne, Galerie Gmurzynska, *Cherchez la Femme*, 1992-93, n.p., no. 46, illustrated
Vienna, Galerie Würthle, *Andy Warhol*, 1993
Hamburg, Deichtorhallen Hamburg; and Stuttgart, Württembergischer Kunstverein Stuttgart, *Andy Warhol Retrospektive*, 1993-94, p.109, illustrated in colour

LITERATURE
Seoul, Ho-Am Museum, *Andy Warhol: Pop Art's Superstar*, 1994, p.?8, illustrated

12



Contemporary Art



Tom Wesselmann
BEDROOM PAINTING #49
signed and dated *Wesselmann 83* on the overlap and titled and dated again *BEDROOM PAINTING #49 1983* on the stretcher
oil on canvas
16 7/8 by 10 1/2 cm. 15 3/4 by 10 3/4 in.

Painted in 1983.

PROVENANCE
Sydney Janis Gallery, New York
Holden Gallery, Inc., Palm Beach
Sotheby's, New York, Contemporary Art Day Sale Wednesday, May 16, 2007, Lot 225
Private Collection, New York
Acquired directly from the above by the present owner



Contemporary Art



**Andy Warhol**
**BRIGITTE BARDOT**
signed 'Warhol' and dated '74' on the overlap
acrylic, silkscreen ink and pencil on canvas
126.6 by 120cm. 49¾ by 47¼in.

PROVENANCE
Gunter Sachs Collection, Switzerland (commissioned directly from the artist)
Sotheby's, New York, Contemporary Art Evening Auction, 11 November 2014, Lot 41
Acquired directly from the above by the present owner

EXHIBITED
Paris, Musée National d'Art Moderne, Centre Georges Pompidou, Andy Warhol Retrospective, June –
September 1990
Hamburg, Museum für Kunst und Gewerbe, Gunter Sachs. Eine Retrospektive. Von Kunst, Pop und
Glamour, August – September 2003
Moscow, Museum Tsaritsyno, Gunter Sachs, 2009
London, Gagosian Gallery, Warhol. Bardot, October – November 2011, p. 35, illustrated in colour
Munich, Museum Villa Stuck, Schöneheit. Kunsthalle Schweinfurt, Die Sammlung Gunter Sachs, October 2012
– March 2014, p. 16, illustrated in colour (in Gunter Sachs' St. Moritz apartment) and pp. 28 and 116, illustrated
in colour

LITERATURE
Exhibition Catalogue, Leipzig, Museum der Bildenden Künste, Gunter Sachs, 2008, p. 33, illustrated in colour
(in Gunter Sachs' St. Moritz apartment)
Neil Printz and Sally King Nero, eds., The Andy Warhol Catalogue Raisonné. Paintings and Sculptures, 1976 –
1977, Vol. 03, New York, 2010, cat. no. 2725, p. 453, illustrated in colour







Yves Klein
UNTITLED ANTHROPOMÉTRIE
(ANT 9)
dry pigment in synthetic resin on paper laid down on canvas
76 by 54cm. 29 7/8 by 21 1/4 in.

Executed in 1960.

This work is recorded in the Yves Klein Archives under number ANT 9

PROVENANCE
Private Collection, Paris (acquired directly from the artist in 1960)
Private Collection
Sotheby's, London, Contemporary Art Evening Auction, 11 February 2015, Lot 22
Acquired directly from the above by the present owner

LITERATURE
Paul Wember, Yves Klein, Catalogue Raisonné, Cologne 1969, p. 125, no. ANT 9, illustrated

15





Contemporary Art



Mark Rothko
Untitled
Dated 65 and stamped by the Mark Rothko Estate on the reverse
acrylic on paper laid on panel
25½ x 20½ in. / 64.7 x 52 cm.

This work is registered under the Mark Rothko Estate number 1218.68.

PROVENANCE
Marlborough Gallery, New York
Kate Rothko Prizel Collection, New York
Galerie Beyeler, Basel
Thomas Segal Gallery, Baltimore
Private Collection
Vail DeWeber Fine Art, New York / Yale Collection
Sotheby's, London, Post War..., 10 March 2016, Lot 10
Acquired directly from the above by the present owner

EXHIBITED
Basel, Galerie Beyeler, Mark Rothko: Works on Paper 1930-1968, 2005, p. 86, no. 51, illustrated in color

16



Contemporary Art



Mark Rothko.
UNTITLED (YELLOW AND BLUE)
Oil on canvas
95.4 by 73.4 in./242.9 by 186.7 cm.

Executed in 1954.

This work is registered under the Mark Rothko estate number 1218.60.

PROVENANCE
Estate of the Artist (Estate no. 5087.54)
Marlborough A.G., Liechtenstein/Marlborough Gallery Inc., New York
(acquired from the above in 1970)
Mr. and Mrs. Paul Mellon, Upperville, Virginia (acquired from the above
circa 1970-1971)
François Pinault, Paris (acquired from the above)
Private Collection Sotheby's, New York, Contemporary Art Evening Auction, 12 May 2015, Lot 11

Acquired directly from the above by the present owner

EXHIBITED
Washington, D.C., National Gallery of Art, Extended Loan, June 1970 –
November 1985; September 1988 – September 1991; December 1997 – March
1998
Washington, D.C., National Gallery of Art, Twentieth-Century Art Selections for
the Tenth Anniversary of the East Building, December 1988 – December 1989
Venice, Palazzo Grassi, "Where are We Going?, Selections from the François
Pinault Collection, April – October 2006, p. 187, illustrated in color and pp. 338-
339 (text by David Anfam)

LITERATURE
Exh. Cat., New Haven, Yale University Art Gallery, Selected Mark Rothko, 1971,
cat. no. 8 (as Yellow and Blue) (checklist)
David Anfam, Mark Rothko; The Works on Canvas: Catalogue Raisonné, New
Haven and London, 1998, cat. no. 502, p. 394, illustrated in colour

17



Contemporary Art



Yves Klein
ACCORD BLEU
(RE52)
signed, titled, dated 58 and inscribed Gelsenkirchen on the reverse
dry pigment in synthetic resin, natural sponges and pebbles on board
52 by 196.5 by 7.6cm.; 20½ by 53¾ by 3in.

This work is registered with the Yves Klein Archives, Paris under number RE 52. Upon the request of the purchaser, a certificate of authenticity will be issued by the archives.

PROVENANCE
Galerie Rive Droite, Paris
Mr. William K. Jacobs, Jr., 1960
The Brooklyn Museum, New York (bequest of the above, 1992)
Christie's, New York, November 14, 2012, Lot 60 (consigned by the above)
Private Collection, Sotheby's, New York, Contemporary Art Evening Auction, 12 May 2015, Lot 33

Acquired directly from the above by the present owner



Contemporary Art



Damien Hirst
IGNATION OF HEAVEN
variously inscribed on the reverse
butterflies and household gloss on canvas
243.8 by 213.4 cm; 96 by 84 in.

Executed in 2006.

PROVENANCE
White Cube, London, 2006
Ahead of the Curve: The Sender Collection
Sotheby's, London, *Contemporary Art Evening Auction*, 30 June 2014, Lot 4
Acquired directly from the above by the present owner





Andreas Gursky
PYONGYANG V
signed on a label affixed to the backing board
c-print mounted on Plexiglas in artist's frame
frame: 307 by 219cm; 120 7/8 by 86 1/4in.
image: 284 by 196.5cm; 111 by 77 3/8 in.

Executed in 2007, this work is number 1 from an edition of 6.

FURTHER EXAMPLES FROM THIS EDITION ARE HELD IN THE FOLLOWING COLLECTIONS
Kunstmuseum, Wolfsburg, Wolfsburg
The National Museum of Art, Osaka
MUMOK, Vienna

PROVENANCE
Matthew Marks Gallery, New York, 2008
Sotheby's, London, Contemporary Art Evening Auction, 30 June 2016, Lot 41
Acquired directly from the above by the present owner

EXHIBITED
Basel, Kunstmuseum Basel, Andreas Gursky, 2007-08, another example exhibited, p. 80, illustrated in colour

LITERATURE
Exhibition Catalogue, Krefeld, Kunstmuseen Krefeld (and travelling), Andreas Gursky: Werke 80-08, 2008, p.
231, illustrated of another example in colour

IN THE HIGH COURT OF JUSTICE
FAMILY DIVISION

CASE NO. FD13D05340

BETWEEN:

TATIANA MIKHAILOVNA AKHMEDOVA

– and –

Applicant

FARKHAD TEMUR OGLY AKHMEDOV

Respondent

WOODBLADE LTD

2nd Respondent

COTOR INVESTMENT SA

3rd Respondent

QUBO 1 ESTABLISHMENT

4th Respondent

QUBO 2 ESTABLISHMENT

5th Respondent

ANNEX 2 TO ORDER DATED 20 DECEMBER 2016

21

THIS DECLARATION OF TRUST is made the 17 day of March 2015

BETWEEN:

(1)   FARKHAD TEYMUR-OGLY AKHMEDOV of House 16, Pestovo Village, Mytishchinskii rayon, Moskovskaya oblast, 141035 Russian Federation ("FTA") and

(2)   WOODBLADE LIMITED a company registered in the Republic of Cyprus under number HE 221906 whose registered address is 332 Agiou Andreou, Patrician Chambers, 3035 Limassol, Republic of Cyprus (the "Trustee")

NOW THIS DEED WITNESSES as follows:

1.   FTA hereby assigns to the Trustee, as trustee of the Akhmedov 2013 Discretionary Trust all his right title and interest of whatsoever nature in the assets set out in the Schedule to this Deed (the "Scheduled Assets").

2.   Pending completion of the transfers of the Scheduled Assets, FTA declares himself to be the trustee of the Scheduled Assets, and undertakes only to deal with the Scheduled Assets as directed by the Trustee.

3.   FTA further undertakes to execute such documentation as the Trustee may reasonably require in order to transfer legal title to the Scheduled Assets to the Trustee.

IN WITNESS of which this deed has been duly executed on the day and year first above written

EXECUTED AS A DEED BY                )
FARKHAD TEYMUR-OGLY AKHMEDOV    )    ..................................

In the presence of:                          ..................................

4. D. Kerrigan
Solicitor
200 Strand
London WC2R 1DJ

22

## SCHEDULED ASSETS

All FTA's right title and interest in the entire issued share capital of the following entities:

| Entity | Country of Incorporation |
|---|---|
| Avenger Assets Corp. | Republic of Panama |
| Carolina Limited | Isle of Man |
| Lucy Limited | Isle of Man |
| Sedell Finance Limited | British Virgin Islands |
| Sunningdale Limited | Republic of Cyprus |

23

IN THE HIGH COURT OF JUSTICE

FAMILY DIVISION

CASE NO. FD13D05340

BETWEEN:

TATIANA MIKHAILOVNA AKHMEDOVA

**Applicant**

– and –

FARKHAD TEMUR OGLY AKHMEDOV

**Respondent**

WOODBLADE LTD

**2nd Respondent**

COTOR INVESTMENT SA

**3rd Respondent**

QUBO 1 ESTABLISHMENT

**4th Respondent**

QUBO 2 ESTABLISHMENT

**5th Respondent**

---

## ANNEX 3 TO ORDER DATED 20 DECEMBER 2016

---

1   Pair of George II mahogany open arm chairs circa 1750
2   George II mahogany oval wine cooler and stand circa 1750
3   Pair of cut glass twelve light, two tier chandeliers,
    20th century in mid 19th Century Perry style
4   Large Empire style faux bronze carved wood torches,
    first half 19th Century

24

5   Ivan Konstantinovich Aivazovsky (Russian, b.1817 - d.1900)
    (stormy coastal view with travellers)
6   Ivan Konstantinovich Aivazovsky (Russian, b.1817 - d.1900)
    (Square with figures standing by a church)
7   Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
    (Shipping of a rocky coast in rough seas)
8   Pair of George III painted and gilt demi lune console tables
9   Kuba runner, the Caucasus, 3rd quarter 19th Century
10  Sergei Arsenevich Vinogradov (Russian b.1869 - d.1938)
11  Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
    (Bullock carts near the coast at sunset)
12  Yuli Yulievich Klever the Younger (Russian, b. 1882 - d.1942)
13  Pair George III mahogany library open arm chairs
14  Aggregate value on Victorian mahogany full size billiards table,
    6 light scroll frame full size biliards table pendant light frame,
    Mahogany circular revolving cues stand,
    Burroughs & Watts mahogany scoreboard,
    89.5cms wide, Balls and accessories wall rack,
    cues rest, balls and accessories
15  Pavel Kuznetsov (Russian b.1878 - d.1968)
16  Alexander Benois (Russian b.1870 - d.1960)
17  Konstantin Krizhitzhki (1858 - 1911)
18  Russian early 19th Century fold over top card table
19  Empire style oval work table, early 19th Century
20  Mid 19th Century circular centre table
21  Russian Karelian birch circular centre table, early 19th Century
22  Russian malachite and ormolu surtout de table in Empire Style,
    mid 19th Cenutry
23  Pair of granite and ormolu mantel urns, 19th Century
24  George III gilt carton pierre overmantel, circa 1775
25  Pair of George III mahogany gilt open arm chairs, probably by
    Thomas Chippendale, circa 1770
26  George III mahogancy library breakfront bookcase, third quarter
    18th century
27  Twelve light two tire chandelier in early 19th Century Perry style
28  Ormolu and malachite mantel clock signed Breguet, first half 19th Century
29  Iranian silk garden carpet, late 20th Century
30  Iranian part silk rug, late 20th Century
31  Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
    (Moonlit sea with a ship)
32  Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
    (Ships being driven offshore in a storm)
33  Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
    (Shipping in a clam with a rocky headland)
34  Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
    (Coastal view with a tower and camels drawing a cart)
35  Isaac Ilyitch Levitan (Russian, b.1860 - d.1900)
    (A marsh with fishing boat and birds at dawn)
36  Set of 12 George III mahogany dining chairs after a design by John Linnell,
    with two open arm charis of a later date

37    George III mahogany serving table circa 1780

38    Pair of Goerge III mahogany demi lune console tables, circa 1780

39    Regency oak and pollard oak four pillar dining table by George Bullock

40    Early 19th Century Carrara and breche marble chimneypiece

41    Pair of Empire bronze and ormolu seven light candelbra
      first half of 19th Century

42    Tabriz carpet, North West Persia, circa 1930

43    Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
      (Moonlight coast landscape with figures on the shore)
      Nicolas Gregorovitch Svertschkoff (Russian b.1817 - d. 1898)

44    (The Tsar being drawn in a sleigh in snow)

45    Nicolas Gregorovitch Svertschkoff (Russian b.1817 - d. 1898)
      (A coachman driving a sleigh in snow)

46    Aggregate value on Pair of 6 light cut glass chandelier in 19th Century
      style, pair matching triple wall sconces

47    Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900) (Mountain top village
      with a ruined tower)

48    Isaac Ilyitch Levitan (Russian, B.1860 - d.1900) (Woodland clearing)

49    Part set of enamelled glass wares made for the Russian
      imperial yacht 'Derzhava'

50    Part suite of George III gilt seat furniture, late 18th Century

51    Pair of early 19th Century rosewood 'X' frame stools or window seats

52    Iranian Tabriz silk carpet, late 20th Century
      (field with 10 bands of formal foliate medallions)

53    Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900) (Sappho)

54    Vassily Vasilievich Veretshchagin (Russian b.1842 - d.1904)

55    Konstantin Somov

56    Alexei Petrovich Bogoliubov (Russian b. 1824 - d.1896)

57    Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
      (Study of a ship of the coast)

58    Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
      (Moonlight landscape in the bay of Naples)

59    Piotr Ivanovich Balashov (Russian b.1835 - d.1888)

60    Sylvester Feodosievich Schedrin (Russian, b.1791 - d.1830)

61    G I Ranin (?)

62    Nicolas Gregorovitch Svertschkoff (Russian b.1817 - d.1898)

63    Russian school late 19th Century (Winter landscapes)

64    Alexandre Altmann (Russian b.1885 - d.1950)

65    Early George III mahogany bureau/bookcase, possibly Irish, circa 1765

66    Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
      (Figures in a boat)

67    N Planin (?)

68    Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
      (Paddle steamer offshore)

69    Late 18th Century mahogany and ormolu cylinder bureau in the
      manner of David Roentgen

70    Ivan Konstantinovich Aivazovsky (Russian b.1817 - d.1900)
      (Winter landscape)

71    Russian silver mounted oval centrepiece bowl

26

72      Russian silver mounted square glass dish
73
        Russian silver punch bowl and ladle
74      Russian silver mounted slender oval dish stand
75      Set of 12 Russian silver plates
76      Russian silver mounted glass punch bowl
77      Russian silver oval bowl with swing handle

IN THE HIGH COURT OF JUSTICE
FAMILY DIVISION

CASE NO. FD13D05340

BETWEEN:

TATIANA MIKHAILOVNA AKHMEDOVA

Applicant

– and –

FARKHAD TEMUR OGLY AKHMEDOV

Respondent

WOODBLADE LTD

2nd Respondent

COTOR INVESTMENT SA

3rd Respondent

QUBO 1 ESTABLISHMENT

4th Respondent

QUBO 2 ESTABLISHMENT

5th Respondent

---

**ANNEX 4 TO ORDER DATED 20 DECEMBER 2016**

---

| Gauge or calibre | Maker's name | Type (e.g. over-and-under, side-by-side, etc) including identification number | | |
|---|---|---|---|---|
| 12 bore | HOLLAND & HOLLAND | Shot Gun | SIDE BY SIDE | 40034 |
| 12 bore | HOLLAND & HOLLAND | Shot Gun | SIDE BY SIDE | 40033 |
| 20 bore | HOLLAND & HOLLAND | Shot Gun | SIDE BY SIDE | 41361 |
| 20 bore | HOLLAND & HOLLAND | Shot Gun | SIDE BY SIDE | 41360 |
| 12 bore | HOLLAND & HOLLAND | Shot Gun | SIDE BY SIDE | 41398 |

28

IN THE HIGH COURT OF JUSTICE
FAMILY DIVISION

CASE NO. FD13D05340

BETWEEN:

TATIANA MIKHAILOVNA AKHMEDOVA

Applicant

– and –

FARKHAD TEMUR OGLY AKHMEDOV

Respondent

WOODBLADE LTD

2nd Respondent

COTOR INVESTMENT SA

3rd Respondent

QUBO 1 ESTABLISHMENT

4th Respondent

QUBO 2 ESTABLISHMENT

5th Respondent

ANNEX 5 TO ORDER DATED 20 DECEMBER 2016

29

*ANNEX V*

Certificate on judgments and court settlements referred to in Articles 54 and 58 of the Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters

1. State of origin: United Kingdom (England and Wales)

2. Court or competent authority issuing the certificate

2.1. Name: the High Court of Justice

2.2. Address: Royal Courts of Justice, Strand, London WC2A 2LL

2.3. Tel./fax/e-mail: +4420 7947 6000

Adminstrativecourtoffice.generaloffice@hmcts.x.gsi.gov.uk

3. Court which delivered the judgment

3.1. Type of court: Family Court

3.2. Place of court: Royal Courts of Justice, London

4. Judgment

4.1. Date 15 December 2016

4.2. Reference number: FD13D05340

4.3. The parties to the judgment

4.3.1. Name of plaintiff (Applicant): Tatiana Mikhailovna Akhmedova

4.3.2. Name of defendant (Respondent): Farkhad Teimur Ogly Akhmedov

4.3.3. Name(s) of other parties, if any:

Woodblade Limited (Cyprus) [Second Respondent]

Cotor Investment SA (Panama) [Third Respondent]

Qubo 1 Establishment (Liechtenstein) [Fourth Respondent]

Qubo 2 Establishment (Liechtenstein) [Fifth Respondent]

4.4. Date of service of the document instituting the proceedings where judgment was given in default of appearance:

Served on Defendant/Respondent on 23 December 2013 (& he submitted to the jurisdiction on 18 June 2015)

Served on Second Respondent on 25 October 2016 and 8 November 2016

Page 1 of 2

30

Served on Third Respondent on 26 October 2016 and 8 November 2016

Served on the Fourth Respondent on 26 October 2016 and 8 November 2016

Served on the Fifth Respondent on 26 October 2016 and 8 November 2016

4.5. Text of the judgment as annexed to this certificate

Attached

5. Names of parties to whom legal aid has been granted: not applicable

The judgment is enforceable in the State of origin (Article 38/58 of the Convention) against:

Name: Farkhad Temur Ogly Akhmedov

Woodblade Limited

Cotor Investment SA

Qubo 1 Establishment

Qubo 2 Establishment

Done at Royal Courts of Justice, London, on 20 December 2016

Signature and/or stamp:

*ANNEX V*

Certificate on judgments and court settlements referred to in Articles 54 and 58 of the Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters

1. State of origin: United Kingdom (England and Wales)

2. Court or competent authority issuing the certificate

2.1. Name: the High Court of Justice

2.2. Address: Family Division, Royal Courts of Justice, Strand, London WC2A 2LL

2.3. Tel./fax/e-mail: +4420 7947 7161

rcj.familyhighcourt@hmcts.gsi.gov.uk

3. Court which delivered the judgment

3.1. Type of court: Family Court

3.2. Place of court: Family Division, Royal Courts of Justice, Strand, London WC2A 2LL

4. Judgment and order

4.1. Date Judgments dated 15 December 2016 & 20 December 2016 (order dated 20 December 2019)

4.2. Reference number: FD13D05340

4.3. The parties to the judgment

4.3.1. Name of plaintiff (Applicant): Tatiana Mikhailovna Akhmedova

4.3.2. Name of defendant (Respondent): Farkhad Temur Ogly Akhmedov

4.3.3. Name(s) of other parties, if any:

Woodblade Limited (Cyprus) [Second Respondent]

Cotor Investment SA (Panama) [Third Respondent]

Qubo 1 Establishment (Liechtenstein) [Fourth Respondent]

Qubo 2 Establishment (Liechtenstein) [Fifth Respondent]

4.4. Date of service of the document instituting the proceedings where judgment was given in default of appearance:

Served on Defendant/Respondent on 23 December 2013 (& he submitted to the jurisdiction on 18 June 2016)

Served on Second Respondent on 25 October 2016 and 8 November 2016

Page 1 of 2

32

Served on Third Respondent on 25 October 2016 and 8 November 2016

Served on the Fourth Respondent on 25 October 2016 and 8 November 2016

Served on the Fifth Respondent on 25 October 2016 and 8 November 2016

4.5. Text of the judgment as annexed to this certificate

Attached

5. Names of parties to whom legal aid has been granted: not applicable

The judgment is enforceable in the State of origin (Article 38/58 of the Convention) against:

Name: Farkhad Tamur Ogly Akhmedov

Woodblade Limited

Cotor Investment SA

Qubo 1 Establishment

Qubo 2 Establishment

Done at Royal Courts of Justice, Strand, London WC2A 2LL, on 20 December 2016 and amended on 3 January 2017

Signature and/or stamp:

IN THE HIGH COURT OF JUSTICE
FAMILY DIVISION

CASE NO. FD13D05340

B E T W E E N :

TATIANA MIKHAILOVNA AKHMEDOVA

Applicant

– and –

FARKHAD TEMUR OGLY AKHMEDOV

Respondent

WOODBLADE LTD

2nd Respondent

COTOR INVESTMENT SA

3rd Respondent

QUBO 1 ESTABLISHMENT

4th Respondent

QUBO 2 ESTABLISHMENT

5th Respondent

---

**ANNEX 6 TO ORDER DATED 20 DECEMBER 2016**

---

34

EXTRACT FROM A DECISION/COURT SETTLEMENT IN MATTERS RELATING TO MAINTENANCE
OBLIGATIONS SUBJECT TO PROCEEDINGS FOR RECOGNITION AND A DECLARATION OF
ENFORCEABILITY
(Article 28 and Article 75(2) of Council Regulation (EC) No 4/2009 of 18 December 2008 on jurisdiction,
applicable law, recognition and enforcement of decisions and cooperation in matters relating to maintenance
obligations (1))
IMPORTANT
To be issued by the court of origin
To be issued only if the decision or court settlement is enforceable in the Member State of origin
Mention only information which is given in the decision or court settlement or of which the court of
origin has been made aware

1. Nature of the document
Decision
Date and reference number: 20 DECEMBER 2016
FD13D05340
2. Court of origin
2.1. Name: THE HIGH COURT OF JUSTICE (FAMILY DIVISION) .
2.2. Address: ROYAL COURTS OF JUSTICE, STRAND, LONDON WC2A 2LL
2.2.1. Street and number/PO box: STRAND
2.2.2. Place and postal code:  LONDON WC2A 2LL
2.2.3. Member State: UNITED KINGDOM
2.3. Telephone/Fax/E-mail: +4420 7947 6000
ADMINSTRATIVECOURTOFFICE.GENERALOFFICE@HMCTS.X.GSI.GOV.UK
3. Claimant
3.1. Person A
3.1.1. Surname and given name(s): TATIANA MIKHAILOVNA AKHMEDOVA
3.1.2. Date (dd/mm/yyyy) and place of birth: 26 JULY 1972 BUDAPEST, HUNGARY

(**) If the decision/court settlement concerns more than three claimants or three defendants, attach an additional sheet.
3.1.3. Identity number or social security number:
3.1.4. Address:
3.1.4.1. Street and number/PO box: SOMERTON HOUSE, ST.GEORGE'S HILL
3.1.4.2. Place and postal code: WEYBRIDGE, SURREY KT13 0NR
3.1.4.3. Country: UNITED KINGDOM
3.1.5. Has benefited from
3.1.5.1. legal aid:
NO
3.1.5.2. exemption from costs and expenses:
NO
3.1.5.3. free proceedings before an administrative authority listed in Annex X of Regulation (EC) No 4/2009:
NO

4. Defendant(s) (*) (**)

*4.1. Respondent*

4.1.1. Surname and given name(s):FARKHAD TEMUR OGLY AKHMEDOV

4.1.2. Date (dd/mm/yyyy) and place of birth: 15 SEPTEMBER 1955, AZERBAIJAN

4.1.3. Identity number or social security number:.

4.1.4. Address:

4.1.4.1. Street and number/PO box: . . . . 17 MIRZA SHAFI STREET, OLD CITY

4.1.4.2. Place and postal code: BAKU AZ1095

4.1.4.3. Country: AZERBAIJAN

(**) If the decision/court settlement concerns more than three claimants or three defendants, attach an additional sheet.

4.1.5. Has benefited from

4.1.5.1. legal aid:

NO

4.1.5.2. exemption from costs and expenses:

NO

4.1.5.3. free proceedings before an administrative authority listed in Annex X of Regulation (EC) No 4/2009:

NO

*4.2. Second Respondent*

4.2.1. Surname and given name(s): WOODBLADE LIMITED

4.2.2. Date (dd/mm/yyyy) and place of birth: COMPANY REGISTERED IN CYPRUS. . . . .

. .

4.2.3. Identity number or social security number:.

4.2.4. Address:

4.2.4.1. Street and number/PO box: PATRICIAN CHAMBERS, 332 AGIOU ANDREOU STREET 3035

4.2.4.2. Place and postal code: LIMASSOL PO BOX545443

4.2.4.3. Country: CYPRUS

4.2.5. Has benefited from

4.2.5.1. legal aid: NO

4.2.5.2. exemption from costs and expenses:

NO

4.2.5.3. free proceedings before an administrative authority listed in Annex X of Regulation (EC) No 4/2009:

NO

*4.3. Third Respondent*

4.3.1. Surname and given name(s): COTOR INVESTMENT SA

4.3.2. Date (dd/mm/yyyy) and place of birth: COMPANY REGISTERED IN PANAMA

4.3.3. Identity number or social security number:

4.3.4. Address:

4.3.4.1. Street and number/PO box: C/O ANZOLA ROBLES & ASODIADOS, CREDITCORP BANK PLAZA, 26TH FLOOR, NICANOR DE OBARRIO AVENUE, 50TH STREET

4.3.4.2. Place and postal code: . . PO BOX 0832-2325, PANAMA CITY

4.3.4.3. Country: REPUBLIC OF PANAMA

4.3.5. Has benefited from

4.3.5.1. legal aid:

NO

4.3.5.2. exemption from costs and expenses:

NO

Person for whom maintenance is owed:
TATIANA AKHMEDOVA
5.2.1.2. Amount to be paid in one sum
Due date: 4PM ON 6 JANUARY 2017

Amount: £224,430,508

5.2.2.6. Interest (if specified in the decision/court settlement)
If the maintenance claim is subject to interest, please indicate the rate: 8% PER ANNUM
Interest due as from: 06/01/2017 (dd/mm/yyyy)
5.3. *Costs and expenses*
The decision/court settlement provides that
FARKHAD AKHMEDOV, COTOR INVESTMENT SA, QUBO 1 ESTABLISHMENT

AND QUBO 2 ESTABLISHMENT must pay the sum of £1,096,971. . . . . . . . . . . . . . . . . .
to: TATIANA AKHMEDOVA

Done at: THE ROYAL COURTS OF JUSTICE, LONDON on 20/12/2016
(dd/mm/yyyy)

Signature and/or stamp of the court of origin:

Page 4 of 4

IN THE HIGH COURT OF JUSTICE
FAMILY DIVISION

CASE NO. FD13D05340

BETWEEN:

TATIANA MIKHAILOVNA AKHMEDOVA

– and –

Applicant

FARKHAD TEMUR OGLY AKHMEDOV

Respondent

WOODBLADE LTD

2nd Respondent

COTOR INVESTMENT SA

3rd Respondent

QUBO 1 ESTABLISHMENT

4th Respondent

QUBO 2 ESTABLISHMENT

5th Respondent

ANNEX 7 TO ORDER DATED 20 DECEMBER 2016

38

CERTIFICATE CONCERNING A JUDGMENT IN CIVIL AND COMMERCIAL MATTERS

Article 53 of Regulation (EU) No 1215/2012 of the European Parliament and of the Council on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters

1. Court of origin
1.1. Name: THE HIGH COURT OF JUSTICE (FAMILY DIVISION) .
1.2. Address: ROYAL COURTS OF JUSTICE, STRAND, LONDON WC2A 2LL
1.2.1. Street and number/PO box: STRAND
1.2.2. Place and postal code: LONDON WC2A 2LL
1.2.3. Member State: UNITED KINGDOM
1.3. Telephone/Fax/E-mail: +4420 7947 6000
ADMINSTRATIVECOURTOFFICE.GENERALOFFICE@HMCTS.X.GSI.GOV.UK

2. Claimant
2.1. Surname and given name(s): TATIANA MIKHAILOVNA AKHMEDOVA
2.2 Identification number (if applicable and available)
2.3 Date (dd/mm/yyyy) and place of birth: 26/07/1972 BUDAPEST, HUNGARY

2.4. Address:
2.4.1. Street and number/PO box: SOMERTON HOUSE, ST.GEORGE'S HILL
2.4.2. Place and postal code: WEYBRIDGE, SURREY KT13 0NR
2.4.3. Country: UNITED KINGDOM
2.5 Email (if available)

3. Defendant(s)
*Respondent*
3.1.1. Surname and given name(s):FARKHAD TEMUR OGLY AKHMEDOV
3.1.2 Identification number (if applicable and available)
3.1.3. Date (dd/mm/yyyy) and place of birth: 15/09/1955, AZERBAIJAN
3.1.4. Address:
3.1.4.1. Street and number/PO box: . . . . 17 MIRZA SHAFI STREET, OLD CITY
3.1.4.2. Place and postal code: BAKU AZ1095
3.1.4.3. Country: AZERBAIJAN
3.1.5 Email (if available): fta@f-ta.net

*Second Respondent*
3.2.1. Surname and given name(s) / name of company or organisation: WOODBLADE LIMITED
3.2.2 Identification number (if applicable and available)
3.2.3. Date (dd/mm/yyyy) and place of birth: COMPANY REGISTERED IN CYPRUS. . . . .
3.2.4. Address:
3.2.4.1. Street and number/PO box: PATRICIAN CHAMBERS, 332 AGIOU ANDREOU STREET 3035
3.2.4.2. Place and postal code: LIMASSOL PO BOX545443
3.2.4.3. Country: CYPRUS
3.2.5 Email (if available): fta@f-ta.net

*Third Respondent*
3.3.1. Surname and given name(s) / name of company or organisation: COTOR
INVESTMENT SA
3.3.2 Identification number (if applicable and if available)
3.3.3. Date (dd/mm/yyyy) and place of birth: COMPANY REGISTERED IN PANAMA
3.3.4. Address:
3.3.4.1. Street and number/PO box: C/O ANZOLA ROBLES & ASODIADOS, CREDITCORP
BANK PLAZA, 26TH FLOOR, NICANOR DE OBARRIO AVENUE, 50TH STREET
3.3.4.2. Place and postal code: . . PO BOX 0832-2325, PANAMA CITY
3.3.4.3. Country: REPUBLIC OF PANAMA
3.3.5 Email (if available): fta@f-ta.net

*Fourth Respondent*
3.4.1. Surname and given name(s) / name of company or organisation: QUBO 1
ESTABLISHMENT
3.4.2 Identification number (if applicable and if available): 0002.532.781-9
3.4.3. Date (dd/mm/yyyy) and place of birth: LIECHTENSTEIN ANSTALT REGISTERED
21 OCTOBER 2016
3.4.4. Address:
3.4.4.1. Street and number/PO box: WALPART TRUST, ZOLLSTRASSE 2
3.4.4.2. Place and postal code: 9490 VADUZ
3.4.4.3. Country: LIECHTENSTEIN
3.4.5 Email (if available): fta@f-ta.net

*Fifth Respondent*
3.5.1. Surname and given name(s) / name of company or organisation: QUBO 2
ESTABLISHMENT
3.5.2 Identification number (if applicable and if available): 0002.532.775-5
3.5.3. Date (dd/mm/yyyy) and place of birth: LIECHTENSTEIN ANSTALT REGISTERED
21 OCTOBER 2016
3.5.4. Address:
3.5.4.1. Street and number/PO box: WALPART TRUST, ZOLLSTRASSE 2
3.5.4.2. Place and postal code: 9490 VADUZ
3.5.4.3. Country: LIECHTENSTEIN
3.5.5 Email (if available): fta@f-ta.net

4. THE JUDGMENT

4.1    Date of the judgment: 15/12/2016 & 20/12/2016

4.2    Reference number of the judgment: FD13D05340 / [2016] EWHC 3234 (Fam)

4.3    The judgment was given in default of appearance:

4.3.2    YES – please indicate the date on which the document instituting the proceedings was
served on the defendant:

Served on Defendant/Respondent on 23 December 2013 (& he submitted to the jurisdiction on 18 June 2015 but did not attend the final hearing or provide financial disclosure – please see Judgments)

Served on Second Respondent on 25 October 2016 and 8 November 2016

Served on Third Respondent on 25 October 2016 and 8 November 2016

Served on the Fourth Respondent on 25 October 2016 and 8 November 2016

Served on the Fifth Respondent on 25 October 2016 and 8 November 2016

4.4     The Judgment is enforceable in the Member State of origin without any further conditions having to be met:

4.1.1   YES ON 20/12/2016

4.5     As at the date of issue of th certificate, the judgment has been served on the defendant(s):

4.5.2   Not to the knowledge of the court

4.6     Terms of Judgment and interest

4.6.1   Judgment on a monetary claim

4.6.1.1 Short description of the subject-matter of the case: FINANCIAL RELIEF ON DIVORCE

4.6.1.2 The court has ordered:
FARKHAD AKHMEDOV, COTOR INVESTMENT SA, QUBO 1 ESTABLISHMENT AND QUBO 2 ESTABLISHMENT to make payment to TATIANA AKHMEDOVA

4.6.1.2.1   If more than one person has been held liable for one and the same claim, the whole amount may be collected from any one of them:

4.6.1.2.1.1   YES

4.6.1.3   POUNDS STERLING (GBP)

4.6.1.4   Principal amount

4.6.1.4.1   Amount to be paid in one sum: £350,000,000 (of which £224,430,508 amounts to *maintenance*) by 4pm on 06/01/2017

4.6.1.5.1   Interest:

Page 3 of 4

| | |
|---|---|
| 4.6.1.5.1.2 | SPECIFIED IN THE JUDGMENT AS FOLLOWS: 8% PER ANNUM FROM 06/01/2017 |
| 4.7 | Costs |
| 4.7.1 | POUNDS STERLING (GBP) |
| 4.7.2 | The following person(s) against whom enforcement is sought has/have been ordered to bear the costs: |
| 4.7.2.1. | Surname and given name(s) / name of company or organisation: FARKHAD AKHMEDOV, COTOR INVESTMENT SA, QUBO 1 ESTABLISHMENT AND QUBO 2 ESTABLISHMENT |
| 4.7.2.2 | If more than one person has been ordered to bear the costs, the whole amount may be collected from any one of them: |
| 4.7.2.2.1 | Yes |
| 4.7.3 | The costs of which recovery is sought are as follows: |
| 4.7.3.3 | Liability for the costs has been determined in the judgment and the exact amounts are as follows: £1,096,971 |
| 4.7.3.3.1 | Court fees: £850 |
| 4.7.3.3.2 | Lawyers fees £1,096,121 |
| 4.7.4 | Interest on costs |
| 4.7.4.2.2 | Rate: 8% |
| 4.7.4.2.2.1 | Interest due from 06/01/2017 UNTIL PAYMENT |

Done at: THE ROYAL COURTS OF JUSTICE, LONDON on 20/12/2016 (dd/mm/yyyy)

Signature and/or stamp of the court of origin:

Page 4 of 4

42

# EXHIBIT 3



*Order*

No. FD13D05340

# IN THE HIGH COURT OF JUSTICE
## SITTING IN THE CENTRAL CRIMINAL COURT

**BEFORE THE HONOURALE MR JUSTICE HADDON-CAVE ON 21st MARCH 2018, SITTING IN OPEN COURT**

Upon the Applicant's application notice dated 28th February 2018

**BEFORE THE HON. MR JUSTICE HADDON-CAVE ON 21st MARCH 2018, SITTING IN OPEN COURT**

**PARTIES:**

The Applicant is Tatiana Mikhailovna Akhmedova and is represented by Dakis Hagen QC and Andrew Holden.

The First Respondent is Farkhad Teimur Ogly Akhmedov and is unrepresented.

The Second Respondent is Woodblade Limited, a company registered in Cyprus, of which the First Respondent is the only director and is unrepresented.

The Third Respondent is Cotor Investment SA, a company registered in Panama and is unrepresented.

The Fourth Respondent is Qubo 1 and the Fifth Respondent is Qubo 2, and they are unrepresented.

The Sixth Respondent is Straight Establishment, a Liechtenstein Anstalt (an establishment formed under the Principality of Liechtenstein) and is unrepresented.

The Seventh Respondent is Avenger Assets Corporation, a company registered in Panama and is unrepresented.

**IT IS DECLARED THAT:**

1.  The Sixth Respondent is the alter ego of the First Respondent, alternatively his privy, and through the First Respondent has submitted to the court's jurisdiction.

2.  The Sixth Respondent is the First Respondent's nominee and the assets held and previously held in the name of the Sixth Respondent belong beneficially to the First Respondent.

3.   Without prejudice to the generality of paragraph 2, the vessel known as "LUNA" with IMO No. IMO-1010222, which is currently registered with the Office of the Maritime Administrator of the Republic of the Marshall Islands with Certificate of Registry No. 5817-PY in the name of Sixth Respondent (the "Vessel") is held by the Sixth Respondent absolutely for the First Respondent.

4.   The Seventh Respondent is the alter ego of the First Respondent, alternatively his privy, and through the First Respondent has submitted to the court's jurisdiction.

5.   The Seventh Respondent is the First Respondent's nominee and the assets held and previously held in the name of the Seventh Respondent belong beneficially to the First Respondent.

**IT IS ORDERED THAT:-**

6.   The Sixth and Seventh Respondents are joined to the proceedings forthwith.

7.   The corporate veil of the Sixth Respondent is pierced.

8.   Any actual or purported disposition of any interest in the Vessel formerly held by the Fifth Respondent to the Sixth Respondent is set aside under s.37 of the Matrimonial Causes Act 1973 and s.423-5 of the Insolvency Act 1986.

9.   The Vessel be transferred into the Applicant's name under s.24(1) of the Matrimonial Causes Act 1973 and s.423(2) and 425(1)(a) of the Insolvency Act 1986 such that she holds absolute beneficial title to the Vessel, and that the Sixth Respondent and the First Respondent do effect all necessary steps and formalities for the proper vesting of the Vessel in, and the transfer of such title to, the Applicant.

and it is DECLARED that with immediate effect the Applicant is the legal and beneficial owner of the Vessel.

10.   In the event that the foregoing transfer of title is not effected within 7 days of this order, the Sixth Respondent do pay a liquidated cash sum to the Applicant representing the capital value of the Vessel, namely $487,278,000 (FOUR HUNDRED EIGHTY SEVEN MILLION TWO HUNDRED SEVENTY EIGHT THOUSAND US DOLLARS) or its sterling equivalent of £346,600,841 (THREE HUNDRED FORTY SIX MILLION SIX HUNDRED THOUSAND EIGHT HUNDRED AND FORTY ONE POUNDS STERLING) under s.423(2) and 425(1)(d) of the Insolvency Act 1986  (at a rate of USD:GBP 1:0.711; source: Financial Times, 20 March 2018).

11.   The transfer of  260,000,000 (TWO HUNDRED SIXTY MILLION EUROS) by the First Respondent to the Seventh Respondent on 15 December 2014 is set aside under s.423-5 of the Insolvency Act 1986.

12.   The Seventh Respondent do pay a liquidated cash sum of  260,000,000 (TWO HUNDRED SIXTY MILLION EUROS) or its sterling equivalent of £228,085,369 (TWO HUNDRED TWENTY EIGHT MILLION EIGHTY FIVE THOUSAND THREE

Please address all communications for the Court The Family Division of the High Court, 1ˢᵗ Mezzanine, Queen's Building, Royal Courts of Justice, Strand, London WC2A 2LL quoting the number in the top right hand corner of this form. The Court Office is open between 10.00 a.m. and 4.30 p.m. on Mondays to Fridays.

rosie                                                                                                                                                            D264

HUNDRED SIXTY NINE POUNDS STERLING) to the Applicant under s.425(1)(d) of the Insolvency Act 1986 (at a rate of EUR:GBP 1:0.877; source: Financial Times, 20 March 2018).

13.     The Sixth and Seventh Respondents are jointly and severally liable for the payment of the lump sum payable pursuant to the Order of the Honourable Mr Justice Haddon-Cave dated 20 December 2016, up to the amounts set out at paragraphs 10 and 12, such that:

(i)     payment of the sums payable pursuant to paragraphs 8 and 10 above shall reduce pro tanto the amount of the lump sum outstanding under that Order; and

(ii)    reduction of the lump sum below the amounts set out at paragraphs 8 and 10 above shall reduce pro tanto the amounts payable as set out at those paragraphs.

14.     The freezing injunction granted on 20 December 2016 and continued on 12 January 2017 be varied pending further order:

(i)     Such that it is extended to the Sixth and Seventh Respondents; and

(ii)    In particular, to prohibit further removal, disposal, charging, and/or diminution of the value of the Vessel.

15.     The Applicant's service of this application by the alternative methods set out below is valid service and is deemed to have taken place on 5 March 2018 in each case:

(a)     On the First Respondent:

(i)     By WhatsApp on +994 50 211 64 53.

(ii)    By registered post to the First Respondent's son's residential address at 100 Knightsbridge, Apartment C 7.1, London SW1X 7LJ.

(iii)   By email to asr79@bk.ru being the email address of the First Respondent's personal secretary.

(iv)    By courier to the First Respondent's office address at Bld 1H, 9 Solyanka Street, Moscow, 109028, Russia.

(b)     On the Fifth Respondent:

(i)     By registered post to its registered agent, WalPart Trust Registered, Zollstrasse 2, 9490 Vaduz, Liechtenstein

(ii)    By email to mail@walchschurti.net

(iii)   By email to mail@walpart.net

    (c)      On the Sixth Respondent:

        (i)      By registered post to its registered agent, Counselor Trust Registered, Zollstrasse 2, 9490 Vaduz, Liechtenstein

        (ii)     By email to mail@walchschurti.net

        (iii)    By email to mail@walpart.net

    (d)      On the Seventh Respondent:

        (i)      By registered post to the address of the registered agent, Anzola Robles & Asociados, Credicorp Bank Plaza, 26th floor, Nicanor De obarrio Avenue, 50th Street, PO Box 0832 2325, Panama City, Republic of Panama;

        (ii)     By email to info@anzolaw.net.

16.    The Applicant has permission to serve this Order and any other documents in these proceedings by the alternative methods referred to in paragraph15 above, and such service will be deemed to take place i) in the case of registered post, on the date on which the documents are delivered and ii) in the case of email or WhatsApp, the date on which the email or WhatsApp (as the case may be) is sent.

17.    The costs of this application be paid on the indemnity basis by the First Respondent and/or the Sixth Respondent and/or the Seventh Respondent with joint and several liability, such costs summarily assessed in the sum of £141,284.20.

Dated: This 21st March 2018

ca



# EXHIBIT 4

#39303256_v1

# Application notice

| To be completed by the relevant party | |
|---|---|
| Name of court<br>**THE HIGH COURT**<br>**FAMILY DIVISION** | Case No.<br>**FD13D05340** |

Name of Petitioner/Applicant
**TATIANA MIKHAILOVNA AKHMEDOVA**

Name of Respondent
**(1) FARKHAD TEIMUR OGLY AKHMEDOV**

Names of Co-Respondents (if applicable)
**(2) WOODBLADE LIMITED**
**(3) COTOR INVESTMENT S.A**
**(4) QUBO 1 ESTABLISHMENT**
**(5) QUBO 2 ESTABLISHMENT**
**(6) STRAIGHT ESTABLISHMENT SA**
**(7) AVENGER ASSETS CORPORATION**
**(8) COUNSELOR TRUST REG.**
**(9) SOBALDO ESTABLISHMENT**
**(10) TEMUR AKHMEDOV**

Solicitor's fee account no **PBA0088077**

Help with Fees – Ref no (if applicable)

| H | W | F | | - | | | | | - | | | |

If completing this form by hand, please use **black ink and BLOCK CAPITAL LETTERS** and tick the boxes that apply.

1. Please state your name or, if you are a solicitor, the name of your firm.

   PCB Litigation LLP

2. Are you the ☐ Petitioner ☐ Applicant ☐ Respondent ☐ Co-Respondent ☒ Solicitor

   in the main proceedings, or

   ☐ Other?
   (If other, please specify)

   If you are a solicitor, whom do you represent?

   The Applicant, Tatiana Akhmedova

3. What order are you asking the court to make and why?

   For the reasons set out in the seventh witness statement of Anthony John Riem dated 21 July 2020, the Applicant seeks the following orders (capitalised words carrying the defined terms as defined in the draft order enclosed with this application):

   1. That the Tenth Respondent shall, by 27 July 2020:

1339821 v.1

    a)   procure that each of his Electronic Devices are delivered up and made available (with unrestricted access) to Stroz Friedberg Limited, an Aon Company ("**Aon**") at Aon's offices at: The Aon Centre, The Leadenhall Building, 122 Leadenhall Street, London EC3V 4AN;

    b)   provide to Aon and the Applicant a list, verified by statement of truth, of all Cloud Accounts and Mobile Communication Services used by him since 1 January 2013, identifying the applicable user-name, e-mail address or telephone number for each such service;

    c)   provide to Aon all PIN numbers, user-names, email addresses, combinations, passwords, security verification codes and any other item or piece of information (including, without limitation, authorisations to third party service providers) which may be necessary to give access to the Electronic Devices, Cloud Accounts or Mobile Communication Services.

2.   That without prejudice to the preceding paragraph, the Tenth Respondent shall forthwith take such further steps as Aon may require from time to time to obtain effective access to any Electronic Device, Cloud Account or Mobile Communication Service (including, without limitation, completing any two-factor authentication, providing any necessary information to access or decrypt any document, answering questions raised by Aon, and providing his authorisation to third party service providers).

3.   That Aon shall act as independent forensic IT experts, and are directed to:

    a)   take two forensic images or copies of the data stored on the Electronic Devices, Mobile Communication Services and Cloud Accounts (insofar as such copies can be made);

    b)   examine all Electronic Devices, Mobile Communication Services and Cloud Accounts (or the images or copies thereof, if they consider suitable) using such non-destructive process as they consider appropriate in order to:

        i)     assess whether any data which is not readily accessible can be recovered and, if so, to recover that data;

        ii)    assess whether it appears to him that relevant data has been deleted and/or otherwise destroyed on that device or medium and, if so, to assess how and when such acts took place;

        iii)   assess whether the Tenth Respondent's explanation for the loss of data (including the explanation provided in the Tenth Respondent's N265 Disclosure List dated 17 July 2020) is consistent with their examination of those devices;

    c)   as soon as reasonably practicable, and on a rolling basis, provide a copy of all documents which contain user-generated material (that is, excluding system files and program files), including recovered documents, found on all Electronic Devices, Mobile Communication Services and Cloud Accounts to the Tenth Respondent's solicitors;

    d)   as soon as reasonably practicable and in any event by 21 August 2020, prepare an expert report addressed to the Court setting out:

        i)     what Electronic Devices, Mobile Communication Services and Cloud Accounts they have inspected;

        ii)    the nature and results of the examination set out in sub-paragraph b) above; and

        iii)   any other matters which they consider material which they have identified in the course of their investigations.

    e)   save in accordance with sub-paragraphs c) and d) above, or with the consent of the Tenth Respondent and/or pursuant to a further order of the Court, Aon shall keep confidential all data and information received by them in the performance of this order;

    f)   Aon shall return Electronic Devices to the Tenth Respondent as soon as practicable. If Aon requires to retain any Electronic Device for more than 3 working days, it shall give notice to the

Applicant and the Tenth Respondent explaining why (and the parties shall have permission to apply to Court for directions);

g) Aon may make a request in writing to the Court for directions for the purpose of assisting it in carrying out its functions at any time. Aon shall provide a copy of any such request to the Applicant and the Tenth Respondent simultaneously with (or before) filing it with the Court, unless Aon considers that doing so would undermine the purpose of this order (in which case it must explain why in its request).

4. That Aon's report shall be provided to the Tenth Respondent's solicitors, who shall be entitled to redact the report to the extent that it contains privileged material. The report (as redacted, if appropriate) shall be provided to the Court and to all other parties within 7 days of it being provided to the Tenth Respondent's solicitors.

5. That the Tenth Respondent's solicitors shall, save to the extent that they are satisfied that the documents have already been searched, undertake appropriate searches of those documents and disclose (with simultaneous inspection) any documents which are material to these proceedings. Such searches shall include any reasonable keywords or other parameters which the Applicant notifies to the Tenth Respondent's solicitors. The Tenth Respondent's solicitors shall undertake such searches as expeditiously as reasonably practicable, and provide disclosure on a rolling basis as it becomes available but not later than 21 days after receipt of the relevant tranche of documents from Aon.

6. That without prejudice to such order as the Court may subsequently make, each of the Applicant and the Tenth Respondent shall pay 50% of any invoice (or request for payment on account) from Aon for the purposes of performing this order.

7. Orders as to service of the order.

Please attach a draft copy of the order you are applying for.

4. This application may be considered by a judge on the information you have set out in your application notice. The judge may make an order on that information, without a hearing. However, any party who objects to an order made in this way may apply to the court within 7 days of it being made, for a hearing, at which all parties can attend, when the application will be reconsidered.

Are there any reasons why this application should not be dealt with on paper by a judge?   [X] Yes   [ ] No

If Yes, please provide details.

| The application is not suitable for disposal without a hearing. |
| --- |

5. Are there any reasons why this application should not be dealt with at a telephone hearing?   [X] Yes   [ ] No

If Yes, please provide details.

| The application is not suitable for a telephone hearing, and should instead be heard via video conference (such as Zoom). |
| --- |

6. How long do you think the hearing will last?
**[Including pre-reading and Judgment]**   [3] hours   [0] minutes

Is this estimate agreed by all parties?   [ ] Yes   [X] No

7. Give details of any fixed hearing date or period?

| A return date hearing (relating to freezing order application by the Applicant against the Tenth Respondent) is listed before Mrs Justice Gwynneth Knowles on 23 July 2020. |
| --- |

1339821 v.1

8.  Does this application need to be heard by a specific judge/
    level of judge?                                                    [X] Yes    [ ]    No

    If Yes, please enter name/level of judge

    Assigned to Mrs Justice Gwynneth
    Knowles

9.  Who should be served with this application?

    The Tenth Respondent.

10. What information will you be relying on?

    [X]   the attached statement.

    [ ]   the divorce /dissolution/nullity/(judicial) separation petition.

    [ ]   the affidavit in support of the divorce / dissolution / nullity / (judicial) separation.

    [ ]   the evidence set out in the box below:

    (If necessary, please continue on a separate sheet)

1339821 v.1

## Statement of Truth

**This section must be completed by the person making this application (referred to in this section as the 'Applicant'), or by a solicitor acting for the Applicant.**

*delete as appropriate

*[I believe] [the Applicant believes] that the facts stated in this section (and any continuation sheets) are true.

*I am duly authorised by the Applicant to sign this statement.

| | | | | |
|---|---|---|---|---|
| Signed | | Dated | | / / |
| | Applicant('s Solicitor)('s litigation friend) | | | |
| Print full name | | | | |
| Name of Applicant's solicitor's firm | | | | |
| Position or office held (if signing on behalf of firm or company) | | | | |

**Proceedings for contempt of court may be brought against a person who makes or causes to be made, a false statement in a document verified by a statement of truth.**

11.   Signature and address details

| | | | | |
|---|---|---|---|---|
| Signed | *PCB Litigation LLP* | Dated | | 2 0 / 0 7 / 2 0 2 0 |
| | Applicant('s Solicitor)('s litigation friend) | | | |

Position or office held
(if signing on behalf of firm or company) | Partner

Applicant's address to which documents about this application should be sent:

PCB Litigation LLP
4th Floor, 90 Chancery Lane
London WC2A 1EU

| If applicable | |
|---|---|
| Telephone no. | +44 (0) 20 7831 2691 |
| Fax no. | +44 (0) 20 7404 9435 |
| DX no. | 0038 LDE |
| Your ref. | A150.5 |

Postcode | W C 2 A | 1 E U

| E-mail | ajr@pcblitigation.com; rt@pcblitigation.com; akh@pcblitigation.com |
|---|---|

1339821 v.1

## Notice of application – Notes for guidance

Court Staff cannot give out legal advice. If you need information or advice on a legal problem you can contact Community Legal Advice on 0845 345 4 345 or www.communitylegaladvice.org.uk, or a Citizens Advice Bureau. Details of your local offices and contact numbers are available on their website www.citizensadvice.org.uk.

### Paying the court fee

A court fee is payable depending on the type of application you are making. For example:

- To apply for leave to issue a divorce petition without a marriage certificate.
- To apply for an order within existing proceedings.
- To apply for directions to be given by the judge in existing proceedings.
- To ask for a hearing to be adjourned.

For more information on court fees, please refer to booklet **EX50 – Civil and Family Court fees.**

This booklet is available from your local court or on the internet at hmctsformfinder.justice.gov.uk

### What if I cannot afford to pay a court fee?

If you cannot afford to pay a court fee, you may be eligible for help with your court fee in full or in part. The booklet **EX160 Guide - How to apply for help with court fees** gives all the information you need. You can get a copy from any court office or online at hmctsformfinder.justice.gov.uk

### Completing the form

### Question 3

Set out what order you are applying for and why; e.g. to adjourn the hearing because..., to apply for leave to issue my divorce petition without my marriage certificate because... etc. If you are applying to vary an existing order or to re-activate proceedings you should enter the details here. A draft copy of any order you are applying for must be attached to your application. The draft should state the amount of any costs to be paid by the other party and a brief calculation of how it was arrived at.

### Question 4 and 5

Most applications will require a hearing and you will be expected to attend. The court will allocate a hearing date and time for the application. Please indicate in a covering letter any dates that you are unavailable to attend within the next six weeks.

The court will only deal with the application 'without a hearing' in the following circumstances:

- where all the parties agree to the terms of the order being asked for;
- where all the parties agree that the court should deal with the application without a hearing; or
- where the court does not consider that a hearing would be appropriate.

Telephone hearings are only available in applications where at least one of the parties involved in the case is legally represented.

Not all applications will be suitable for a telephone hearing and the court may refuse your request.

### Question 6

If you do not know how long the hearing will take do not guess, instead leave these boxes blank.

### Question 7

If your case has already been allocated a hearing date or trial period please insert details of those dates in the box.

### Question 8

Enter the details if there is a requirement for your case to be heard by a specific judge or level of judge.

### Question 9

Please indicate in the box provided who you want the court to send a copy of the application to.

### Question 10

In this section please set out the information you want the court to take into account in support of the application you are making. If you wish to rely on:

- a **witness statement**, tick the first box and attach the statement to the application notice. A witness statement form is available on request from the court office.
- a **statement of case**, tick the second box if you intend to rely on your particulars of claim or defence in support of your application.
- **written evidence** on this form, tick the fourth box and enter details in the space provided. You must also complete the statement of truth. Proceedings for contempt of court may be brought against a person who signs a statement of truth without an honest belief in its truth.

### Question 11

The application must be signed and dated and your current address and contact details completed. If you agree that the court and the other parties may communicate with you by Document Exchange, telephone, facsimile or email, please complete the details.

### Before returning your form to the court

Have you:

- signed the form on page 3?
- enclosed the correct fee or an application for fee remission?
- if you have applied for your Help with Fees online please insert your Help with Fees reference number in the box provided at the top right hand side of this form
- made sufficient copies of your application and supporting documentation? You will need to submit one copy for each party to be served and one copy for the court.

1339821 v.1



**In the High Court of Justice**       No: FD13D05340
**Family Division**

**The Matrimonial Causes Act 1973**

**The Senior Courts Act 1981**

**The Marriage of Tatiana Mikhailovna Akhmedova and Farkhad Teimur Ogly Akhmedov**

**AFTER HEARING** James Willan and Mark Belshaw for Tatiana Mikhailovna Akhmedova (the Applicant); and [xxxx] for Temur Akhmedov (the Tenth Respondent).

**AND UPON** the application of the Applicant by application notice dated 20 July 2020

**TO TEMUR AKHMEDOV of** Apartment C.07.1, One Hyde Park, 100 Knightsbridge, London SW1X 7LJ.

---

**WARNING:**

IF YOU, TEMUR AKHMEDOV, NEGLECT TO OBEY THIS ORDER, YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS TEMUR AKHMEDOV TO BREACH THE TERMS OF THIS ORDER MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED

---

**The Parties to the Proceedings**

1. The Applicant is Tatiana Mikhailovna Akhmedova

   The First Respondent is Farkhad Teimur Ogly Akhmedov

   The Second Respondent is Woodblade Limited

   The Third Respondent is Cotor Investments SA

   The Fourth Respondent is Qubo 1 Establishment

   The Fifth Respondent is Qubo 2 Establishment

   The Sixth Respondent is Straight Establishment

   The Seventh Respondent is Avenger Assets Corporation

The Eighth Respondent is Counselor Trust Reg in its capacity as trustee of the trusts set out in Part A of Schedule 1 to the Order of Mrs Justice Knowles dated 15 August 2019

The Ninth Respondent is Sobaldo Establishment in its capacity as trustee of the trusts set out in Part B of Schedule 1 to the Order of Mrs Justice Knowles dated 15 August 2019

The Tenth Respondent is Temur Akhmedov

### Recitals

2.  By order of Mrs Justice Knowles dated 19 June 2020 (the "Disclosure Order"), as amended by consent, the Tenth Respondent was required to provide standard disclosure, specific disclosure and inspection of documents by 17 July 2020 and was also required to provide responses to the Applicant's Request for Further Information (the "RFI"). On 17 July 2020, the Tenth Respondent provided disclosure and responses to the RFI in compliance with the Disclosure Order. Inspection of a limited number of documents was provided on 17 June 2020, with inspection of the majority of documents being provided on 20 June 2020.

3.  Also on 17 July 2020, the Applicant sought and obtained against the Tenth Respondent an *ex parte* without notice Worldwide Freezing Order with ancillary asset disclosure (the "WFO"). The WFO was served on the Respondent on 17 July 2020 in accordance with paragraph 39 thereof.

4.  On 20 July 2020, the Applicant applied for an order for delivery up of the Tenth Respondent's Electronic Devices, Mobile Communication Services and Cloud Accounts and for such Electronic Devices, Mobile Communication Services and Cloud Accounts to be imaged by an independent forensic IT expert with a view to such images being reviewed by the Tenth Respondent's solicitors for the purposes of verifying and, if appropriate, securing compliance with the Tenth Respondent's obligation to give disclosure in accordance with the Disclosure Order.

5.  The Judge read the following witness statement:

    Seventh witness statement of Anthony John Riem dated 20 July 2020

6.  The Judge accepted the undertakings given by the independent forensic IT expert set out in Schedule 1 hereto.

### IT IS ORDERED THAT:

7.  For the purposes of this order, the following definitions shall apply:

    **"Cloud Accounts"** means any remote, internet-based or cloud-based service, including but not limited to webmail or electronic mail services (such as Outlook, Hotmail, Gmail and Yahoo), storage and back up services (such as One Drive, iCloud, Google Drive and Dropbox) and electronic hosting services (such as Rackspace US, Inc) which are currently or have been used by the Tenth Respondent at any time since 1 January 2013.

    **"Electronic Devices"** means any electronic devices (including without limitation computers, tablets, PDAs, mobile telephones, servers, external hard-drives and USB storage devices) within the Tenth Respondent's possession, power, custody or control

1339828 v.1

which are currently or have been used by the Tenth Respondent at any time since 1 January 2013, and which hold or are capable of storing electronic documents.

"**Mobile Communication Services**" means any service which provides instant communication services (such as WhatsApp, iMessage, Signal or Telegram), which is currently or has been used by the Tenth Respondent at any time since 1 January 2013.

8. The Tenth Respondent shall, by 27 July 2020:

   a) procure that each of his Electronic Devices are delivered up and made available (with unrestricted access) to Stroz Friedberg Limited, an Aon Company ("**Aon**") at Aon's offices at: The Aon Centre, The Leadenhall Building, 122 Leadenhall Street, London EC3V 4AN;

   b) provide to Aon and the Applicant a list, verified by statement of truth, of all Cloud Accounts and Mobile Communication Services used by him since 1 January 2013, identifying the applicable user-name, e-mail address or telephone number for each such service;

   c) provide to Aon all PIN numbers, user-names, email addresses, combinations, passwords, security verification codes and any other item or piece of information (including, without limitation, authorisations to third party service providers) which may be necessary to give access to the Electronic Devices, Cloud Accounts or Mobile Communication Services.

9. Without prejudice to paragraph 8, the Tenth Respondent shall forthwith take such further steps as Aon may require from time to time to obtain effective access to any Electronic Device, Cloud Account or Mobile Communication Service (including, without limitation, completing any two-factor authentication, providing any necessary information to access or decrypt any document, answering questions raised by Aon, and providing his authorisation to third party service providers).

10. Aon shall act as independent forensic IT experts and are directed to:

    a) take two forensic images or copies of the data stored on the Electronic Devices, Mobile Communication Services and Cloud Accounts (insofar as such copies can be made);

    b) examine all Electronic Devices, Mobile Communication Services and Cloud Accounts (or the images or copies thereof, if they consider suitable) using such non-destructive process as they consider appropriate in order to:

       i)    assess whether any data which is not readily accessible can be recovered and, if so, to recover that data;

       ii)   assess whether it appears to him that relevant data has been deleted and/or otherwise destroyed on that device or medium and, if so, to assess how and when such acts took place;

       iii)  assess whether the Tenth Respondent's explanation for the loss of data (including the explanation provided in the Tenth Respondent's N265

Disclosure List dated 17 July 2020) is consistent with their examination of those devices;

c) as soon as reasonably practicable, and on a rolling basis, provide a copy of all documents which contain user-generated material (that is, excluding system files and program files), including recovered documents, found on all Electronic Devices, Mobile Communication Services and Cloud Accounts to the Tenth Respondent's solicitors;

d) as soon as reasonably practicable and in any event by 21 August 2020, prepare an expert report addressed to the Court setting out:

   i)    what Electronic Devices, Mobile Communication Services and Cloud Accounts they have inspected;

   ii)   the nature and results of the examination set out in sub-paragraph b) above; and

   iii)  any other matters which they consider material which they have identified in the course of their investigations.

e) save in accordance with sub-paragraphs c) and d) above, or with the consent of the Tenth Respondent and/or pursuant to a further order of the Court, Aon shall keep confidential all data and information received by them in the performance of this order;

f) Aon shall return Electronic Devices to the Tenth Respondent as soon as practicable. If Aon requires to retain any Electronic Device for more than 3 working days, it shall give notice to the Applicant and the Tenth Respondent explaining why (and the parties shall have permission to apply to Court for directions);

g) Aon may make a request in writing to the Court for directions for the purpose of assisting it in carrying out its functions at any time. Aon shall provide a copy of any such request to the Applicant and the Tenth Respondent simultaneously with (or before) filing it with the Court, unless Aon considers that doing so would undermine the purpose of this order (in which case it must explain why in its request).

11. Aon's report shall be provided to the Tenth Respondent's solicitors, who shall be entitled to redact the report to the extent that it contains privileged material. The report (as redacted, if appropriate) shall be provided to the Court and to all other parties within 7 days of it being provided to the Tenth Respondent's solicitors.

12. The Tenth Respondent's solicitors shall, save to the extent that they are satisfied that the documents have already been searched, undertake appropriate searches of those documents and disclose (with simultaneous inspection) any documents which are material to these proceedings. Such searches shall include any reasonable keywords or other parameters which the Applicant notifies to the Tenth Respondent's solicitors. The Tenth Respondent's solicitors shall undertake such searches as expeditiously as reasonably practicable, and provide disclosure on a rolling basis as it becomes available but not later than 21 days after receipt of the relevant tranche of documents from Aon.

13. In addition to the activities set out in paragraph 10 above, Aon shall perform such other functions as may be agreed by the Applicant and the Tenth Respondent or as may be ordered by the Court.

**Costs**

14. Without prejudice to such order as the Court may subsequently make, each of the Applicant and the Tenth Respondent shall pay 50% of any invoice (or request for payment on account) from Aon for the purposes of performing this order.

15. The costs of this application are [reserved].

**Effectiveness of this order**

16. **This order shall take immediate effect once approved by the Court notwithstanding that it does not bear the seal of the High Court.**

**Interpretation of this order**

17. A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

18. A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

**Service of this order**

19. The Applicant will serve this order upon the Tenth Respondent as soon as practicable.

20. For the purposes of paragraph 19 above, service shall be made by the following methods:

   a) WhatsApp message to the Tenth Respondent's mobile telephone with number +44 7795 973199 attaching this order and a web link to the other documents referred to at paragraph 19 above and informing the Tenth Respondent that the documents have also been emailed to his solicitors;

   b) email to the following email addresses: (i) khyshen@gmail.com; and (ii) temur@stecapital.net, in each case in the same manner as set out in paragraph 20.a) above; and

   c) email to the Tenth Respondent's solicitors Hughes Fowler Carruthers at m.harper@hfclaw.com and f.hughes@hfclaw.com, in each case in the same manner as set out in paragraph 20.a) above.

21. For the purposes of enforcement of this order pursuant to FPR r.37.4, personal service of this order on the Tenth Respondent be dispensed with pursuant to FPR r.37.8 provided that the Tenth Respondent has been served or notified of this order by any of the methods permitted by this order (although the service shall be valid even if the documents cannot successfully be delivered to the email addresses identified in paragraph 20.b) above).

22. The Applicant is not required to serve this order on the First to Ninth Respondents.

1339828 v.1

**Communications with the court**

23. All communications to the court about this order should be sent to the Family Division of the High Court, 1st Mezzanine, Queen's Building, Royal Courts of Justice, Strand, London WC2A 2LL quoting the number in the top right hand corner of this form.

24. The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

Dated: 23 July 2020

## SCHEDULE 1

### Undertakings given by Aon as Independent Forensic IT Expert

1. Aon will retain any device delivered to it in its safe keeping until it has made the requisite copies and returned the device to the Tenth Respondent. Aon shall not permit anyone other than its officers or employees to have access to the device during the period that it is held by it.

2. Aon will make two forensic images or copies of the data stored on the Electronic Devices, Mobile Communication Services and Cloud Accounts (insofar as copies can be made) and shall retain those copies or images in its safe keeping until further order of the Court.

3. Aon will use its best endeavours to ensure that no damage is done to any Electronic Device, Mobile Communication Service or Cloud Account, or data contained on the same.

4. Aon will keep confidential all documents, data and information (and copies thereof) which it obtains in performance of its functions under this order, and shall only use or disclose such information: (i) for the performance of its functions under this order; (ii) as permitted by further order of the Court; or (iii) in accordance with an agreement in writing by the Applicant and the Tenth Respondent (or their respective solicitors).

# EXHIBIT 5

Applicant
AJ Riem
Seventh witness statement
Exhibit AJR-20
20 July 2020

**Claim No. FD13D05340**

**IN THE HIGH COURT OF JUSTICE**
**FAMILY DIVISION**

**BETWEEN:**

**TATIANA AKHMEDOVA**

**Applicant**

**And**

**(1) FARKHAD TEIMUR OGLY AKHMEDOV**
**(2) WOODBLADE LIMITED**
**(3) COTOR INVESTMENT SA**
**(4) QUBO 1 ESTABLISHMENT**
**(5) QUBO 2 ESTABLISHMENT**
**(6) STRAIGHT ESTABLISHMENT**
**(7) AVENGER ASSETS CORPORATION**
**(8) COUNSELOR TRUST REG.**
**(9) SOBALDO ESTABLISHMENT**
**(10) TEMUR AKHMEDOV**

**Respondent**

---

SEVENTH WITNESS STATEMENT OF
ANTHONY JOHN RIEM

---

I, ANTHONY JOHN RIEM, a partner at PCB Litigation LLP of 90 Chancery Lane, London WC2A 1EU SAY as follows:

1. I am a solicitor of the Senior Courts and a partner at the firm PCB Litigation LLP ("**PCB**"). I have day-to-day conduct of this matter on behalf of the Claimant/Applicant Ms Tatiana Akhmedova ("**Tatiana**"), on whose behalf I am authorised to make this witness statement.

2. The facts stated in this witness statement are true to the best of my knowledge. Except where otherwise stated, those facts are within my own knowledge, or derive from my instructions, advice from foreign counsel or from the documents to which

1

I refer.  Nothing in this witness statement is intended to waive privilege and I am not authorised by Tatiana to do so.

3. There is now produced a paginated bundle of documents marked "**Exhibit AJR-20**" to which I will refer for the purposes of this witness statement. References to page numbers are to pages of that exhibit.

4. For convenience, and without any discourtesy, I refer to members of the Akhmedov family by their first names.

5. I make this witness statement in support of an application requiring Temur to deliver up his electronic devices to an independent forensic IT expert so that an image can be taken of those devices and that image inspected (the "**Delivery Up Order**").  A draft of the Delivery Up Order has been provided to the court.

6. On 17 July 2020, Tatiana obtained an *ex parte* without notice Worldwide Freezing Order with ancillary asset disclosure (the "**WFO**").

7. Also on 17 July 2020, Temur gave disclosure (but not inspection) of documents, as required by the order of Knowles J dated 19 June 2020 (the "**Disclosure Order**").  Temur's disclosure statement reveals that he has previously held a wide variety of relevant documents but (on his own case) has systematically destroyed his documents since January 2018.  In fact, aside from his UBS bank statements, Temur has disclosed only two documents created between April 2016 and today.  Although Temur seeks to justify this destruction as justified by "security reasons", it appears likely that such destruction has in fact taken place in order to frustrate Tatiana's claims against him.  Tatiana therefore seeks relief for the purposes of enabling an independent forensic IT expert to examine Temur's electronic devices and platforms for the purpose of (**i**) recovering electronic documents, if possible, and (**ii**) investigating how, when and what documents have been destroyed.

**Temur's disclosure**

8. On 17 July 2020, Temur gave standard disclosure by list (on Form N265) and specific disclosure in accordance with the Disclosure Order.  Temur's disclosure consists of:

2

a. 819 emails which span the period of 6 November 2014 to 1 March 2016 (pages 5 to 15), all but one of which were sent to/from or copied to one of Farkhad's legal advisors (particularly Mr Kerman, Mr Devlin and/or Ms Brightman of Kerman & Co and Mr Moore, Mr Unwalla, Ms Mackay and/or Mr Pidatala of Reed Smith in the UAE).[1] Initial analysis of the metadata contained in these emails indicates that they derive from the servers of Kerman & Co, rather than any of Temur's devices, accounts or cloud storage.

b. Heavily redacted bank statements for Temur's UBS bank account, showing only the payments received from Farkhad;

c. two emails from October 2013 between Farkhad, Temur and UBS (which are not in native form, but appear to have been forwarded recently to Temur's solicitors);

d. a power of attorney in favour of Ms Marina Sagadeeva; and

e. a letter from 'Team Fusion' dated 6 July 2020.

9. In breach of the Disclosure Order (as varied), Temur did not provide simultaneous inspection on 17 July 2020, and only provided inspection on 20 July 2020 following repeated requests to his solicitors.

10. Temur's disclosure gives rise to serious concerns that he has failed to comply with his disclosure obligations and/or has systematically destroyed relevant documents, including in the teeth of these proceedings. I note the following matters in particular, which are stated by Temur in his Form N265 (pages 1 to 4, at page 3):

a. Leaving aside his UBS bank statements, the power of attorney and the letter from 'Team Fusion', Temur has not disclosed a single contemporaneous document created after 1 March 2016 (which is the period during which the Monetary Assets were transferred into Liechtenstein, over US$36 million was transferred to Temur, and the various dealings with the Moscow

---

[1] The single email which was not sent to/from or copied to one of Farkhad's lawyers did contain such communications earlier in the chain.

Property have taken place).  Further, the emails he has disclosed up to 1 March 2016 all appear to derive from a partial archive provided to Temur from Kerman & Co rather than from his own records.  The result appears to be that not a single one of these earlier documents derives from Temur's own records.

b.  Temur expressly states that a number of documents which ought to be disclosed are no longer in his control because they were stored on "*mobile devices, on computers and/or on solid-state drives, to which I no longer have access by reason that they have been destroyed*".  It is also said that "*Increasingly, since January 2018 on professional advice, I have adopted a practice of periodically destroying mobile devices and computer storage for security reasons*".  The same is said in respect of communications contained on "*electronic storage*".  Accordingly, it appears to be Temur's case that he has destroyed virtually every document which is relevant to these proceedings created since 1 March 2016.

c.  It is concerning that Temur has never before drawn Tatiana or the Court's attention to such "professional advice", nor has he provided any explanation for how (if at all) his approach to and implementation of this "professional advice" changed after he became aware of the present proceedings against him and, in particular, after he became subject to the express prohibition on destruction of documents at paragraph 21 of the Order of Knowles J dated 20 January 2020 by which he was joined to these proceedings.  The "professional advice" appears to be from a company called 'Team Fusion', although the only relevant communication from Team Fusion which has been disclosed is a letter dated 6 July 2020, apparently produced for the purposes of these proceedings and to explain why Temur has apparently been systematically destroying relevant documents since early 2016 (pages 16 to 17).

d.  In any event, I suggest that it is implausible to suggest that all of Temur's documents from March 2016 have, on a regular basis, been completely obliterated (which appears to follow from the disclosure Temur has given).  This would mean, amongst other things, that Temur has permanently

4

deleted all such documents (without keeping any record, even in a secure environment) and that he cannot retrieve them even for his own legitimate purposes. I suggest that it is not credible that any person could operate in a way that means that they have no access to any documents or information relating to past dealings.

e. Temur also states that *"communications were made through messaging services (Signal or Telegraph) which automatically delete communications data after a short period of time"*. I understand that, in order for these services to automatically delete such communications, that setting must be specifically enabled. In other words, Temur would have had to specifically set up these services in such a way as to automatically delete material. At the very least, it appears that – even after the commencement of the present proceedings and the preservation order made by Mrs Justice Knowles on 20 January 2020 – Temur has: (i) failed to disable this feature; and/or (ii) continued to communicate using a service which he knew would automatically delete relevant messages. All of Tatiana's rights in this regard are reserved.

11. In addition to Temur's express statements that *prima facie* disclosable documents have been destroyed, there are further obvious gaps and inconsistencies in his disclosure, including that:

a. No explanation has been provided for why, if documents have been systematically destroyed since January 2018, Temur is able to give disclosure of (i) the two emails from October 2013, and (ii) emails between 6 November 2014 and 1 March 2016 (but not later). It is implausible to suggest that Temur destroyed more recent documents, but not these documents which relate to an earlier date period. Based on an initial review of the documents disclosed by Temur, it appears that the answer may be that these earlier emails were taken from a partial email archive provided to him by his father's lawyers (Kerman & Co), although this is not stated anywhere in Temur's N265, nor does he say that he carried out a search of any such archive. If this was the source of the documents, it is also striking

that the partial archive appears to stop very suddenly in early 2016, before the transfers which lie at the heart of Tatiana's claims against Temur.

b.  The emails from October 2013 have been provided as printed versions rather than in native format, having apparently been forwarded (I assume recently) to Temur's solicitors, which suggests that Temur has access to a source of his emails but which he is unwilling to reveal by providing emails in native form.

c.  The documents disclosed by Ross Henderson (and which Tatiana is entitled to rely on in these proceedings as if they had been disclosed to her by Temur) show that Temur was involved in communications at least up until the transfer of the Monetary Assets into Liechtenstein trusts in late 2016. It is implausible that Temur does not have such documents in his possession or control, unless they have been destroyed in breach of his disclosure obligations.

d.  It is similarly implausible to suggest that Temur has no communications whatsoever which relate to, for example, the property owned by Solyanka Servis LLC (the "**Moscow Property**"). The shares in Solyanka Servis LLC were owned by Temur and those shares (together with the beneficial interest in the Moscow Property) are at the heart of Tatiana's claims against Temur. As the court will be aware, one of the triggers for Tatiana's application for the WFO was Temur's apparent dissipation of the shares in Solyanka Servis LLC by the execution of a share purchase agreement on 19 May 2020 (the "**Termination Agreement**") by his authorised representative under a power of attorney dated February 2020. It simply cannot be correct that Temur has no documents relating to the execution of the Termination Agreement, apart from the relevant power of attorney itself. For example, at the very least, one would expect that Temur would have communicated with his agent about the execution of the Termination Agreement. Even if it is correct that Temur innocently destroyed documents from January 2018, the most recent steps in relation to the Moscow Property all took place in 2020 (after Mrs Justice Knowles had ordered preservation

6

of documents in January 2020) and such documents should still be within Temur's possession and control.

e. The list of devices searched appears to be incomplete. By way of example only, Tatiana has informed me that she has known Temur to use around five computers (if not more) at any one time but only two are listed on the N265.

**The Delivery Up Order**

12. There is no doubt that Temur has destroyed relevant documents. He accepts this in his Form N265, in which he states that he "*had*" documents in four categories of documents "*but they are no longer in my control*". This includes:

    a. documents relating to the "investment purpose", the shares in Solyanka Servis LLC, and the "relevant issues" as defined in the Order of Mrs Justice Knowles;

    b. documents evidencing communications with Ms Abashkina, Ms Irina Shcheglova, Mrs Rybalko, and representatives of Solyanka Servis LLC and Sunningdale Ltd;

    c. documents evidencing communications with Mr Kerman/Mr Devlin in relation to the "relevant issues" as defined; and

    d. documents evidencing communications with Walch & Schurti in relation to the "relevant issues" as defined.

13. These documents are self-evidently likely to be significant to the issues in these proceedings. They include communications with the key individuals involved in transfers of the Monetary Assets and the Moscow Property.

14. Whether or not Temur's destruction of documents was improper, I suggest that it is important that all possible steps be taken to recover these documents if possible. I am advised by the proposed expert, Stroz Friedberg Ltd, now an Aon Company ("**Aon**"), that – even when steps have been taken to destroy electronic documents – certain forensic techniques may be used to recover the documents themselves or information about them. Given that: (i) this is a claim of significant value

involving serious allegations; **(ii)** Temur held documents which are self-evidently relevant and potentially very important; **(iii)** Temur claims to have destroyed virtually every relevant document since March 2016; and **(iv)** the concerns about Temur's conduct, as identified in the context of the WFO, it is appropriate that steps be taken by an independent expert to seek to recover these documents.

15. Moreover, for the reasons given above, there is strong reason to believe that Temur has deliberately destroyed documents in order to conceal his wrongdoing. I suggest that this not only justifies taking all possible steps to recover the documents which have been destroyed, but also justifies an independent IT expert analysing the devices in order to explain to the Court (insofar as possible) how and when the data came to be destroyed. For example, the Court may well be more willing to draw adverse inferences if it concludes that documents have been destroyed since the commencement of these proceedings than if they were (as Temur claims) destroyed in 2018.

16. Further, there is a real risk that Temur will fail to comply with the asset and other disclosure requirements of the WFO, which justifies steps being taken to ensure that forensic images of his devices are obtained now so that, if Temur fails to provide information in accordance with this Court's orders, the Court can (if it sees fit) order that the information be obtained from the images of those devices.

17. In the circumstances, Tatiana seeks an order requiring Temur to deliver up his electronic devices and to provide access to his document storage platforms to Aon and for Aon to be directed to take forensic images or copies of the data on those devices/platforms. This will then allow Aon to seek to retrieve any deleted documents, which can then be provided to Temur's solicitors for review and disclosure of relevant documents and information in accordance with Temur's disclosure obligations, both under the Disclosure Order and under the WFO. It will also enable Aon to provide an independent report to the court explaining what it has been able to identify about how, when and what documents have been destroyed.

18. I understand that the court has the power to grant such an order to ensure that previous orders for disclosure have been complied with, and to confirm whether

documents said to have been irretrievably destroyed can in fact be retrieved. I believe that the court has the same power to ensure that the asset disclosure provisions of a freezing order are complied with. Accordingly, and for the reasons set out above, amongst others, I invite the court to grant the Delivery Up Order in the form of the draft order provided to the court.

**The Proposed Independent Expert**

19. The independent IT expert that Tatiana proposes be appointed is Stroz Friedberg Ltd, an Aon company (which I refer to as "**Aon**"), with the following individuals having conduct of this matter: Alex Campbell and Amy Francis. I understand that Aon is a company specialising in, amongst other things, digital forensics and investigations. I exhibit a copy of the CVs for Mr Campbell and Ms Francis (pages 18 to 19 and 20 to 21 respectively) and note that they each have specific expertise in conducting forensic acquisitions, investigations and analysis, as well as experience working on high-profile and substantial international and domestic cases.

20. The steps which will be taken by Aon depend on the devices delivered to them and the platforms to which they are provided access. However, I am advised by Aon that, in general terms, they will take the following steps:

    a. The expert will take two forensic images of electronic devices. This is a non-destructive process by which the expert obtains, using specialist forensic software and hardware, an exact copy of all the data stored on an electronic device (including data which is designated on the device as "deleted"). Depending on the amount of data stored, this process normally takes up to several hours. Having taken this image, Aon would then return the device as it would have a forensically identical copies in its possession.

    b. The expert will then, using a copy of the forensic image, undertake a number of processes (using specialist forensic software and expert examination) to attempt to recover any "deleted" data. The expert may be able to recover deleted documents in full or in part (fragments).

c. The expert would also analyse the information on the device, including log files and system files, to understand (insofar as possible) how, when and what has been destroyed on the device.

d. As regards cloud storage and hosted emails, the expert would seek to obtain two full copies of all data available.  How this is done and what can be obtained will depend on the service being used and its configuration.  Again, the experts would examine the data copied to understanding (insofar as possible) how, when and what has been destroyed on the service.

e. The steps taken would not involve altering or destroying data held on Temur's devices or platforms, as the experts would work on copies taken. (The only exception is that the process of accessing a platform may result in that access being recorded in the cloud platform's logs and records, but this will not affect the integrity of the data itself.)

f. In order to access the devices and platforms, the expert will require Temur to provide relevant usernames, passwords, authentication and authorisations.

g. Aon is able to, and will, keep confidential all information it obtains, and will only provide that to the parties or court as directed by the Court.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: ...........................................................

Anthony John Riem

Date of signature: 20 July 2020

Applicant
A J Riem
Seventh witness statement
Exhibit AJR20
20 July 2020

Claim No. FD13D05340

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>FAMILY DIVISION</u>

BETWEEN:

TATIANA AKHMEDOVA

<u>Applicant</u>

And

(1) FARKHAD TEIMUR OGLY AKHMEDOV
(2) WOODBLADE LIMITED
(3) COTOR INVESTMENT SA
(4) QUBO 1 ESTABLISHMENT
(5) QUBO 2 ESTABLISHMENT
(6) STRAIGHT ESTABLISHMENT (7) AVENGER ASSETS CORPORATION
(8) COUNSELOR TRUST REG.
(9) SOBALDO ESTABLISHMENT
(10) TEMUR AKHMEDOV

<u>Respondents</u>

---

**EXHIBIT AJR20**

---

# List of documents:
# standard disclosure

| In the | |
|---|---|
| High Court of Justice Family Division | |
| **Claim No.** | FD13D05340 |
| **Claimant** (including ref) | Tatiana Akhmedova |
| **Defendant** (including ref) | Temur Akhmedov |
| **Date** | 17 July 2020 |

### Notes

- The rules relating to standard disclosure are contained in Part 31 of the Civil Procedure Rules.
- Documents to be included under standard disclosure are contained in Rule 31.6
- A document has or will have been in your control if you have or have had possession, or a right of possession, of it **or** a right to inspect or take copies of it.

## Disclosure Statement

I, the above named

☐ Claimant    ☑ Defendant

☐ Party (if party making disclosure is a company, firm or other organisation identify here who the person making the disclosure statement is and why he is the appropriate person to make it)

state that I have carried out a reasonable and proportionate search to locate all the documents which I am

required to disclose under the order made by the court on (date of order) | 24 June 2020 |

☐ I did not search for documents:-

☐ pre-dating

☐ located elsewhere than

☐ in categories other than

☐ for electronic documents

☑ I carried out a search for electronic documents contained on or created by the following:
(list what was searched and extent of search)

1. My mobile telephone, being an Apple iPhone with number 07795973199.
2. My laptop computer, being an Apple Macbook.
3. My personal computer, being a desktop computer with solid-state drive storage.
4. My smartwatch, being an AppleWatch.
5. The email data associated with the email "kyshen@gmail.com".
6. The message data associated with the WhatsApp account for the telephone number 07795973199.
7. A digital image of my mobile telephone, an Apple iPhone XS, created in November 2019.

~~I did not search for the following:-~~

☐ documents created before _____

documents contained on or created by the   ☐ Claimant   ☐ Defendant

☐ PCs            ☐ portable data storage media
☐ databases      ☐ servers
☐ back-up tapes  ☐ off-site storage
☐ mobile phones  ☐ laptops
☐ notebooks      ☐ handheld devices
☐ PDA devices

documents contained on or created by the   ☐ Claimant   ☐ Defendant

☐ mail files         ☐ document files
☐ calendar files     ☐ web-based applications
☐ spreadsheet files  ☐ graphic and presentation files

documents other than by reference to the following keyword(s)/concepts
(delete if your search was not confined to specific keywords or concepts)

_____

I certify that I understand the duty of disclosure and to the best of my knowledge I have carried out that duty. I further certify that the list of documents set out in or attached to this form, is a complete list of all documents which are or have been in my control and which I am obliged under the order to disclose.

I understand that I must inform the court and the other parties immediately if any further document required to be disclosed by Rule 31.6 comes into my control at any time before the conclusion of the case.

☐ ~~I have not permitted inspection of documents within the category or class of documents (as set out below) required to be disclosed under Rule 31(6)(b)or (c) on the grounds that to do so would be disproportionate to the issues in the case.~~

_____

Signed _____    Date  17 July 2020

~~(Claimant)~~(Defendant)(~~'s litigation friend~~)

002

List and number here, in a convenient order, the documents (or bundles of documents if of the same nature, e.g. invoices) in your control, which you do not object to being inspected. Give a short description of each document or bundle so that it can be identified, and say if it is kept elsewhere i.e. with a bank or solicitor

I have control of the documents numbered and listed here. I do not object to you inspecting them/producing copies.

1. The documents already disclosed by me in these proceedings.
2. The emails listed in the attached schedule.
3. Bank statements recording receipt of payments from my father/other corporate entities.
4. Email dated 10 October 2013 from UBS to my father (copying me) and my father's response.
5. Email dated 18 October 2013 from UBS to me.
6. Power of Attorney to Marina Sagadeeva (with Russian translation).
7. Letter from Team Fusion dated 6 July 2020.

---

List and number here, as above, the documents in your control which you object to being inspected. (Rule 31.19)

I have control of the documents numbered and listed here, but I object to you inspecting them:

None.

Say what your objections are

I object to you inspecting these documents because:

N/A

---

List and number here, the documents you once had in your control, but which you no longer have. For each document listed, say when it was last in your control and where it is now.

I have had the documents numbered and listed below, but they are no longer in my control.

See continuation sheet

---

**FORM N265**

**CONTINUATION SHEET**

---

**I have had the documents numbered and listed below, but they are no longer in my control:**

1. Documents evidencing communications with my father in relation to: (i) the "investment purpose" and "generalised financial support" / "general financial provision" as pleaded in my Defence dated 21 February 2020; (ii) the shares in Solyanka Servis LLC; (iii) the "relevant issues" as defined in paragraph 11 of the order of Mrs Justice Knowles dated 24 June 2020 (other than those set out in the Form N265, or previously disclosed by me in these proceedings).

2. Documents evidencing communications with Ms Abashkina, Ms Irina Shcheglova, Mrs Rybalko, any representative of Solyanka Servis LLC and/or any representative of Sunningdale Ltd in relation to the shares in Solyanka Servis LLC (i.e. those communications referred to at 10(b) of the order of Mrs Justice Knowles dated 24 June 2020) (other than those previously disclosed by me in these proceedings).

3. Documents evidencing communications with Mr Kerman/Mr Devlin in relation to the "relevant issues" as defined in paragraph 11 of the order of Mrs Justice Knowles dated 24 June 2020 (other than those set out in the Form N265, or previously disclosed by me in these proceedings).

4. Documents evidencing communications with Walch & Schurti in relation to the "relevant issues" as defined in paragraph 11 of the order of Mrs Justice Knowles dated 24 June 2020.

**These documents are no longer within my control because:**

1. They were stored on mobile devices, on computers and/or on solid-state drives, to which I no longer have access by reason that they have been destroyed. Increasingly, since January 2018 on professional advice, I have adopted a practice of periodically destroying mobile devices and computer storage for security reasons.

2. They were stored electronically, but were subsequently deleted. Increasingly, since January 2018 on professional advice, I have adopted a practice of periodically deleting data in electronic storage for security reasons.

3. The communications were made through messaging services (Signal or Telegraph) which automatically delete communications data after a short period of time.

I confirm that I have not destroyed or deleted data, in the manner described at paragraphs 1-3 above, in a manner inconsistent with the obligations imposed upon me pursuant to paragraph 21 of the order of Mrs Justice Knowles, dated 20 January 2020.

| No. | Date | Type | From | To |
|---|---|---|---|---|
| 1 | 06-Nov-14 | Email | Donald Moore | Andy Kerman |
| 2 | 06-Nov-14 | Email | Donald Moore | Andy Kerman |
| 3 | 06-Nov-14 | Email | Andy Kerman | Donald Moore |
| 4 | 06-Nov-14 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 5 | 06-Nov-14 | Email | Donald Moore | Kayaan Unwalla and Andy Kerman |
| 6 | 06-Nov-14 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 7 | 06-Nov-14 | Email | Kayaan Unwalla | Donald Moore and Andy Kerman |
| 8 | 06-Nov-14 | Email | Donald Moore | Andy Kerman |
| 9 | 10-Nov-14 | Email | Andy Kerman | Ross Henderson |
| 10 | 10-Nov-14 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 11 | 10-Nov-14 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 12 | 10-Nov-14 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 13 | 10-Nov-14 | Email | Kayaan Unwalla | Andy Kerman |
| 14 | 10-Nov-14 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 15 | 10-Nov-14 | Email | Kayaan Unwalla | Andy Kerman |
| 16 | 11-Nov-14 | Email | Andy Kerman | Kayaan Unwalla |
| 17 | 11-Nov-14 | Email | Kayaan Unwalla | Andy Kerman |
| 18 | 12-Nov-14 | Email | Kayaan Unwalla | Andy Kerman |
| 19 | 13-Nov-14 | Email | Kayaan Unwalla | Andy Kerman |
| 20 | 15-Nov-14 | Email | Kayaan Unwalla | |
| 21 | 16-Nov-14 | Email | Kayaan Unwalla | Andy Kerman |
| 22 | 17-Nov-14 | Email | Kayaan Unwalla | Andy Kerman |
| 23 | 25-Nov-14 | Email | Andy Kerman | Nail Shahverdiyev |
| 24 | 25-Nov-14 | Email | Nail Shahverdiyev | Andy Kerman |
| 25 | 27-Nov-14 | Email | Kayaan Unwalla | Andy Kerman |
| 26 | 27-Nov-14 | Email | Andy Kerman | Kayaan Unwalla |
| 27 | 27-Nov-14 | Email | Kayaan Unwalla | Andy Kerman |
| 28 | 27-Nov-14 | Email | Andy Kerman | Kayaan Unwalla |
| 29 | 11-Dec-14 | Email | Andy Kerman | Taimur Satti |
| 30 | 11-Dec-14 | Email | Andy Kerman | Taimur Satti |
| 31 | 12-Dec-14 | Email | Andy Kerman | Taimur Satti |
| 32 | 12-Dec-14 | Email | Andy Kerman | Taimur Satti |
| 33 | 12-Dec-14 | Email | Andy Kerman | Kayaan Unwalla |
| 34 | 12-Dec-14 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 35 | 17-Dec-14 | Email | Taimur Satti | Andy Kerman |
| 36 | 21-Dec-14 | Email | Andy Kerman | Kayaan Unwalla |
| 37 | 21-Dec-14 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 38 | 23-Dec-14 | Email | Andy Kerman | Taimur Satti |
| 39 | 27-Dec-14 | Email | Andy Kerman | Temur Akhmedov |
| 40 | 27-Dec-14 | Email | Temur Akhmedov | Andy Kerman |
| 41 | 30-Dec-14 | Email | Andy Kerman | Ross Henderson and Kirill Pronine |
| 42 | 04-Jan-15 | Email | Kayaan Unwalla | Andy Kerman |
| 43 | 12-Jan-15 | Email | Andy Kerman | Bernhard Brand |
| 44 | 12-Jan-15 | Email | Ross Henderson | Andy Kerman |
| 45 | 12-Jan-15 | Email | Andy Kerman | Ross Henderson |
| 46 | 12-Jan-15 | Email | Ross Henderson | Andy Kerman |
| 47 | 13-Jan-15 | Email | Kayaan Unwalla | Andy Kerman |
| 48 | 13-Jan-15 | Email | Kayaan Unwalla | Andy Kerman |
| 49 | 13-Jan-15 | Email | Andy Kerman | Kayaan Unwalla |
| 50 | 14-Jan-15 | Email | Andy Kerman | Ross Henderson and Kirill Pronine |
| 51 | 14-Jan-15 | Email | Andy Kerman | Kayaan Unwalla |
| 52 | 14-Jan-15 | Email | Ross Henderson | Andy Kerman and Kirill Pronine |
| 53 | 14-Jan-15 | Email | Kayaan Unwalla | Andy Kerman |
| 54 | 16-Jan-15 | Email | Ross Henderson | Andy Kerman |
| 55 | 19-Jan-15 | Email | Andy Kerman | Ross Henderson |
| 56 | 19-Jan-15 | Email | Bernhard Brand | Kayaan Unwalla and Andy Kerman |
| 57 | 19-Jan-15 | Email | Andy Kerman | Kayaan Unwalla |
| 58 | 19-Jan-15 | Email | Kayaan Unwalla | Andy Kerman |
| 59 | 19-Jan-15 | Email | Kayaan Unwalla | Andy Kerman |
| 60 | 21-Jan-15 | Email | Kayaan Unwalla | Andy Kerman |
| 61 | 21-Jan-15 | Email | Ross Henderson | Kayaan Unwalla |
| 62 | 21-Jan-15 | Email | Sebastian Devlin | Ross Henderson |
| 63 | 21-Jan-15 | Email | Ross Henderson | Sebastian Devlin |
| 64 | 21-Jan-15 | Email | Ross Henderson | Andy Kerman |
| 65 | 21-Jan-15 | Email | Kayaan Unwalla | Andy Kerman |
| 66 | 21-Jan-15 | Email | Kayaan Unwalla | Andy Kerman |
| 67 | 21-Jan-15 | Email | Kayaan Unwalla | Andy Kerman |
| 68 | 21-Jan-15 | Email | Sebastian Devlin | Kayaan Unwalla |
| 69 | 22-Jan-15 | Email | Andy Kerman | Kayaan Unwalla |
| 70 | 23-Jan-15 | Email | Andy Kerman | Ross Henderson |
| 71 | 23-Jan-15 | Email | Ross Henderson | Andy Kerman |
| 72 | 23-Jan-15 | Email | Andy Kerman | Ross Henderson |
| 73 | 23-Jan-15 | Email | Ross Henderson | Andy Kerman |
| 74 | 26-Jan-15 | Email | Ross Henderson | Andy Kerman |
| 75 | 28-Jan-15 | Email | Ross Henderson | Andy Kerman |

| 76 | 02-Feb-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 77 | 02-Feb-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 78 | 02-Feb-15 | Email | Andy Kerman | Donald Moore and Kayaan Unwalla |
| 79 | 02-Feb-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 80 | 03-Feb-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 81 | 05-Feb-15 | Email | Donald Moore | Rudiger von Wedel |
| 82 | 05-Feb-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 83 | 09-Feb-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 84 | 10-Feb-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 85 | 13-Feb-15 | Email | Andy Kerman | Donald Moore |
| 86 | 13-Feb-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 87 | 16-Feb-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 88 | 16-Feb-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 89 | 17-Feb-15 | Email | Andy Kerman | Donald Moore |
| 90 | 19-Feb-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin and Donald Moore |
| 91 | 19-Feb-15 | Email | Sebastian Devlin | Kayaan Unwalla, Andy Kerman and Donald Moore |
| 92 | 20-Feb-15 | Email | Donald Moore | Andy Kerman |
| 93 | 20-Feb-15 | Email | Andy Kerman | Donald Moore |
| 94 | 20-Feb-15 | Email | Donald Moore | Andy Kerman |
| 95 | 22-Feb-15 | Email | Sebastian Devlin | Kayaan Unwalla |
| 96 | 22-Feb-15 | Email | Kayaan Unwalla | Kayaan Unwalla |
| 97 | 23-Feb-15 | Email | Sebastian Devlin | Kayaan Unwalla |
| 98 | 23-Feb-15 | Email | Andy Kerman | Donald Moore |
| 99 | 24-Feb-15 | Email | Sebastian Devlin | Donald Moore and Kayaan Unwalla |
| 100 | 25-Feb-15 | Email | Donald Moore | Andy Kerman |
| 101 | 25-Feb-15 | Email | Donald Moore | Sebastian Devlin and Kayaan Unwalla |
| 102 | 02-Mar-15 | Email | Andy Kerman | Donald Moore |
| 103 | 02-Mar-15 | Email | Kayaan Unwalla | Sebastian Devlin and Donald Moore |
| 104 | 02-Mar-15 | Email | Sebastian Devlin | Kayaan Unwalla and Donald Moore |
| 105 | 02-Mar-15 | Email | Donald Moore | Sebastian Devlin and Kayaan Unwalla |
| 106 | 03-Mar-15 | Email | Donald Moore | Andy Kerman |
| 107 | 04-Mar-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin and Donald Moore |
| 108 | 04-Mar-15 | Email | Donald Moore | Andy Kerman |
| 109 | 08-Mar-15 | Email | Kayaan Unwalla | Sebastian Devlin |
| 110 | 09-Mar-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 111 | 09-Mar-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 112 | 10-Mar-15 | Email | Andy Kerman | Ross Henderson |
| 113 | 10-Mar-15 | Email | Donald Moore | Andy Kerman |
| 114 | 10-Mar-15 | Email | Andy Kerman | Donald Moore |
| 115 | 10-Mar-15 | Email | Donald Moore | Andy Kerman |
| 116 | 11-Mar-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 117 | 12-Mar-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 118 | 12-Mar-15 | Email | Andy Kerman | Ross Henderson |
| 119 | 12-Mar-15 | Email | Ross Henderson | Andy Kerman |
| 120 | 17-Mar-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin and Donald Moore |
| 121 | 17-Mar-15 | Email | Kayaan Unwalla | Andy Kerman, Donald Moore and Sebastian Devlin |
| 122 | 23-Mar-15 | Email | Sebastian Devlin | Kayaan Unwalla |
| 123 | 30-Mar-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 124 | 30-Mar-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 125 | 30-Mar-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 126 | 30-Mar-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 127 | 02-Apr-15 | Email | Kayaan Unwalla | Andy Kerman, Donald Moore and Sebastian Devlin |
| 128 | 02-Apr-15 | Email | Andy Kerman | Ross Henderson and Kirill Pronine |
| 129 | 02-Apr-15 | Email | Sebastian Devlin | Kirill Pronine |
| 130 | 03-Apr-15 | Email | Donald Moore | Andy Kerman and Sebastian Devlin |
| 131 | 03-Apr-15 | Email | Sebastian Devlin | Donald Moore and Andy Kerman |
| 132 | 03-Apr-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Andy Kerman |
| 133 | 03-Apr-15 | Email | Donald Moore | Kayaan Unwalla, Sebastian Devlin and Andy Kerman |
| 134 | 03-Apr-15 | Email | Sebastian Devlin | Donald Moore, Kayaan Unwalla and Andy Kerman |
| 135 | 05-Apr-15 | Email | Kayaan Unwalla | Sebastian Devlin and Donald Moore |
| 136 | 05-Apr-15 | Email | Kayaan Unwalla | Sebastian Devlin and Donald Moore |
| 137 | 07-Apr-15 | Email | Ross Henderson | Kayaan Unwalla and Donald Moore |
| 138 | 07-Apr-15 | Email | Farkhad Akhmedov | Mike Brun |
| 139 | 08-Apr-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Andy Williams |
| 140 | 09-Apr-15 | Email | Kayaan Unwalla | Kirill Pronine, Donald Moore and Ross Henderson |
| 141 | 14-Apr-15 | Email | Andy Kerman | Temur Akhmedov |
| 142 | 14-Apr-15 | Email | Donald Moore | Andy Kerman and Sebastian Devlin |
| 143 | 14-Apr-15 | Email | Sebastian Devlin | Donald Moore |
| 144 | 14-Apr-15 | Email | Kayaan Unwalla | Sebastian Devlin and Donald Moore |
| 145 | 14-Apr-15 | Email | Sebastian Devlin | Ross Henderson |
| 146 | 14-Apr-15 | Email | Temur Akhmedov | Andy Kerman |
| 147 | 14-Apr-15 | Email | Sebastian Devlin | Temur Akhmedov and Andy Kerman |
| 148 | 16-Apr-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Andy Kerman |
| 149 | 17-Apr-15 | Email | Sebastian Devlin | Ross Henderson |
| 150 | 18-Apr-15 | Email | Ross Henderson | Sebastian Devlin |
| 151 | 20-Apr-15 | Email | Andy Kerman | Temur Akhmedov |

| | | | | |
|---|---|---|---|---|
| 152 | 20-Apr-15 | Email | Temur Akhmedov | Ross Henderson |
| 153 | 21-Apr-15 | Email | Andy Kerman | Temur Akhmedov |
| 154 | 27-Apr-15 | Email | Kayaan Unwalla | Sebastian Devlin and Donald Moore |
| 155 | 27-Apr-15 | Email | Andy Kerman | Nail Shahverdiyev |
| 156 | 27-Apr-15 | Email | Temur Akhmedov | Andy Kerman, Sebastian Devli and Ross Henderson |
| 157 | 27-Apr-15 | Email | Andy Kerman | Temur Akhmedov, Ross Henderson and Sebastian Devlin |
| 158 | 27-Apr-15 | Email | Temur Akhmedov | Andy Kerman |
| 159 | 27-Apr-15 | Email | Andy Kerman | Temur Akhmedov |
| 160 | 27-Apr-15 | Email | Temur Akhmedov | Andy Kerman |
| 161 | 27-Apr-15 | Email | Andy Kerman | Nail Shahverdiyev |
| 162 | 27-Apr-15 | Email | Temur Akhmedov | Andy Kerman |
| 163 | 28-Apr-15 | Email | Andy Kerman | Temur Akhmedov |
| 164 | 29-Apr-15 | Email | Hanna Brightman | Nail Shahverdiyev |
| 165 | 29-Apr-15 | Email | Sebastian Devlin | Kayaan Unwalla, Donald Moore, Kirill Pronine and Ross Henderson |
| 166 | 29-Apr-15 | Email | Sebastian Devlin | Kayaan Unwalla and Kirill Pronine |
| 167 | 29-Apr-15 | Email | Kayaan Unwalla | Sebastian Devlin and Kirill Pronine |
| 168 | 30-Apr-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Andy Kerman |
| 169 | 30-Apr-15 | Email | Andy Kerman | Temur Akhmedov |
| 170 | 01-May-15 | Email | Andy Kerman | Donald Moore and Kayaan Unwalla |
| 171 | 01-May-15 | Email | Andy Kerman | Ross Henderson |
| 172 | 01-May-15 | Email | Andy Kerman | Temur Akhmedov |
| 173 | 02-May-15 | Email | Andy Kerman | Temur Akhmedov |
| 174 | 02-May-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 175 | 02-May-15 | Email | Donald Moore | Kayaan Unwalla and Andy Kerman |
| 176 | 03-May-15 | Email | Donald Moore | Kayaan Unwalla and Andy Kerman |
| 177 | 05-May-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 178 | 06-May-15 | Email | Ross Henderson | Temur Akhmedov, Andy Kerman and Sebastian Devlin |
| 179 | 06-May-15 | Email | Andy Kerman | Temur Akhmedov, Sebastian Devlin and Ross Henderson |
| 180 | 06-May-15 | Email | Ross Henderson | Temur Akhmedov and Andy Kerman |
| 181 | 11-May-15 | Email | Andy Kerman | Temur Akhmedov, Ross Henderson and Kirill Pronine |
| 182 | 11-May-15 | Email | Donald Moore | Andy Kerman, Kayaan Unwalla, Ross Henderson and Kirill Pronine |
| 183 | 12-May-15 | Email | Andy Kerman | Donald Moore |
| 184 | 13-May-15 | Email | Donald Moore | Andy Kerman |
| 185 | 13-May-15 | Email | Kayaan Unwalla | Donald Moore and Andy Kerman |
| 186 | 14-May-15 | Email | Sebastian Devlin | Kayaan Unwalla, Donald Moore, and Andy Kerman |
| 187 | 14-May-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Andy Kerman |
| 188 | 15-May-15 | Email | Donald Moore | Andy Kerman, Kayaan Unwalla and Sebastian Devlin |
| 190 | 15-May-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin and Donald Moore |
| 190 | 18-May-15 | Email | Kayaan Unwalla | Andy Kerman |
| 191 | 19-May-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin, Donald Moore and Katrina Mackay |
| 192 | 21-May-15 | Email | Donald Moore | Andy Kerman |
| 193 | 21-May-15 | Email | Andy Kerman | Ross Henderson |
| 194 | 21-May-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 195 | 21-May-15 | Email | Ross Henderson | Andy Kerman, Joel Waterhouse and Kirill Pronine |
| 196 | 21-May-15 | Email | Andy Kerman | Ross Henderson, Joel Waterhouse and Kirill Pronine |
| 197 | 21-May-15 | Email | Ross Henderson | Andy Kerman |
| 198 | 22-May-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin and Donald Moore |
| 199 | 24-May-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 200 | 25-May-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 201 | 26-May-15 | Email | Andy Kerman | Temur Akhmedov, Ross Henderson, Kirill Pronine and Sebastian Devlin |
| 202 | 27-May-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin, Ross Henderson and Kirill Pronine |
| 203 | 27-May-15 | Email | Donald Moore | Kayaan Unwalla, Andy Kerman, Kirill Pronine, Ross Henderson and Sebastian Devlin |
| 204 | 01-Jun-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 205 | 01-Jun-15 | Email | Andy Kerman | Donald Moore and Kayaan Unwalla |
| 206 | 01-Jun-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 207 | 01-Jun-15 | Email | Andy Kerman | Donald Moore and Kayaan Unwalla |
| 208 | 01-Jun-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 209 | 01-Jun-15 | Email | Andy Kerman | Kayaan Unwalla |
| 210 | 01-Jun-15 | Email | Andy Kerman | Ross Henderson |
| 211 | 01-Jun-15 | Email | Ross Henderson | Andy Kerman |
| 212 | 01-Jun-15 | Email | Kayaan Unwalla | Andy Kerman |
| 213 | 02-Jun-15 | Email | Andy Kerman | Kayaan Unwalla |
| 214 | 02-Jun-15 | Email | Andy Kerman | Kayaan Unwalla |
| 215 | 02-Jun-15 | Email | Andy Kerman | Kayaan Unwalla |
| 216 | 02-Jun-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 217 | 02-Jun-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 218 | 03-Jun-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 219 | 03-Jun-15 | Email | Andy Kerman | Kayaan Unwalla |
| 220 | 04-Jun-15 | Email | Andy Kerman | Donald Moore |
| 221 | 08-Jun-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 222 | 08-Jun-15 | Email | Andy Kerman | Andy Kerman, Donald Moore, Sai Pidatala and Katrina Mackay |
| 223 | 08-Jun-15 | Email | Sai Pidatala | Andy Kerman, Donald Moore, Kayaan Unwalla and Katrina Mackay |
| 224 | 08-Jun-15 | Email | Andy Kerman | Kayaan Unwalla, Donald Moore, Sai Pidatala and Katrina Mackay |
| 225 | 09-Jun-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 226 | 09-Jun-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 227 | 09-Jun-15 | Email | Andy Kerman | Temur Akhmedov |

007

| No. | Date | Type | From | To |
|---|---|---|---|---|
| 228 | 09-Jun-15 | Email | Temur Akhmedov | Andy Kerman |
| 229 | 09-Jun-15 | Email | Temur Akhmedov | Andy Kerman |
| 230 | 09-Jun-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 231 | 10-Jun-15 | Email | Kayaan Unwalla | Sebastian Devlin |
| 232 | 10-Jun-15 | Email | Temur Akhmedov | Andy Kerman, Sebastian Devli, Ross Henderson and Kirill Pronine |
| 233 | 10-Jun-15 | Email | Andy Kerman | Temur Akhmedov |
| 234 | 10-Jun-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin and Donald Moore |
| 235 | 10-Jun-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 236 | 10-Jun-15 | Email | Farkhad Akhmedov | Ross Henderson |
| 237 | 10-Jun-15 | Email | Temur Akhmedov | Andy Kerman |
| 238 | 10-Jun-15 | Email | Temur Akhmedov | Donald Moore |
| 239 | 10-Jun-15 | Email | Donald Moore | Temur Akhmedov |
| 240 | 10-Jun-15 | Email | Donald Moore | Andy Kerman |
| 241 | 12-Jun-15 | Email | Sebastian Devlin | Temur Akhmedov |
| 242 | 12-Jun-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 243 | 13-Jun-15 | Email | Farkhad Akhmedov | Sebastian Devlin |
| 244 | 13-Jun-15 | Email | Farkhad Akhmedov | Sebastian Devlin |
| 245 | 14-Jun-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 246 | 14-Jun-15 | Email | Temur Akhmedov | Andy Kerman, Sebastian Devlin, Ross Henderson, Kirill Pronine and Donald Moore |
| 247 | 14-Jun-15 | Email | Donald Moore | Temur Akhmedov, Andy Kerman, Sebastian Devlin, Ross Henderson, Kirill Pronine, Kayaan Unwalla |
| 248 | 14-Jun-15 | Email | Donald Moore | Temur Akhmedov and Adnan Jawad |
| 249 | 14-Jun-15 | Email | Adnan Jawad | Donald Moore and Temur Akhmedov |
| 250 | 14-Jun-15 | Email | Donald Moore | Andy Kerman |
| 251 | 15-Jun-15 | Email | Andy Kerman | Temur Akhmedov |
| 252 | 15-Jun-15 | Email | Andy Kerman | Temur Akhmedov |
| 253 | 15-Jun-15 | Email | Kayaan Unwalla | Adnan Jawad, Donald Moore and Temur Akhmedov |
| 254 | 15-Jun-15 | Email | Donald Moore | Andy Kerman |
| 255 | 15-Jun-15 | Email | Andy Kerman | Adnan Jawad |
| 256 | 15-Jun-15 | Email | Andy Kerman | Donald Moore |
| 257 | 15-Jun-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 258 | 16-Jun-15 | Email | Farkhad Akhmedov | Andy Kerman and Sebastian Devlin |
| 259 | 16-Jun-15 | Email | Andy Kerman | Farkhad Akhmedov |
| 260 | 16-Jun-15 | Email | Donald Moore | Andy Kerman |
| 261 | 16-Jun-15 | Email | Andy Kerman | Donald Moore |
| 262 | 16-Jun-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 263 | 16-Jun-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 264 | 17-Jun-15 | Email | Andy Kerman | Temur Akhmedov |
| 265 | 17-Jun-15 | Email | Donald Moore | Andy Kerman |
| 266 | 17-Jun-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin and Donald Moore |
| 267 | 17-Jun-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin and Donald Moore |
| 268 | 17-Jun-15 | Email | Andy Kerman | Adnan Jawad |
| 269 | 17-Jun-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin, Donald Moore and Katrina Mackay |
| 270 | 17-Jun-15 | Email | Kayaan Unwalla | Yunus bin Atip, Andy Kerman, Kirill Pronine, Ross Henderson, Michael Latefi, Adnan Jawad, Sebastian Devlin and Katrina Mackay |
| 271 | 17-Jun-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 272 | 19-Jun-15 | Email | Andy Kerman | Donald Moore |
| 273 | 19-Jun-15 | Email | Donald Moore | Andy Kerman |
| 274 | 19-Jun-15 | Email | Donald Moore | Andy Kerman |
| 275 | 19-Jun-15 | Email | Andy Kerman | Donald Moore |
| 276 | 20-Jun-15 | Email | Temur Akhmedov | Colin Mcdonald |
| 277 | 20-Jun-15 | Email | Temur Akhmedov | Colin Mcdonald |
| 278 | 21-Jun-15 | Email | Donald Moore | Kayaan Unwalla and Andy Kerman |
| 279 | 22-Jun-15 | Email | Ross Henderson | Andy Kerman |
| 280 | 22-Jun-15 | Email | Andy Kerman | Temur Akhmedov |
| 281 | 22-Jun-15 | Email | Andy Kerman | Temur Akhmedov |
| 282 | 22-Jun-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 283 | 22-Jun-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 284 | 22-Jun-15 | Email | Donald Moore | Kayaan Unwalla and Andy Kerman |
| 285 | 22-Jun-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 286 | 22-Jun-15 | Email | Michael Latefi | Temur Akhmedov |
| 287 | 23-Jun-15 | Email | Donald Moore | Andy Kerman, Temur Akhmedov Farkhad Akhmedov, Ross Henderson and Kirill Pronine |
| 288 | 23-Jun-15 | Email | Andy Kerman | Temur Akhmedov |
| 289 | 23-Jun-15 | Email | Farkhad Akhmedov | Donald Moore |
| 290 | 23-Jun-15 | Email | Temur Akhmedov | Donald Moore |
| 291 | 24-Jun-15 | Email | Andy Kerman | Temur Akhmedov |
| 292 | 24-Jun-15 | Email | Donald Moore | Andy Kerman |
| 293 | 24-Jun-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 294 | 24-Jun-15 | Email | Temur Akhmedov | Andy Kerman |
| 295 | 25-Jun-15 | Email | Andy Kerman | Donald Moore and Kayaan Unwalla |
| 296 | 25-Jun-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 297 | 25-Jun-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 298 | 25-Jun-15 | Email | Kayaan Unwalla | Donald Moore and Andy Kerman |
| 299 | 26-Jun-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 300 | 26-Jun-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 301 | 27-Jun-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 302 | 28-Jun-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |

| 303 | 28-Jun-15 | Email | Temur Akhmedov | Sebastian Devlin and Andy Kerman |
|---|---|---|---|---|
| 304 | 28-Jun-15 | Email | Temur Akhmedov | Kayaan Unwalla |
| 305 | 29-Jun-15 | Email | Andy Kerman | Ross Henderson |
| 306 | 29-Jun-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 307 | 29-Jun-15 | Email | Andy Kerman | Viorel Campeanu |
| 308 | 29-Jun-15 | Email | Viorel Campeanu | Andy Kerman |
| 309 | 30-Jun-15 | Email | Andy Kerman | Andrew Schildbach |
| 310 | 30-Jun-15 | Email | Andrew Schildbach | Andy Kerman |
| 311 | 30-Jun-15 | Email | Ross Henderson | Viorel Campeanu |
| 312 | 30-Jun-15 | Email | Viorel Campeanu | Ross Henderson |
| 313 | 30-Jun-15 | Email | Ross Henderson | Viorel Campeanu |
| 314 | 30-Jun-15 | Email | Viorel Campeanu | Ross Henderson |
| 315 | 01-Jul-15 | Email | Andrew Schildbach | Andy Kerman |
| 316 | 01-Jul-15 | Email | Andy Kerman | Andrew Schildbach |
| 317 | 01-Jul-15 | Email | Andrew Schildbach | Andy Kerman |
| 318 | 01-Jul-15 | Email | Viorel Campeanu | Ross Henderson, Andy Kerman, Temur Akhmedov and Sebastian Devlin |
| 319 | 02-Jul-15 | Email | Viorel Campeanu | Andy Kerman |
| 320 | 02-Jul-15 | Email | Viorel Campeanu | Andy Kerman |
| 321 | 02-Jul-15 | Email | Donald Moore | Kayaan Unwalla and Andy Kerman |
| 322 | 02-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 323 | 02-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 324 | 03-Jul-15 | Email | Viorel Campeanu | Andy Kerman |
| 325 | 03-Jul-15 | Email | Andy Kerman | Ross Henderson |
| 326 | 05-Jul-15 | Email | Ross Henderson | Andy Kerman |
| 327 | 06-Jul-15 | Email | Andy Kerman | Viorel Campeanu |
| 328 | 06-Jul-15 | Email | Andy Kerman | Ross Henderson |
| 329 | 06-Jul-15 | Email | Andy Kerman | Andrew Schildbach |
| 330 | 06-Jul-15 | Email | Donald Moore | Andy Kerman, Temur Akhmedov, Ross Henderson and Kirill Pronine |
| 331 | 06-Jul-15 | Email | Andy Kerman | Viorel Campeanu |
| 332 | 06-Jul-15 | Email | Donald Moore | Andy Kerman, Temur Akhmedov, Kirill Pronine and Ross Henderson |
| 333 | 06-Jul-15 | Email | Andy Kerman | Donald Moore, Temur Akhmedov, Kirill Pronine and Ross Henderson |
| 334 | 06-Jul-15 | Email | Temur Akhmedov | Andy Kerman |
| 335 | 06-Jul-15 | Email | Andy Kerman | Kirill Pronine and Sebastian Devlin |
| 336 | 07-Jul-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 337 | 07-Jul-15 | Email | Donald Moore | Andy Kerman, Temur Akhmedov, Kirill Pronine and Ross Henderson |
| 338 | 07-Jul-15 | Email | Andy Kerman | Donald Moore |
| 339 | 07-Jul-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 340 | 07-Jul-15 | Email | Andy Kerman | Temur Akhmedov |
| 341 | 07-Jul-15 | Email | Temur Akhmedov | Andy Kerman |
| 342 | 07-Jul-15 | Email | Temur Akhmedov | Andy Kerman |
| 343 | 07-Jul-15 | Email | Andy Kerman | Temur Akhmedov |
| 344 | 07-Jul-15 | Email | Temur Akhmedov | Andy Kerman |
| 345 | 08-Jul-15 | Email | Katrina Mackay | Andy Kerman and Sebastian Devlin |
| 346 | 08-Jul-15 | Email | Adnan Jawad | Kayaan Unwalla |
| 347 | 08-Jul-15 | Email | Donald Moore | Andy Kerman, Temur Akhmedov, Kirill Pronine and Ross Henderson |
| 348 | 09-Jul-15 | Email | Donald Moore | Andy Kerman |
| 349 | 09-Jul-15 | Email | Donald Moore | Andy Kerman |
| 350 | 09-Jul-15 | Email | Donald Moore | Andy Kerman |
| 351 | 09-Jul-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 352 | 09-Jul-15 | Email | Donald Moore | Andy Kerman, Temur Akhmedov, Kirill Pronine and Ross Henderson |
| 353 | 09-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 354 | 09-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 355 | 09-Jul-15 | Email | Kayaan Unwalla | Temur Akhmedov and Donald Moore |
| 356 | 09-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 357 | 09-Jul-15 | Email | Temur Akhmedov | Kayaan Unwalla |
| 358 | 09-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 359 | 09-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 360 | 09-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 361 | 09-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 362 | 09-Jul-15 | Email | Temur Akhmedov | Farkhad Akhmedov |
| 363 | 09-Jul-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 364 | 09-Jul-15 | Email | Temur Akhmedov | Farkhad Akhmedov |
| 365 | 09-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 366 | 10-Jul-15 | Email | Donald Moore | Andy Kerman |
| 367 | 10-Jul-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 368 | 10-Jul-15 | Email | Temur Akhmedov | Farkhad Akhmedov |
| 369 | 10-Jul-15 | Email | Temur Akhmedov | Andy Kerman |
| 370 | 10-Jul-15 | Email | Temur Akhmedov | Farkhad Akhmedov |
| 371 | 10-Jul-15 | Email | Temur Akhmedov | Farkhad Akhmedov |
| 372 | 10-Jul-15 | Email | Temur Akhmedov | Andy Kerman |
| 373 | 10-Jul-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 374 | 10-Jul-15 | Email | Ross Henderson | Farkhad Akhmedov and Temur Akhmedov |
| 375 | 10-Jul-15 | Email | Temur Akhmedov | Farkhad Akhmedov |
| 376 | 10-Jul-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 377 | 10-Jul-15 | Email | Temur Akhmedov | Farkhad Akhmedov |
| 378 | 10-Jul-15 | Email | Temur Akhmedov | Donald Moore |

| | | | | |
|---|---|---|---|---|
| 379 | 10-Jul-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 380 | 10-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 381 | 10-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 382 | 10-Jul-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 383 | 10-Jul-15 | Email | Andy Kerman | Donald Moore and Temur Akhmedov |
| 384 | 10-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 385 | 11-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 386 | 11-Jul-15 | Email | Donald Moore | Andy Kerman and Temur Akhmedov |
| 387 | 11-Jul-15 | Email | Donald Moore | Andy Kerman and Temur Akhmedov |
| 388 | 11-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 389 | 12-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 390 | 12-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 391 | 12-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 392 | 12-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 393 | 12-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 394 | 12-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 395 | 12-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 396 | 12-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 397 | 12-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 398 | 13-Jul-15 | Email | Andy Kerman | Kayaan Unwalla, Donald Moore and Katrina Mackay |
| 399 | 13-Jul-15 | Email | Andy Kerman | Matthias Lehmann |
| 400 | 13-Jul-15 | Email | Andy Kerman | Mike Brun |
| 401 | 13-Jul-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 402 | 13-Jul-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 403 | 13-Jul-15 | Email | Andy Kerman | Temur Akhmedov |
| 404 | 13-Jul-15 | Email | Donald Moore | Temur Akhmedov and Kayaan Unwalla |
| 405 | 13-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 406 | 13-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 407 | 13-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 408 | 13-Jul-15 | Email | Kirill Pronine | Katrina Mackay, Andy Kerman, Donald Moore and Kayaan Unwalla |
| 409 | 14-Jul-15 | Email | Andrew Schildbach | Andy Kerman |
| 410 | 14-Jul-15 | Email | Andrew Schildbach | Andy Kerman and Sebastian Devlin |
| 411 | 14-Jul-15 | Email | Andrew Schildbach | Temur Akhmedov |
| 412 | 14-Jul-15 | Email | Andy Kerman | Temur Akhmedov |
| 413 | 14-Jul-15 | Email | Temur Akhmedov | Andy Kerman |
| 414 | 14-Jul-15 | Email | Andrew Schildbach | Temur Akhmedov |
| 415 | 14-Jul-15 | Email | Andy Kerman | Yves Mirabaud and Sebastian Devlin |
| 416 | 15-Jul-15 | Email | Temur Akhmedov | Farkhad Akhmedov |
| 417 | 15-Jul-15 | Email | Temur Akhmedov | Farkhad Akhmedov, Andy Kerman and Sebastian Devlin |
| 418 | 15-Jul-15 | Email | Farkhad Akhmedov | Donald Moore |
| 419 | 15-Jul-15 | Email | Farkhad Akhmedov | Ahmad Ali Chahidi, Saman Sarrafzadeh, Kayaan Unwalla and Donald Moore |
| 420 | 15-Jul-15 | Email | Donald Moore | Farkhad Akhmedov, Ahmad Ali Chahidi, Saman Sarrafzadeh and Kayaan Unwalla |
| 421 | 15-Jul-15 | Email | Farkhad Akhmedov | Donald Moore, Ahmad Ali Chahidi, Saman Sarrafzadeh and Kayaan Unwalla |
| 422 | 15-Jul-15 | Email | Kayaan Unwalla | Farkhad Akhmedov, Donald Moore, Ahmad Ali Chahidi and Saman Sarrafzadeh |
| 423 | 15-Jul-15 | Email | Kayaan Unwalla | Farkhad Akhmedov, Donald Moore, Ahmad Ali Chahidi and Saman Sarrafzadeh |
| 424 | 15-Jul-15 | Email | Ahmad Ali Chahidi | Farkhad Akmedov and Temur Akhmedov |
| 425 | 16-Jul-15 | Email | Andy Kerman | Kayaan Unwalla, Temur Akhmedov, Sebastian Devlin, Ross Henderson and Kirill Pronine |
| 426 | 19-Jul-15 | Email | Michael Latefi | Mohammad Mansour, Andy Kerman, Abdulla Al Raisi and Temur Akhmedov |
| 427 | 20-Jul-15 | Email | Andy Kerman | Viorel Campeanu |
| 428 | 20-Jul-15 | Email | Mohamad Mansour | Michael Latefi |
| 429 | 20-Jul-15 | Email | Temur Akhmedov | Andy Kerman |
| 430 | 20-Jul-15 | Email | Kayaan Unwalla | Andy Kerman |
| 431 | 20-Jul-15 | Email | Andy Kerman | Kayaan Unwalla, Temur Akhmedov, Sebastian Devlin, Ross Henderson and Kirill Pronine |
| 432 | 20-Jul-15 | Email | Andy Kerman | Kayaan Unwalla, Temur Akhmedov, Sebastian Devlin, Ross Henderson and Kirill Pronine |
| 433 | 20-Jul-15 | Email | Kayaan Unwalla | Andy Kerman, Temur Akhmedov, Sebastian Devlin, Ross Henderson and Kirill Pronine |
| 434 | 21-Jul-15 | Email | Viorel Campeanu | Andy Kerman |
| 435 | 21-Jul-15 | Email | Andy Kerman | Kayaan Unwalla |
| 436 | 21-Jul-15 | Email | Temur Akhmedov | Adnan Jawad and Michael Latefi |
| 437 | 21-Jul-15 | Email | Andy Kerman | Kayaan Unwalla |
| 438 | 21-Jul-15 | Email | Kayaan Unwalla | Andy Kerman |
| 439 | 21-Jul-15 | Email | Temur Akhmedov | Andy Kerman |
| 440 | 22-Jul-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 441 | 22-Jul-15 | Email | Temur Akhmedov | Andy Kerman |
| 442 | 24-Jul-15 | Email | Andy Kerman | Kayaan Unwalla |
| 443 | 24-Jul-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 444 | 24-Jul-15 | Email | Kirill Pronine | Andy Kerman, Donald Moore and Kayaan Unwalla |
| 445 | 24-Jul-15 | Email | Andy Kerman | Farkhad Akhmedov |
| 446 | 24-Jul-15 | Email | Temur Akhmedov | Andy Kerman |
| 447 | 25-Jul-15 | Email | Temur Akhmedov | Andy Kerman, Sebastian Devlin and Ross Henderson |
| 448 | 25-Jul-15 | Email | Donald Moore | Andy Kerman |
| 449 | 25-Jul-15 | Email | Ross Henderson | Temur Akhmedov |
| 450 | 25-Jul-15 | Email | Andy Kerman | Donald Moore |
| 451 | 25-Jul-15 | Email | Donald Moore | Andy Kerman |
| 452 | 25-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 453 | 25-Jul-15 | Email | Andy Kerman | Donald Moore |
| 454 | 26-Jul-15 | Email | Andy Kerman | Donald Moore |

| | | | | |
|---|---|---|---|---|
| 455 | 26-Jul-15 | Email | Andy Kerman | Donald Moore |
| 456 | 27-Jul-15 | Email | Andy Kerman | Donald Moore |
| 457 | 27-Jul-15 | Email | Andy Kerman | Donald Moore |
| 458 | 27-Jul-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 459 | 27-Jul-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 460 | 27-Jul-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 461 | 27-Jul-15 | Email | Andy Kerman | Donald Moore and Kayaan Unwalla |
| 462 | 27-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 463 | 27-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 464 | 27-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 465 | 27-Jul-15 | Email | Donald Moore | Temur Akhmedov, Kirill Pronine, Kayaan Unwalla and Katrina Mackay |
| 466 | 27-Jul-15 | Email | Donald Moore | Andy Kerman |
| 467 | 28-Jul-15 | Email | Andy Kerman | Donald Moore |
| 468 | 28-Jul-15 | Email | Donald Moore | Andy Kerman |
| 469 | 30-Jul-15 | Email | Sai Pidatala | Andy Kerman, Donald Moore, Christiana Kouppi, Michelle Draper and Anna Lebedeva |
| 470 | 30-Jul-15 | Email | Temur Akhmedov | Farkhad Akhmedov |
| 471 | 30-Jul-15 | Email | Temur Akhmedov | Farkhad Akhmedov, Andy Kerman and Sebastian Devlin |
| 472 | 30-Jul-15 | Email | Farkhad Akhmedov | Andy Kerman and Sebastian Devlin |
| 473 | 30-Jul-15 | Email | Farkhad Akhmedov | Andy Kerman, Sebastian Devlin, Ross Henderson, Donald Moore and Kayaan Unwalla |
| 474 | 30-Jul-15 | Email | Donald Moore | Farkhad Akhmedov, Andy Kerman, Sebastian Devlin, Ross Henderson and Kayaan Unwalla |
| 475 | 30-Jul-15 | Email | Temur Akhmedov | Donald Moore |
| 476 | 30-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 477 | 30-Jul-15 | Email | Donald Moore | Temur Akhmedov |
| 478 | 31-Jul-15 | Email | Andy Kerman | Donald Moore |
| 479 | 03-Aug-15 | Email | Katrina Mackay | Andy Kerman and Sebastian Devlin |
| 480 | 03-Aug-15 | Email | Kayaan Unwalla | Katrina Mackay, Andy Kerman and Sebastian Devlin |
| 481 | 04-Aug-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 482 | 04-Aug-15 | Email | Andy Kerman | Hans Wirth |
| 483 | 04-Aug-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 484 | 04-Aug-15 | Email | Kayaan Unwalla | Temur Akhmedov, Donald Moore, Andy Kerman and Sebastian Devlin |
| 485 | 05-Aug-15 | Email | Donald Moore | Andy Kerman, Ross Henderson and Kirill Pronine |
| 486 | 05-Aug-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 487 | 05-Aug-15 | Email | Katrina Mackay | Andy Kerman and Sebastian Devlin |
| 488 | 05-Aug-15 | Email | Temur Akhmedov | Donald Moore |
| 489 | 05-Aug-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 490 | 05-Aug-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 491 | 05-Aug-15 | Email | Kirill Pronine | Donald Moore, Andy Kerman and Ross Henderson |
| 492 | 05-Aug-15 | Email | Saman Sarrafzadeh | Temur Akhmedov |
| 493 | 05-Aug-15 | Email | Donald Moore | Andy Kerman and Kayaan Unwalla |
| 494 | 06-Aug-15 | Email | Sebastian Devlin | Donald Moore |
| 495 | 07-Aug-15 | Email | Russell Stockil | Sai Pidatala, Julie Thibault, "JLuna" and Gary Wright |
| 496 | 09-Aug-15 | Email | Sai Pidatala | Andy Kerman, Sebastian Devlin and Donald Moore |
| 497 | 09-Aug-15 | Email | Sai Pidatala | Russell Stockil, Julie Thibault, "JLuna" and Gary Wright |
| 498 | 11-Aug-15 | Email | Andy Kerman | Donald Moore |
| 499 | 14-Aug-15 | Email | Russell Stockil | Sai Pidatala, Julie Thibault, "JLuna" and Gary Wright |
| 500 | 16-Aug-15 | Email | Sai Pidatala | Russell Stockil, Julie Thibault, "JLuna" and Gary Wright |
| 501 | 17-Aug-15 | Email | Andy Kerman | Sebastian Devlin, Donald Moore and Sai Pidatala |
| 502 | 17-Aug-15 | Email | Sebastian Devlin | Ross Henderson |
| 503 | 17-Aug-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 504 | 17-Aug-15 | Email | Sebastian Devlin | Temur Akhmedov |
| 505 | 17-Aug-15 | Email | Kayaan Unwalla | Temur Akhmedov, Andy Kerman, Sebastian Devlin, Ross Henderson and Kirill Pronine |
| 506 | 17-Aug-15 | Email | Ross Henderson | Sebastian Devlin |
| 507 | 17-Aug-15 | Email | Russell Stockil | Sai Pidatala, Julie Thibault, "JLuna" and Gary Wright |
| 508 | 17-Aug-15 | Email | Donald Moore | Andy Kerman, Sai Pidatala and Sebastian Devlin |
| 509 | 18-Aug-15 | Email | Sebastian Devlin | Farkhad Akhmedov and Temur Akhmedov |
| 510 | 18-Aug-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Sai Pidatala |
| 511 | 18-Aug-15 | Email | Sebastian Devlin | Kayaan Unwalla, Donald Moore and Sai Pidatala |
| 512 | 18-Aug-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Sai Pidatala |
| 513 | 18-Aug-15 | Email | Sai Pidatala | Russell Stockil, Julie Thibault, "JLuna" and Gary Wright |
| 514 | 19-Aug-15 | Email | Ross Henderson | Sebastian Devlin |
| 515 | 19-Aug-15 | Email | Katrina Mackay | Andy Kerman and Sebastian Devlin |
| 516 | 19-Aug-15 | Email | Kayaan Unwalla | Steve Cain, Sebastian Devlin, Andrew Wilson, Donald Moore and Sai Pidatala |
| 517 | 19-Aug-15 | Email | Sebastian Devlin | Sai Pidatala |
| 518 | 19-Aug-15 | Email | Russell Stockil | Sai Pidatala, Julie Thibault, "JLuna" and Gary Wright |
| 519 | 19-Aug-15 | Email | Kirill Pronine | Sebastian Devlin and Ross Henderson |
| 520 | 20-Aug-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Sai Pidatala |
| 521 | 20-Aug-15 | Email | Ross Henderson | Sebastian Devlin |
| 522 | 20-Aug-15 | Email | Sebastian Devlin | Kayaan Unwalla, Donald Moore and Sai Pidatala |
| 523 | 20-Aug-15 | Email | Sebastian Devlin | Kayaan Unwalla, Donald Moore and Sai Pidatala |
| 524 | 20-Aug-15 | Email | Sebastian Devlin | Temur Akhmedov and Andy Kerman |
| 525 | 20-Aug-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Sai Pidatala |
| 526 | 20-Aug-15 | Email | Sebastian Devlin | Kayaan Unwalla, Donald Moore and Sai Pidatala |
| 527 | 20-Aug-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Sai Pidatala |
| 528 | 20-Aug-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Sai Pidatala |
| 529 | 20-Aug-15 | Email | Donald Moore | Kayaan Unwalla, Sebastian Devlin and Sai Pidatala |
| 530 | 20-Aug-15 | Email | Sebastian Devlin | Steve Cain |

| | | | | |
|---|---|---|---|---|
| 531 | 20-Aug-15 | Email | Kayaan Unwalla | Joel Waterhouse |
| 532 | 20-Aug-15 | Email | Kayaan Unwalla | Steve Cain and Joel Waterhouse |
| 533 | 20-Aug-15 | Email | Ross Henderson | Sebastian Devlin |
| 534 | 20-Aug-15 | Email | Ross Henderson | Sebastian Devlin |
| 535 | 20-Aug-15 | Email | Ross Henderson | Sebastian Devlin |
| 536 | 20-Aug-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Sai Pidatala |
| 537 | 20-Aug-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore and Sai Pidatala |
| 538 | 21-Aug-15 | Email | Ross Henderson | Farkhad Akhmedov, Andy Kerman and Sebastian Devlin |
| 539 | 21-Aug-15 | Email | Sebastian Devlin | Kayaan Unwalla |
| 540 | 21-Aug-15 | Email | Donald Moore | Sebastian Devlin and Kayaan Unwalla |
| 541 | 21-Aug-15 | Email | Ross Henderson | Sebastian Devlin |
| 542 | 21-Aug-15 | Email | Sebastian Devlin | Donald Moore and Kayaan Unwalla |
| 543 | 21-Aug-15 | Email | Sebastian Devlin | Ross Henderson |
| 544 | 23-Aug-15 | Email | Kayaan Unwalla | Andy Kerman and Sebastian Devlin |
| 545 | 24-Aug-15 | Email | Temur Akhmedov | Farkhad Akhmedov, Andy Kerman and Sebastian Devlin |
| 546 | 24-Aug-15 | Email | Sai Pidatala | Andy Kerman,  Sebastian Devlin |
| 547 | 24-Aug-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 548 | 24-Aug-15 | Email | Sai Pidatala | Donald Moore, Christiana Kouppi, Kayaan Unwalla and Katrina Mackay |
| 549 | 24-Aug-15 | Email | Sebastian Devlin | Kayaan Unwalla and Donald Moore |
| 550 | 24-Aug-15 | Email | Sebastian Devlin | Temur Akhmedov |
| 551 | 24-Aug-15 | Email | Temur Akhmedov | Sebastian Devlin |
| 552 | 24-Aug-15 | Email | Temur Akhmedov | Sebastian Devlin and Ross Henderson |
| 553 | 24-Aug-15 | Email | Temur Akhmedov | |
| 554 | 24-Aug-15 | Email | Ross Henderson | Farkhad Akhmedov |
| 555 | 24-Aug-15 | Email | Temur Akhmedov | Ross Henderson |
| 556 | 24-Aug-15 | Email | Ross Henderson | Temur Akhmedov |
| 557 | 24-Aug-15 | Email | Ross Henderson | Ross Henderson |
| 558 | 24-Aug-15 | Email | Ross Henderson | Temur Akhmedov |
| 559 | 24-Aug-15 | Email | Temur Akhmedov | Sebastian Devlin |
| 560 | 24-Aug-15 | Email | Kayaan Unwalla | Sebastian Devlin and Donald Moore |
| 561 | 24-Aug-15 | Email | Sebastian Devlin | Kayaan Unwalla and Donald Moore |
| 562 | 24-Aug-15 | Email | Sai Pidatala | Christiana Kouppi, Katrina Mackay, Kayaan Unwalla and Donald Moore |
| 563 | 25-Aug-15 | Email | Kayaan Unwalla | Sebastian Devlin and Donald Moore |
| 564 | 27-Aug-15 | Email | Donald Moore | Andy Kerman |
| 565 | 27-Aug-15 | Email | Temur Akhmedov | Kayaan Unwalla and Donald Moore |
| 567 | 27-Aug-15 | Email | Donald Moore | Temur Akhmedov and Kayaan Unwalla |
| 568 | 01-Sep-15 | Email | Donald Moore | Andy Kerman |
| 569 | 01-Sep-15 | Email | Donald Moore | Andy Kerman |
| 570 | 02-Sep-15 | Email | Kayaan Unwalla | Donald Moore and Andy Kerman |
| 571 | 03-Sep-15 | Email | Andy Kerman | Kayaan Unwalla and Donald Moore |
| 572 | 03-Sep-15 | Email | Temur Akhmedov | Andy Kerman |
| 573 | 03-Sep-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 574 | 06-Sep-15 | Email | Kayaan Unwalla | Temur Akhmedov, Andy Kerman and Sebastian Devlin |
| 575 | 06-Sep-15 | Email | Farkhad Akhmedov | Donald Moore |
| 576 | 06-Sep-15 | Email | Donald Moore | Andy Kerman |
| 577 | 06-Sep-15 | Email | Temur Akhmedov | Farkhad Akhmedov, Andy Kerman and Sebastian Devlin |
| 578 | 06-Sep-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 579 | 06-Sep-15 | Email | Donald Moore | Farkhad Akhmedov |
| 580 | 06-Sep-15 | Email | Kayaan Unwalla | Donald Moore and Andy Kerman |
| 581 | 07-Sep-15 | Email | Donald Moore | Andy Kerman |
| 582 | 07-Sep-15 | Email | Kayaan Unwalla | Donald Moore and Andy Kerman |
| 583 | 07-Sep-15 | Email | Andy Kerman | Donald Moore |
| 584 | 07-Sep-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 585 | 07-Sep-15 | Email | Temur Akhmedov | Farkhad Akhmedov, Andy Kerman and Sebastian Devlin |
| 586 | 08-Sep-15 | Email | Temur Akhmedov | Kayaan Unwalla |
| 587 | 09-Sep-15 | Email | Andy Kerman | Donald Moore, Kayaan Unwalla, Temur Akhmedov and Sebastian Devlin |
| 588 | 09-Sep-15 | Email | Donald Moore | Andy Kerman, Kayaan Unwalla, Temur Akhmedov and Sebastian Devlin |
| 589 | 10-Sep-15 | Email | Saman Sarrafzadeh | Andy Kerman and Sebastian Devlin |
| 590 | 10-Sep-15 | Email | Saman Sarrafzadeh | Sebastian Devlin and Andy Kerman |
| 591 | 10-Sep-15 | Email | Andy Kerman | Donald Moore |
| 592 | 11-Sep-15 | Email | Donald Moore | Saman Sarrafzadeh |
| 593 | 13-Sep-15 | Email | Andy Kerman | Temur Akhmedov |
| 594 | 13-Sep-15 | Email | Farkhad Akhmedov | Temur Akhmedov, Andy Kerman and Sebastian Devlin |
| 595 | 14-Sep-15 | Email | Kayaan Unwalla | Saman Sarrafzadeh, Sebastian Devlin and Andy Kerman |
| 596 | 15-Sep-15 | Email | Kayaan Unwalla | PaulB@emiratesNBD.com, SamanSAR@EmiratesNBD.com, AhmadAC@EmiratesNBD.com, Robin.Abraham@CliffordChance.com, AmitKK@EmiratesNBD.com and Lilly.Alamir@CliffordChance.com |
| 597 | 15-Sep-15 | Email | Kayaan Unwalla | Andy Kerman |
| 598 | 15-Sep-15 | Email | Sai Pidatala | Elpida Soteriou |
| 599 | 15-Sep-15 | Email | Kayaan Unwalla | Sai Pidatala and Elpida Soteriou |
| 600 | 15-Sep-15 | Email | Sebastian Devlin | Kayaan Unwalla, Sai Pidatala and Elpida Soteriou |
| 601 | 15-Sep-15 | Email | Ahmad Ali Chahidi | Kayaan Unwalla, Paul Bagatelas, Saman Sarrafzadeh, Robin Abraham, Amit Khandelwal and Lily Alamir |
| 602 | 15-Sep-15 | Email | Kayaan Unwalla | Ahmad Ali Chahidi, Paul Bagatelas, Saman Sarrafzadeh, Robin Abraham, Amit Khandelwal and Lily Alamir |
| 603 | 15-Sep-15 | Email | Kayaan Unwalla | Kayaan Unwalla |
| 604 | 15-Sep-15 | Email | Andy Kerman | Kayaan Unwalla |

| | | | | |
|---|---|---|---|---|
| 605 | 16-Sep-15 | Email | Kayaan Unwalla | Andy Kerman and Donald Moore |
| 606 | 16-Sep-15 | Email | Kayaan Unwalla | Ahmad Ali Chahidi, Paul Bagatelas, Saman Sarrafzadeh, Robin Abraham, Lilly Alamir and Amrit Kumar Khandelwal |
| 607 | 16-Sep-15 | Email | Katrina Mackay | Christiana Kouppi and Elpida Soteriou |
| 608 | 16-Sep-15 | Email | Christiana Kouppi | Sai Pidatala and Elpida Soteriou |
| 609 | 16-Sep-15 | Email | Kayaan Unwalla | Sebastian Devlin and Donald Moore |
| 610 | 17-Sep-15 | Email | Sebastian Devlin | Kayaan Unwalla and Donald Moore |
| 611 | 17-Sep-15 | Email | Farkhad Akhmedov | Andy Kerman and Sebastian Devlin |
| 612 | 17-Sep-15 | Email | Farkhad Akhmedov | Andy Kerman and Sebastian Devlin |
| 613 | 17-Sep-15 | Email | Kayaan Unwalla | Sebastian Devlin and Donald Moore |
| 614 | 18-Sep-15 | Email | Sebastian Devlin | Kayaan Unwalla and Donald Moore |
| 615 | 18-Sep-15 | Email | Farkhad Akhmedov | Andy Kerman and Sebastian Devlin |
| 616 | 20-Sep-15 | Email | Saman Sarrafzadeh | Farkhad Akhmedov |
| 617 | 20-Sep-15 | Email | Kayaan Unwalla | Sebastian Devlin, Donald Moore, Steven Cain and Andrew Wilson |
| 618 | 21-Sep-15 | Email | Saman Sarrafzadeh | Farkhad Akhmedov and Temur Akhmedov |
| 619 | 21-Sep-15 | Email | Andy Kerman | Farkhad Akhmedov |
| 620 | 21-Sep-15 | Email | Kayaan Unwalla | Temur Akhmedov, Sebastian Devlin, Donald Moore and Katrina Mackay |
| 621 | 22-Sep-15 | Email | Christiana Kouppi | Andy Kerman and Sebastian Devlin |
| 622 | 22-Sep-15 | Email | Farkhad Akhmedov | Andy Kerman and Sebastian Devlin |
| 623 | 22-Sep-15 | Email | Sai Pidatala | Christiana Kouppi and Elpida Soteriou |
| 624 | 22-Sep-15 | Email | Kayaan Unwalla | Sai Pidatala, Christina Kouppi and Elpida Soteriou |
| 625 | 22-Sep-15 | Email | Andy Kerman | Kayaan Unwalla, Sai Pidatala, Christiana Kouppi and Elpida Soteriou |
| 626 | 22-Sep-15 | Email | Kayaan Unwalla | Temur Akhmedov and Sebastian Devlin |
| 627 | 22-Sep-15 | Email | Andy Kerman | Temur Akhmedov and Sebastian Devlin |
| 628 | 23-Sep-15 | Email | Andy Kerman | Saman Sarrafzadeh |
| 629 | 23-Sep-15 | Email | Andy Kerman | Saman Sarrafzadeh |
| 630 | 23-Sep-15 | Email | Donald Moore | Andy Kerman |
| 631 | 23-Sep-15 | Email | Sebastian Devlin | Temur Akhmedov |
| 632 | 24-Sep-15 | Email | Kayaan Unwalla | Donald Moore and Andy Kerman |
| 633 | 27-Sep-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin, Donald Moore, Sai Pidatala and Katrina Mackay |
| 634 | 27-Sep-15 | Email | Sai Pidatala | Christiana Kouppi and Elpida Soteriou |
| 635 | 28-Sep-15 | Email | Andy Kerman | Stefanie Staehli |
| 636 | 28-Sep-15 | Email | Kayaan Unwalla | Temur Akhmedov, Andy Kerman, Sebastian Devlin, Donald Moore and Katrina Mackay |
| 637 | 28-Sep-15 | Email | Sebastian Devlin | Saman Sarrafzadeh |
| 638 | 28-Sep-15 | Email | Donald Moore | Andy Kerman |
| 639 | 28-Sep-15 | Email | Andy Kerman | Temur Akhmedov |
| 640 | 29-Sep-15 | Email | Andy Kerman | Kayaan Unwalla |
| 641 | 29-Sep-15 | Email | Christiana Kouppi | Sai Pidatala and Elpida Soteriou |
| 642 | 30-Sep-15 | Email | Kayaan Unwalla | Temur Akhmedov, Andy Kerman, Sebastian Devlin, Donald Moore and Katrina Mackay |
| 643 | 30-Sep-15 | Email | Kayaan Unwalla | Andy Kerman and Sebastian Devlin |
| 644 | 30-Sep-15 | Email | Belinda Britto | Andy Kerman, Donald Moore, Kayaan Unwalla and Katrina Mackay |
| 645 | 30-Sep-15 | Email | Andy Kerman | Kayaan Unwalla and Esther Boers |
| 646 | 30-Sep-15 | Email | Kayaan Unwalla | Andy Kerman, Ester Boers-de-Vries, Donald Moore and Katrina Mackay |
| 647 | 30-Sep-15 | Email | Andy Kerman | Kayaan Unwalla, EsterBoers-de Vries, Donald Moore and Katrina Mackay |
| 648 | 30-Sep-15 | Email | Kayaan Unwalla | Andy Kerman, Ester Boers-de Vries, Donald Moore and Katrina Mackay |
| 649 | 30-Sep-15 | Email | Esther Boers-de Vries | Andy Kerman, Kayaan Unwalla, Donald Moore and Katrina Mackay |
| 650 | 30-Sep-15 | Email | Andy Kerman | Belinda Britto, Kayaan Unwalla, Donald Moore and Katrina Mackay |
| 651 | 30-Sep-15 | Email | Kayaan Unwalla | Andy Kerman, Temur Akhmedov, Donald Moore and Katrina Mackay |
| 652 | 30-Sep-15 | Email | Temur Akhmedov | Kayaan Unwalla |
| 653 | 01-Oct-15 | Email | Saman Sarrafzadeh | Andy Kerman |
| 654 | 01-Oct-15 | Email | Donald Moore | Andy Kerman |
| 655 | 01-Oct-15 | Email | Andy Kerman | Donald Moore and Sebastian Devlin |
| 656 | 01-Oct-15 | Email | Donald Moore | Andy Kerman and Sebastian Devlin |
| 657 | 01-Oct-15 | Email | Katrina Mackay | Christiana Kouppi and Elpida Soteriou |
| 658 | 02-Oct-15 | Email | Andy Kerman | Temur Akhmedov |
| 659 | 02-Oct-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin and Donald Moore |
| 660 | 02-Oct-15 | Email | Katrina Mackay | Andy Kerman and Sebastian Devlin |
| 661 | 03-Oct-15 | Email | Farkhad Akhmedov | Andy Kerman and Sebastian Devlin |
| 662 | 02-Oct-15 | Email | Farkhad Akhmedov | Temur Akhmedov, Andy Kerman and Saman Sarrafzadeh |
| 663 | 02-Oct-15 | Email | Temur Akhmedov | Andy Kerman |
| 664 | 03-Oct-15 | Email | Farkhad Akhmedov | Saman Sarrafzadeh, Andy Kerman and Sebastian Devlin |
| 665 | 03-Oct-15 | Email | Farkhad Akhmedov | Matthias Lehman and Mike Brun |
| 666 | 04-Oct-15 | Email | Michael Chahine | Andy Kerman |
| 667 | 04-Oct-15 | Email | Donald Moore | Andy Kerman |
| 668 | 04-Oct-15 | Email | Donald Moore | Andy Kerman |
| 669 | 04-Oct-15 | Email | Matthias Lehmann | Farkhad Akhmedov and Mike Brun |
| 670 | 04-Oct-15 | Email | Farkhad Akhmedov | Temur Akhmedov and Edgar Akhmedov |
| 671 | 04-Oct-15 | Email | Temur Akhmedov | Farkhad Akhmedov |
| 672 | 04-Oct-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 673 | 05-Oct-15 | Email | Donald Moore | Andy Kerman |
| 674 | 05-Oct-15 | Email | Donald Moore | Andy Kerman |
| 675 | 05-Oct-15 | Email | Andy Kerman | Temur Akhmedov |
| 676 | 05-Oct-15 | Email | Andy Kerman | Temur Akhmedov |
| 677 | 05-Oct-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 678 | 05-Oct-15 | Email | Michael Chahine | Farkhad Akhmedov and Temur Akhmedov |
| 679 | 05-Oct-15 | Email | Donald Moore | Kayaan Unwalla |

013

| | | | From | To |
|---|---|---|---|---|
| 680 | 06-Oct-15 | Email | Andy Kerman | Saman Sarrafzadeh |
| 681 | 06-Oct-15 | Email | Andy Kerman | Michael Chahine |
| 682 | 06-Oct-15 | Email | Donald Moore | Andy Kerman |
| 683 | 06-Oct-15 | Email | Andy Kerman | Donald Moore |
| 684 | 06-Oct-15 | Email | Donald Moore | Andy Kerman |
| 685 | 06-Oct-15 | Email | Sebastian Devlin | Farkhad Akhmedov and Andy Kerman |
| 686 | 06-Oct-15 | Email | Michael Chahine | Andy Kerman |
| 687 | 06-Oct-15 | Email | Saman Sarrafzadeh | Andy Kerman |
| 688 | 06-Oct-15 | Email | Farkhad Akhmedov | Saman Sarrafzadeh |
| 689 | 06-Oct-15 | Email | Michael Chahine | Farkhad Akhmedov |
| 690 | 07-Oct-15 | Email | Sebastian Devlin | Saman Sarrafzadeh and Christiana Kouppi |
| 691 | 07-Oct-15 | Email | Sebastian Devlin | Saman Sarrafzadeh, Lisa Osland and Andy Limbrick |
| 692 | 07-Oct-15 | Email | Sebastian Devlin | Donald Moore and Andy Kerman |
| 693 | 07-Oct-15 | Email | Donald Moore | Sai Pidatala, Sebastian Devlin and Andy Kerman |
| 694 | 07-Oct-15 | Email | Sebastian Devlin | Donald Moore, Sai Pidatala and Andy Perman |
| 695 | 08-Oct-15 | Email | Donald Moore | Andy Kerman |
| 696 | 08-Oct-15 | Email | Temur Akhmedov | Andy Kerman and Sebastian Devlin |
| 697 | 08-Oct-15 | Email | Michael Chahine | Farkhad Akhmedov and Kayaan Unwalla |
| 698 | 08-Oct-15 | Email | Saman Sarrafzadeh | Sebastian Devlin, Lisa Osland and Andy Limbrick |
| 699 | 08-Oct-15 | Email | Saman Sarrafzadeh | Sebastian Devlin and Christiana Kouppi |
| 700 | 09-Oct-15 | Email | Kayaan Unwalla | Donald Moore and Andy Kerman |
| 701 | 09-Oct-15 | Email | Temur Akhmedov | Kayaan Unwalla |
| 702 | 09-Oct-15 | Email | Kayaan Unwalla | Temur Akhmedov |
| 703 | 09-Oct-15 | Email | Sebastian Devlin | Kayaan Unwalla, Donald Moore and Andy Kerman |
| 704 | 12-Oct-15 | Email | Sebastian Devlin | Kayaan Unwalla, Donald Moore and Andy Kerman |
| 705 | 13-Oct-15 | Email | Saman Sarrafzadeh | Andy Kerman |
| 706 | 15-Oct-15 | Email | Andy Kerman | Saman Sarrafzadeh |
| 707 | 16-Oct-15 | Email | Saman Sarrafzadeh | Andy Kerman |
| 708 | 16-Oct-15 | Email | Andy Kerman | Belinda Britto |
| 709 | 19-Oct-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 710 | 19-Oct-15 | Email | Temur Akhmedov | Andy Kerman |
| 711 | 19-Oct-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 712 | 19-Oct-15 | Email | Andy Kerman | Temur Akhmedov |
| 713 | 20-Oct-15 | Email | Farkhad Akhmedov | Saman Sarrafzadeh and Michael Chahine |
| 714 | 20-Oct-15 | Email | Andy Kerman | Temur Akhmedov |
| 715 | 21-Oct-15 | Email | Donald Moore | Andy Kerman and Temur Akhmedov |
| 716 | 21-Oct-15 | Email | Kayaan Unwalla | Andy Kerman, Donald Moore, Sebastian Devlin, Katrina Mackay and Sai Pidatala |
| 717 | 21-Oct-15 | Email | Andy Kerman | Temur Akhmedov |
| 718 | 21-Oct-15 | Email | Kayaan Unwalla | Donald Moore, Andy Kerman and Temur Akhmedov |
| 719 | 22-Oct-15 | Email | Sebastian Devlin | Kayaan Unwalla |
| 720 | 22-Oct-15 | Email | Andrew Schildbach | Andy Kerman |
| 721 | 22-Oct-15 | Email | Andy Kerman | Andrew Schildbach |
| 722 | 22-Oct-15 | Email | Sebastian Devlin | Temur Akhmedov |
| 723 | 23-Oct-15 | Email | Andrew Schildbach | Andy Kerman |
| 724 | 26-Oct-15 | Email | Kayaan Unwalla | Andy Kerman, Donald Moore and Katrina Mackay |
| 725 | 26-Oct-15 | Email | Andy Kerman | Kayaan Unwalla, Donald Moore and Katrina Mackay |
| 726 | 26-Oct-15 | Email | Andy Kerman | Andrew Schildbach |
| 727 | 26-Oct-15 | Email | Andy Kerman | Andrew Schildbach |
| 728 | 27-Oct-15 | Email | Andy Kerman | Antoine Gautier Suvagnac |
| 729 | 27-Oct-15 | Email | Andy Kerman | Farkhad Akhmedov |
| 730 | 27-Oct-15 | Email | Farkhad Akhmedov | Andy Kerman |
| 731 | 27-Oct-15 | Email | Temur Akhmedov | Andy Kerman |
| 732 | 27-Oct-15 | Email | Belinda Britto | Andy Kerman |
| 733 | 28-Oct-15 | Email | Andrew Schildbach | Andy Kerman |
| 734 | 28-Oct-15 | Email | Donald Moore | Andy Kerman |
| 735 | 28-Oct-15 | Email | Andy Kerman | Andrew Schildbach |
| 736 | 30-Oct-15 | Email | Andrew Schildbach | Andy Kerman |
| 737 | 30-Oct-15 | Email | Andrew Schildbach | Andy Kerman |
| 738 | 30-Oct-15 | Email | Andrew Schildbach | Andy Kerman |
| 739 | 30-Oct-15 | Email | Andy Kerman | Andrew Schildbach |
| 740 | 30-Oct-15 | Email | Andy Kerman | Andrew Schildbach |
| 741 | 02-Nov-15 | Email | Andrew Schildbach | Andy Kerman |
| 742 | 03-Nov-15 | Email | Andrew Schildbach | Andy Kerman |
| 743 | 03-Nov-15 | Email | Donald Moore | Andy Kerman |
| 744 | 03-Nov-15 | Email | Saman Sarrafzadeh | Kaushik Viswanathan and Praveen Thyagarajan |
| 745 | 03-Nov-15 | Email | Saman Sarrafzadeh | Sebastian Devlin, Temur Akhmedov and Andy Kerman |
| 746 | 05-Nov-15 | Email | Katrina Mackay | Andy Kerman and Sebastian Devlin |
| 747 | 05-Nov-15 | Email | Kayaan Unwalla | Katrina Mackay, Andy Kerman and Sebastian Devlin |
| 748 | 05-Nov-15 | Email | Andy Kerman | Kayaan Unwalla, Katrina Mackay and Sebastian Devlin |
| 749 | 05-Nov-15 | Email | Kayaan Unwalla | Andy Kerman, Katrina Mackay and Sebastian Devlin |
| 750 | 05-Nov-15 | Email | Donald Moore | Andy Kerman, Kayaan Unwalla, Katrina Mackay and Sebastian Devlin |
| 751 | 06-Nov-15 | Email | Andrew Schildbach | Andy Kerman |
| 752 | 06-Nov-15 | Email | Andrew Schildbach | Andy Kerman |
| 753 | 09-Nov-15 | Email | Kayaan Unwalla | Andy Kerman, Sebastian Devlin, Donald Moore and Katrina Mackay |
| 754 | 11-Nov-15 | Email | Andrew Schildbach | Andy Kerman |
| 755 | 12-Nov-15 | Email | Andrew Schildbach | Andy Kerman |

014

| | | | | |
|---|---|---|---|---|
| 756 | 12-Nov-15 | Email | Belinda Britto | Andy Kerman |
| 757 | 12-Nov-15 | Email | Andrew Schildbach | Andy Kerman |
| 758 | 16-Nov-15 | Email | Andy Kerman | Andrew Schildbach |
| 759 | 17-Nov-15 | Email | Andrew Schildbach | Andy Kerman |
| 760 | 17-Nov-15 | Email | Andrew Schildbach | Andy Kerman and Sebastian Devlin |
| 761 | 17-Nov-15 | Email | Belinda Britto | Sebastian Devlin |
| 762 | 17-Nov-15 | Email | Sebastian Devlin | Belinda Britto |
| 763 | 18-Nov-15 | Email | Andy Kerman | Andrew Schildbach |
| 764 | 18-Nov-15 | Email | Andrew Schildbach | Andy Kerman and Sebastian Devlin |
| 765 | 18-Nov-15 | Email | Andrew Schildbach | Andy Kerman and Sebastian Devlin |
| 766 | 18-Nov-15 | Email | Andrew Schildbach | Andy Kerman |
| 767 | 18-Nov-15 | Email | Andy Kerman | Andrew Schildbach |
| 768 | 19-Nov-15 | Email | Belinda Britto | Andy Kerman |
| 769 | 22-Nov-15 | Email | Kayaan Unwaila | Andy Kerman and Donald Moore |
| 770 | 24-Nov-15 | Email | Andrew Schildbach | Andy Kerman and Sebastian Devlin |
| 771 | 24-Nov-15 | Email | Donald Moore | Andy Kerman |
| 772 | 25-Nov-15 | Email | Donald Moore | Andy Kerman |
| 773 | 26-Nov-15 | Email | Andrew Schildbach | Andy Kerman and Sebastian Devlin |
| 774 | 26-Nov-15 | Email | Andrew Schildbach | Sebastian Devlin |
| 775 | 02-Dec-15 | Email | Viorel Campeanu | Andy Kerman |
| 776 | 02-Dec-15 | Email | Andrew Schildbach | Sebastian Devlin |
| 777 | 03-Dec-15 | Email | Andy Kerman | Donald Moore |
| 778 | 05-Dec-15 | Email | Andrew Schildbach | Sebastian Devlin |
| 779 | 06-Dec-15 | Email | Belinda Britto | Andy Kerman |
| 780 | 08-Dec-15 | Email | Viorel Campeanu | Andy Kerman |
| 781 | 11-Dec-15 | Email | Donald Moore | Andy Kerman |
| 782 | 18-Dec-15 | Email | Farkhad Akhmedov | Sebastian Devlin |
| 783 | 18-Dec-15 | Email | Sebastian Devlin | Farkhad Akhmedov |
| 784 | 18-Dec-15 | Email | Temur Akhmedov | Sebastian Devlin |
| 785 | 18-Dec-15 | Email | Farkhad Akhmedov | Temur Akhmedov |
| 786 | 18-Dec-15 | Email | Andy Kerman | Viorel Campeanu |
| 787 | 21-Dec-15 | Email | Viorel Campeanu | Sebastian Devlin |
| 788 | 24-Dec-15 | Email | Andy Kerman | Temur Akhmedov |
| 789 | 24-Dec-15 | Email | Temur Akhmedov | Andy Kerman |
| 790 | 28-Dec-15 | Email | Tania Shammas | Sebastian Devlin |
| 791 | 28-Dec-15 | Email | Tania Shammas | Sebastian Devlin |
| 792 | 28-Dec-15 | Email | Sebastian Devlin | Viorel Campeanu |
| 793 | 28-Dec-15 | Email | Viorel Campeanu | Sebastian Devlin |
| 794 | 28-Dec-15 | Email | Sebastian Devlin | Viorel Campeanu |
| 795 | 29-Dec-15 | Email | Sebastian Devlin | Temur Akhmedov |
| 796 | 29-Dec-15 | Email | Temur Akhmedov | Sebastian Devlin |
| 797 | 29-Dec-15 | Email | Viorel Campeanu | Sebastian Devlin |
| 798 | 29-Dec-15 | Email | Sebastian Devlin | Viorel Campeanu |
| 799 | 08-Jan-16 | Email | Andrew Schildbach | Sebastian Devlin and Andy Kerman |
| 800 | 20-Jan-16 | Email | Andrew Schildbach | Andy Kerman |
| 801 | 25-Jan-16 | Email | Farkhad Akhmedov | Donald Moore |
| 802 | 25-Jan-16 | Email | Donald Moore | Andy Kerman |
| 803 | 26-Jan-16 | Email | Donald Moore | Andy Kerman |
| 804 | 27-Jan-16 | Email | Andy Kerman | Donald Moore |
| 805 | 27-Jan-16 | Email | Donald Moore | Andy Kerman |
| 806 | 31-Jan-16 | Email | Donald Moore | Andy Kerman |
| 807 | 31-Jan-16 | Email | Donald Moore | Andy Kerman |
| 808 | 01-Feb-16 | Email | Andy Kerman | Donald Moore |
| 809 | 01-Feb-16 | Email | Andy Kerman | Donald Moore |
| 810 | 01-Feb-16 | Email | Donald Moore | Andy Kerman |
| 811 | 02-Feb-16 | Email | Andy Kerman | Saman Sarrafzadeh, Suvo Sarkar, Michael Chahine and Paul Bagatelas |
| 812 | 02-Feb-16 | Email | Andy Kerman | Mohamad S Mansour and Abdulla S Al Raisi |
| 813 | 02-Feb-16 | Email | Andy Kerman | Donald Moore |
| 814 | 03-Feb-16 | Email | Mohamed Mansour | Andy Kerman and Abdulla Al Raisi |
| 815 | 03-Feb-16 | Email | Paul Bagatelas | Andy perman, Saman Sarrafzadeh, Suvo Sarkar and Michael Chahine |
| 816 | 09-Feb-16 | Email | Donald Moore | Andy Kerman |
| 817 | 15-Feb-16 | Email | Donald Moore | Andy Kerman |
| 818 | 01-Mar-16 | Email | Sebastian Devlin | Paul Bagatelas, Andy Kerman, Saman Sarrafzadeh, Suvo Sarkar and Michael Chahine |
| 819 | 01-Mar-16 | Email | Sebastian Devlin | Farkhad Akhmedov |



29 Bunhill Row
London
EC1Y 8LP
www.teamfusion.com

6 July 2020

**To whom it may concern,**

**Background**

Team Fusion is a specialist and independent provider of private security consultancy. We are an internationally operating company who have been servicing the security requirements of the Akhmedov family for over 5 years.

**Threat to Akhmedov Family**

There have been both physical and technical suspected attacks on the Akhmedov family in recent years. In certain circles they are very well known and despite their efforts have a high profile. Physical threats can be evidenced back to 2016 when Team Fusion were asked to mitigate against attacks by Chechen nationals in the south of France.

Team Fusion provided advice at that time in terms of physical protection, anti-surveillance and technical security. The importance of following this advice has been reinforced by the recent surge of armed Chechen criminality in all areas of France.

The Team Fusion security advice extended beyond any immediate physical threat and included preventative measures should the family thereafter come under electronic attack.

**Details on specific individuals who are targeting the family and methods engaged are available if further scrutiny is deemed relevant.**

**Impact**

It is well known that criminal gangs seek to infiltrate the electronic footprint of a person in order to attack their personal/business lives and/or extort money from them without the need

to resort to violence. This has been evidenced most starkly in recent media reports that a number of high profile businesses have paid ransoms to criminal gangs to desist from or prevent electronic attacks. This demonstrates the level of sophistication and technical knowledge in the criminal world such that even multinational companies could not prevent breaches of their IT security.

**Mitigation Advice – Electronic Counter Measures**

In addition to physical countermeasures, Team Fusion advice to the family was to change all of their communication devices, including such things as mobile telephones and passwords, as often as was possible within the confines of them continuing to run their personal and business lives efficiently.

Physical attacks can sometimes be predicted by an escalating course of violent action by a perpetrator. In relation to electronic attack there may be no specific precursor to such action, a feature of which is that in these crimes the victim sometimes does not even know they are a victim.

The family understand this and so continue to follow the Team Fusion advice in terms of vigilance around communication devices.

Robert Taylor
Managing Director
Team Fusion Ltd





CURRICULUM VITAE

# Alex Campbell
Director

📞 +44 207.061.2232

@ alex.campbell@aon.co.uk

📍 Aon, The Leadenhall Building, 122 Leadenhall Street, London, EC3V 4AN

## ❧ PROFESSIONAL EXPERIENCE

**Director, April 2019 to present**
**London, UK**

Alex Campbell is a Director at Stroz Friedberg's London office. He brings particular expertise in conducting forensic acquisitions and examinations of digital evidence. Mr. Campbell performs analysis and reports on data from a range of digital media including laptops, desktop computers, mobile devices, servers and electronic mail systems.

Mr. Campbell is experienced in performing forensic examinations for a diverse range of matters including civil litigations, criminal matters, internal investigations, covert investigations, incident response investigations, civil search orders, delivery up orders and large scale electronic disclosure projects. He has worked on multiple, high-profile cases for the firm both nationally and internationally, including Belgium, France, Italy, Poland, Russia, Slovakia, Slovenia, South Africa, South Korea and Switzerland.

**Manager, January 2016 to March 2019**
**Senior Consultant, November 2015 to December 2015**
**Digital Forensic Examiner, July 2014 to October 2015**
**Digital Forensic Associate, March 2012 to June 2014**

Significant Engagements:

- Analysed computers, mobile devices, and network logs as part of an internal investigation into the leak of highly sensitive and confidential material from a visual effects company.

- Undertook forensic preservations and analysis for a multinational energy supplier to identify intellectual property theft by a former employee. Successfully identified misappropriation of data which resulted in targeted secure deletions on the custodian's computer and webmail.

- Conducted a covert imaging operation and investigation into online user activity for a prominent sporting establishment, scrutinising a series of leaks of highly sensitive information to a social media website.

- Executed Civil Search Order to seize and preserve evidence relating to intellectual property theft from a worldwide technology company. Performed forensic analysis to identify misappropriation of data which resulted in a court order mandating the remediation of such data.

- Played a substantial role in a vast multi-jurisdictional matter concerning privacy issues and potential misappropriation of personal data. Conducted forensic preservations and collections and assisted with the subsequent remediation process.

- Conducted incident response investigation for a NASDAQ listed company to determine the scope and extent of an advanced attack involving theft of credentials and attempted breach of a supercomputer infrastructure.

- Assisted in a security audit for a FTSE 100 food retailer following a data breach to ensure that no customer data loss had occurred as a result. Conducted follow up security review of internal network and infrastructure.

- Performed forensic analysis of data collected in the United States and Ecuador in an investigation into a conspiracy to defraud the Chevron Corporation of billions of US dollars. Found key digital forensic evidence supporting Chevron's arguments that the judgment was a product of fraudulent conduct, including bribery of Ecuadorian Judges and the ghost writing of supposedly independent expert reports, orders and judgments issued by the Ecuadorian court system.

- Assisted with a complex, extensive investigation into corrupt practices within a multinational corporation. Facilitated the tracking and handling of hundreds of exhibits. Contributed to the preservation, harvesting, and processing of electronic data from desktops, laptops, servers, mobile phones and tablets, generating more than 40 terabytes of data.

**About:** Aon's Cyber Solutions offers holistic cyber security, risk and insurance management, investigative skills, and proprietary technologies to help clients uncover and quantify cyber risks, protect critical assets, and recover from cyber incidents.

Cyber security services offered by Stroz Friedberg Inc. and its affiliates.

www.aon.com/cyber-solutions | © Aon plc 2020. All rights reserved.


Empower Results®

018

# CURRICULUM VITAE

## ⚬ EDUCATION

**University of the West of England, Bristol**
**BSC Hons, Forensic Computing, 1st Class, 2011**

### Certifications

GIAC Certified Reverse Engineering Malware (GREM), 2018

GIAC Certified Incident Handler (GCIH), 2016

GIAC Certified Forensic Analyst (GCFA), 2015

EnCase Certified Examiner (EnCE), 2014

### Training

SANS Institute
Advanced Network Forensics: Threat Hunting, Analysis, and Incident Response, 2019
In-depth discussion and training on advanced skills focused on network communications and artifacts. Exploration of the tools, technology, and processes required to integrate network evidence sources into investigations.

SANS Institute
Reverse Engineering Malware: Malware Analysis Tools and Techniques, 2017
In-depth discussion and training on reverse engineering malicious software that targets common platforms. Exploration of tools and techniques used to analyse and reverse engineer malicious software. Training to establish indicators of compromise and obtain other threat intelligence details for analysing, scoping and containing an incident.

SANS Institute
Hacker Tools, Techniques, Exploits and Incident Handling, 2016
In-depth discussion and training on all aspects of the incident handling process. Exploration of tools, techniques and exploits used during attacks on both enterprise networks and individual machines.

SANS Institute
Advanced Computer Forensic Analysis and Incident Response, 2014
In-depth discussion and training on identifying, containing, remediating, and analysing sophisticated threats on both enterprise networks and individual machines. Trained using incident response processes, threat intelligence, and digital forensics to investigate breached environments from Advanced Persistent Threat (APT) groups, organised crime syndicates, and hacktivists. Course material also covered live memory acquisition and analysis.

Guidance Software, Inc.
EnCase Advanced Computer Forensics, 2013
Training course providing in-depth discussion and coverage of advanced digital forensic practices. Focuses on providing a comprehensive insight into the advanced features of the EnCase version 7 digital forensic software.

Guidance Software, Inc.
EnCase Computer Forensics II, 2012
Core training course on general digital forensics practices and the use of Guidance Software's EnCase digital forensic software to analyse electronic data.

Ongoing Internal
Stroz Friedberg Internal Cyber Training Program; Participate in regular in-house training presentations on current digital forensics, cybercrime response, computer security, desktop, and network forensic tools in conjunction with relevant legal and industry matters.



Empower Results®

## CURRICULUM VITAE



# Amy Francis

Manager, Aon's Cyber Solutions

London, UK

 +44 7870 841 842

 amy.francis@aon.co.uk

The Leadenhall Building, 122
Leadenhall St, Lime Street, London
EC3V 4AN, UK

## ❧ PROFILE

A certified cyber security consultant with expertise in managing forensic investigations, conducting in-depth analysis and writing expert reports. Experienced in working with Senior Management and C-Suite clients on high-profile cases, both domestically and internationally. Committed to contributing to on-going research and testing of forensic software and hardware, alongside various other professional development projects. Competent in using a wide range of computing environments and leading digital forensic tools including EnCase, X-Ways, MacQuisition, Blacklight, Cellebrite, Oxygen Forensic Detective and Logicube Falcon devices. Thrives in a high-pressure environment and has a strong academic background with a BA Hons Physics degree from the University of Oxford.

## ❧ PROFESSIONAL EXPERIENCE

**Aon**
**Manager, April 2020 to present**
**London, UK**

- Conducts digital forensic acquisitions and analysis of digital media including laptops, desktops, servers, mobile devices, and cloud platform data in civil litigations, internal investigations, and network incident response efforts.
- Leads forensic investigations, including client management and expert report writing, often working to tight deadlines under high pressure.
- Develops client relationships and improves client's cyber resilience through leading board simulation events and panel discussions for executives.
- Develops, customises and documents protocols and playbooks for forensic analysis procedures and case management processes.
- Manages team of Consultants and Associates to deliver projects to clients
- Works on internal business development and transformation projects alongside UK Executive Leadership team
- Researches and tests novel and legacy digital storage media and cloud technologies in support of data acquisition and analysis.
- Evaluates and maintains proficiency with industry standard tools and practices.

**Senior Consultant, April 2018 to April 2020**
**Consultant, June 2016 to April 2018**
**Cyber Associate, September 2015 to June 2016**

**The Cockcroft Institute**
**Intern, August 2013**
**Cheshire, United Kingdom**

Applied data analysis and mathematical modelling methods to diagnose a problem with the gas-jet beam profile monitor and implement an effective solution. Completed independent research for a beam diagnostics project.

**About:** Aon's Cyber Solutions offers holistic cyber security, risk and insurance management, investigative skills, and proprietary technologies to help clients uncover and quantify cyber risks, protect critical assets, and recover from cyber incidents.

Cyber security services offered by Stroz Friedberg Inc. and its affiliates.

www.aon.com/cyber-solutions | © Aon plc 2020. All rights reserved.



Empower Results®

020

# CURRICULUM VITAE

## ❧ EDUCATION

**University of Oxford**
**BA Hons Physics, 2015**

**Royal Northern College of Music**
**ATCL Music Diploma, 2012**

**Alderley Edge School for Girls**
**A Levels: Grade A\* in Further Mathematics, Mathematics, Physics, Chemistry, Music Technology, AS Biology; 2012**

### Certifications

**GIAC Advanced Smartphone Forensics (GASF), 2018**

**GIAC Certified Incident Handler (GCIH), 2016**

**GIAC Certified Forensic Examiner (GCFE), 2016**

### Training

**SANS MGT514: Security Strategic Planning, Policy, and Leadership; 2019**

Training course on building and executing strategic plans that resonate with other business executives, creating effective information security policies, and developing management and leadership skills to better lead, inspire, and motivate your teams

**The Pipeline: Leadership Summit; 2019**

**SANS FOR518: Mac and iOS Forensic Analysis and Incident Response; 2018**

Training course on forensic and intrusion analysis of Mac and iOS systems

**Bond Solon: Witness Familiarisation Course; 2018**

Training on presenting evidence as an expert witness in criminal court

**SANS 585: Advanced Smartphone Forensics; 2017**

Training course on mobile device forensics covering malware, smartphone operating systems, third-party applications, and encryption

**SANS 504 Hacker Tools, Techniques, Exploits and Incident Handling; 2016**

Training course on common hacking and exploitation techniques and computer incident response strategies

**SANS 408: Windows Forensic Analysis; 2015**

Training course on in-depth forensic analysis of Windows operating systems

**Internal Cyber Training**

Participate in regular in-house training presentations on current digital forensics, cybercrime response, computer security, desktop, and network forensic tools in conjunction with relevant legal and industry matters.

### Awards and Recognition

Official Commendation from the Examiners for BA Research Project Report, University of Oxford, 2015

The Chairman's Prize for Presentation, University of Oxford, 2014

Prize for Academic Distinction at A Level, Alderley Edge School for Girls, 2012

### Professional and Civic Affiliations

GIAC Advisory Board Member, 2018 – present

Charity Event Organiser



Empower Results®

021

# EXHIBIT 6



**In the High Court of Justice**   No: FD13D05340
**Family Division**

**The Matrimonial Causes Act 1973**

**The Senior Courts Act 1981**

**The Marriage of Tatiana Mikhailovna Akhmedova and Farkhad Teimur Ogly Akhmedov**

**AFTER HEARING** James Willan and Mark Belshaw for Tatiana Mikhailovna Akhmedova (the Applicant); and Timothy James-Matthews for Temur Akhmedov (the Tenth Respondent).

**AND UPON** the application of the Applicant by application notice dated 20 July 2020

**TO TEMUR AKHMEDOV of** Apartment C.07.1, One Hyde Park, 100 Knightsbridge, London SW1X 7LJ.

---

**WARNING:**

**IF YOU, TEMUR AKHMEDOV, NEGLECT TO OBEY THIS ORDER, YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.**

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS TEMUR AKHMEDOV TO BREACH THE TERMS OF THIS ORDER MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED**

---

**The Parties to the Proceedings**

1.  The Applicant is Tatiana Mikhailovna Akhmedova

    The First Respondent is Farkhad Teimur Ogly Akhmedov

    The Second Respondent is Woodblade Limited

    The Third Respondent is Cotor Investments SA

    The Fourth Respondent is Qubo 1 Establishment

    The Fifth Respondent is Qubo 2 Establishment

    The Sixth Respondent is Straight Establishment

    The Seventh Respondent is Avenger Assets Corporation

The Eighth Respondent is Counselor Trust Reg in its capacity as trustee of the trusts set out in Part A of Schedule 1 to the Order of Mrs Justice Knowles dated 15 August 2019

The Ninth Respondent is Sobaldo Establishment in its capacity as trustee of the trusts set out in Part B of Schedule 1 to the Order of Mrs Justice Knowles dated 15 August 2019

The Tenth Respondent is Temur Akhmedov

**Recitals**

2. By order of Mrs Justice Knowles dated 19 June 2020 (the "Disclosure Order"), as amended by consent, the Tenth Respondent was required to provide standard disclosure, specific disclosure and inspection of documents by 17 July 2020 and was also required to provide responses to the Applicant's Request for Further Information (the "RFI"). On 17 July 2020, the Tenth Respondent provided disclosure and responses to the RFI in compliance with the Disclosure Order. Inspection of a limited number of documents was provided on 17 June 2020, with inspection of the majority of documents being provided on 20 June 2020.

3. Also on 17 July 2020, the Applicant sought and obtained against the Tenth Respondent an *ex parte* without notice Worldwide Freezing Order with ancillary asset disclosure (the "WFO"). The WFO was served on the Respondent on 17 July 2020 in accordance with paragraph 39 thereof.

4. On 20 July 2020, the Applicant applied for an order for delivery up of the Tenth Respondent's Electronic Devices, Mobile Communication Services and Cloud Accounts and for such Electronic Devices, Mobile Communication Services and Cloud Accounts to be imaged by an independent forensic IT expert with a view to such images being reviewed by the Tenth Respondent's solicitors for the purposes of verifying and, if appropriate, securing compliance with the Tenth Respondent's obligation to give disclosure in accordance with the Disclosure Order.

5. The Judge read the following witness statement:

Seventh witness statement of Anthony John Riem dated 20 July 2020

6. The Judge accepted the undertakings given by the independent forensic IT expert set out in Schedule 1 hereto.

**IT IS ORDERED THAT:**

7. For the purposes of this order, the following definitions shall apply:

"**Cloud Accounts**" means any remote, internet-based or cloud-based service, including but not limited to webmail or electronic mail services (such as Outlook, Hotmail, Gmail and Yahoo), storage and back up services (such as One Drive, iCloud, Google Drive and Dropbox) and electronic hosting services (such as Rackspace US, Inc) which are currently or have been used by the Tenth Respondent at any time since 1 January 2013.

"**Electronic Devices**" means any electronic devices (including without limitation computers, tablets, PDAs, mobile telephones, servers, external hard-drives and USB storage devices) within the Tenth Respondent's possession, power, custody or control

which are currently or have been used by the Tenth Respondent at any time since 1 January 2013, and which hold or are capable of storing electronic documents.

"**Mobile Communication Services**" means any service which provides instant communication services (such as WhatsApp, iMessage, Signal or Telegraph), which is currently or has been used by the Tenth Respondent at any time since 1 January 2013.

8. The Tenth Respondent shall by noon on 27 July 2020:

   a) provide to Aon and the Applicant a list, verified by statement of truth, of all Cloud Accounts and Mobile Communication Services used by him since 1 January 2013, identifying the applicable user-name, e-mail address or telephone number for each such service;

   b) provide to Aon all PIN numbers, user-names, email addresses, combinations, passwords, security verification codes and any other item or piece of information (including, without limitation, authorisations to third party service providers) which may be necessary to give access to the Electronic Devices, Cloud Accounts or Mobile Communication Services.

9. The Tenth Respondent shall procure that each of his Electronic Devices is delivered up and made available (with unrestricted access) to Stroz Friedberg Limited, an Aon Company ("**Aon**") at Aon's offices at The Aon Centre, The Leadenhall Building, 122 Leadenhall Street, London EC3V 4AN by no later than:

   a) 4pm on 31 July 2020 in respect of the personal computer which he has informed the court is currently located in Turkey; and

   b) 4pm on 28 July 2020 in respect of all other Electronic Devices.

10. Without prejudice to paragraphs 8 and 9, the Tenth Respondent shall forthwith take such further steps as Aon may require from time to time to obtain effective access to any Electronic Device, Cloud Account or Mobile Communication Service (including, without limitation, completing any two-factor authentication, providing any necessary information to access or decrypt any document, answering questions raised by Aon, and providing his authorisation to third party service providers). The Tenth Respondent shall provide Aon with contact details (including a telephone number and email address) for the purposes of making requests pursuant to this paragraph.

11. Aon shall act as independent forensic IT experts and are directed to:

   a) take two forensic images or copies of the data stored on the Electronic Devices, Mobile Communication Services and Cloud Accounts (insofar as such copies can be made);

   b) examine all Electronic Devices, Mobile Communication Services and Cloud Accounts (or the images or copies thereof, if they consider suitable) using such non-destructive process as they consider appropriate in order to:

      i)     assess whether any data which is not readily accessible can be recovered and, if so, to recover that data;

    ii)    assess whether it appears to him that relevant data has been deleted and/or otherwise destroyed on that device or medium and, if so, to assess how and when such acts took place;

    iii)   assess whether the Tenth Respondent's explanation for the loss of data (including the explanation provided in the Tenth Respondent's N265 Disclosure List dated 17 July 2020) is consistent with their examination of those devices;

c) as soon as reasonably practicable, and on a rolling basis, provide a copy of all documents which contain user-generated material (that is, excluding system files and program files), including recovered documents, found on all Electronic Devices, Mobile Communication Services and Cloud Accounts to the Tenth Respondent's solicitors;

d) as soon as reasonably practicable and in any event by 21 August 2020, prepare an expert report addressed to the Court setting out:

    i)    what Electronic Devices, Mobile Communication Services and Cloud Accounts they have inspected;

    ii)    the nature and results of the examination set out in sub-paragraph b) above; and

    iii)   any other matters which they consider material which they have identified in the course of their investigations.

e) save in accordance with sub-paragraphs c) and d) above, or with the consent of the Tenth Respondent and/or pursuant to a further order of the Court, Aon shall keep confidential all data and information received by them in the performance of this order;

f) Aon shall return Electronic Devices to the Tenth Respondent as soon as practicable. If Aon requires to retain any Electronic Device for more than 3 working days, it shall give notice to the Applicant and the Tenth Respondent explaining why (and the parties shall have permission to apply to Court for directions);

g) Aon may make a request in writing to the Court for directions for the purpose of assisting it in carrying out its functions at any time. Aon shall provide a copy of any such request to the Applicant and the Tenth Respondent simultaneously with (or before) filing it with the Court, unless Aon considers that doing so would undermine the purpose of this order (in which case it must explain why in its request).

12. Aon shall provide the report prepared under paragraph 11(d) above to the Tenth Respondent's solicitors. Thereafter:

a) The Tenth Respondent's solicitors shall be entitled to redact the report to the extent that it contains privileged material (the report, as redacted for privileged material only, is referred to as the "**restricted report**").

b) The Tenth Respondent's solicitors shall also entitled to produce a further version of the report which is also redacted to the extent that it contains material which is confidential to the Tenth Respondent and/or material in respect of which the Tenth Respondent has a reasonable expectation of privacy, but which is not relevant to these proceedings (the report, as redacted for both privileged and irrelevant private/confidential material, is referred to as the "**unrestricted report**").

c) The unrestricted report shall be provided to the Court and to all other parties within 7 days of Aon's report being provided to the Tenth Respondent's solicitors.

d) The restricted report shall be provided to the Court and to the Applicant's solicitors within 7 days of Aon's report being provided to the Tenth Respondent's solicitors. Material which is contained in the restricted report, but is redacted in the unrestricted report, shall only be made available to the Applicant's solicitors (PCB Litigation LLP) and counsel and must not (unless permitted by the court or agreed by the Tenth Respondent) be communicated to the Applicant herself or to any third party.

13. The Tenth Respondent's solicitors shall, save to the extent that they are satisfied that the documents have already been searched, undertake appropriate searches of those documents and disclose (with simultaneous inspection) any documents which are material to these proceedings. Such searches shall include any reasonable keywords or other parameters which the Applicant notifies to the Tenth Respondent's solicitors. The Tenth Respondent's solicitors shall undertake such searches as expeditiously as reasonably practicable, and provide disclosure on a rolling basis as it becomes available but not later than 21 days after receipt of the relevant tranche of documents from Aon.

14. In addition to the activities set out in paragraph 11 above, Aon shall perform such other functions as may be agreed by the Applicant and the Tenth Respondent or as may be ordered by the Court.

**Costs**

15. Without prejudice to such order as the Court may subsequently make, the Applicant shall pay any invoice (or request for payment on account) from Aon for the purposes of performing this order.

16. The costs of this application are reserved.

**Effectiveness of this order**

17. **This order shall take immediate effect once approved by the Court notwithstanding that it does not bear the seal of the High Court.**

**Interpretation of this order**

18. A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

19. A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

**Service of this order**

20. The Applicant will serve this order upon the Tenth Respondent as soon as practicable.

21. For the purposes of paragraph 20 above, service shall be made by the following methods:

    a) WhatsApp message to the Tenth Respondent's mobile telephone with number +44 7795 973199 attaching this order and a web link to the other documents referred to at paragraph 20 above and informing the Tenth Respondent that the documents have also been emailed to his solicitors;

    b) email to the following email addresses: (i) khyshen@gmail.com; and (ii) temur@stecapital.net, in each case in the same manner as set out in paragraph 21.a) above; and

    c) email to the Tenth Respondent's solicitors Hughes Fowler Carruthers at m.harper@hfclaw.com and f.hughes@hfclaw.com, in each case in the same manner as set out in paragraph 21.a) above.

22. For the purposes of enforcement of this order pursuant to FPR r.37.4, personal service of this order on the Tenth Respondent be dispensed with pursuant to FPR r.37.8 provided that the Tenth Respondent has been served or notified of this order by any of the methods permitted by this order (although the service shall be valid even if the documents cannot successfully be delivered to the email addresses identified in paragraph 21.b) above).

23. The Applicant is not required to serve this order on the First to Ninth Respondents.

**Communications with the court**

24. All communications to the court about this order should be sent to the Family Division of the High Court, 1st Mezzanine, Queen's Building, Royal Courts of Justice, Strand, London WC2A 2LL quoting the number in the top right hand corner of this form.

25. The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

Dated: 23 July 2020

**SCHEDULE 1**

**Undertakings given by Aon as Independent Forensic IT Expert**

1. Aon will retain any device delivered to it in its safe keeping until it has made the requisite copies and returned the device to the Tenth Respondent. Aon shall not permit anyone other than its officers or employees to have access to the device during the period that it is held by it.

2. Aon will make two forensic images or copies of the data stored on the Electronic Devices, Mobile Communication Services and Cloud Accounts (insofar as copies can be made) and shall retain those copies or images in its safe keeping until further order of the Court.

3. Aon will use its best endeavours to ensure that no damage is done to any Electronic Device, Mobile Communication Service or Cloud Account, or data contained on the same.

4. Aon will keep confidential all documents, data and information (and copies thereof) which it obtains in performance of its functions under this order, and shall only use or disclose such information: (i) for the performance of its functions under this order; (ii) as permitted by further order of the Court; or (iii) in accordance with an agreement in writing by the Applicant and the Tenth Respondent (or their respective solicitors).

# EXHIBIT 7



**In the High Court of Justice**     No: FD13D05340
**Family Division**

**The Matrimonial Causes Act 1973**

**The Senior Courts Act 1981**

**The Marriage of Tatiana Mikhailovna Akhmedova and Farkhad Teimur Ogly Akhmedov**

**AFTER HEARING** Alan Gourgey QC and James Willan for Tatiana Mikhailovna Akhmedova (the Applicant); and Charles Howard QC and Charlotte Hartley for Temur Akhmedov (the Tenth Respondent).

**TO TEMUR AKHMEDOV of** Apartment C.07.1, One Hyde Park, 100 Knightsbridge, London SW1X 7LJ.

---

<u>**WARNING:**</u>

**IF YOU, TEMUR AKHMEDOV, NEGLECT TO OBEY THIS ORDER, YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.**

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS TEMUR AKHMEDOV TO BREACH THE TERMS OF THIS ORDER MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED**

---

**The Parties to the Proceedings**

1.  The Applicant is Tatiana Mikhailovna Akhmedova

    The First Respondent is Farkhad Teimur Ogly Akhmedov

    The Second Respondent is Woodblade Limited

    The Third Respondent is Cotor Investments SA

    The Fourth Respondent is Qubo 1 Establishment

    The Fifth Respondent is Qubo 2 Establishment

    The Sixth Respondent is Straight Establishment

    The Seventh Respondent is Avenger Assets Corporation

    The Eighth Respondent is Counselor Trust Reg in its capacity as trustee of the trusts set out in Part A of Schedule 1 to the Order of Mrs Justice Knowles dated 15 August 2019

The Ninth Respondent is Sobaldo Establishment in its capacity as trustee of the trusts set out in Part B of Schedule 1 to the Order of Mrs Justice Knowles dated 15 August 2019

The Tenth Respondent is Temur Akhmedov

## Recitals

2.  By order of Mrs Justice Knowles dated 23 July 2020 (the "Forensic Examination Order"), the Tenth Respondent was ordered to deliver up his Electronic Devices and to provide access to his Cloud Accounts and Mobile Communication Services for the purposes of independent forensic examination.

3.  On 31 July 2020, the Tenth Respondent served an updated List of documents (N265) explaining that he had searched for electronic documents on a digital image of his mobile telephone and laptop computer created in November 2019 (the "November 2019 Image").

4.  By an order made without notice by Mrs Justice Knowles dated 3 August 2020 (the "Part 71 Order") the Tenth Respondent was ordered to attend court for questioning and to produce documents.

5.  Subsequent to the hearing on 10 August 2020, the Tenth Respondent identified that the November 2019 Image had been taken by TKM Technologies Limited of Suite C, City House, 96a High Road, Beeston, Nottingham, NG9 2LF ("**TKM**").

## IT IS ORDERED THAT:

6.  As to the Forensic Examination Order:

    a)  By 4.00pm on 10 August 2020, the Tenth Respondent shall identify the company which created and holds the November 2019 Image.

    b)  The Tenth Respondent shall procure that a copy of every image made of his Electronic Devices, Cloud Accounts and/or Mobile Communication Services, including the November 2019 Images, is delivered up and made available (with unrestricted access) to Aon at The Aon Centre, The Leadenhall Building, 122 Leadenhall Street, London EC3V 4AN by no later than 4.30pm on 12 August 2020 for the purposes of examination under the Forensic Examination Order.

    c)  TKM is hereby authorised and directed to:

        i)   retain in their possession and safekeeping all images made (or other data extracted or copied) on the instructions of the Tenth Respondent and/or of the Tenth Respondent's Electronic Devices, Cloud Accounts and Mobile Communication Services; and

        ii)  forthwith deliver up a copy of all such images (and other data) to Aon at The Aon Centre, The Leadenhall Building, 122 Leadenhall Street, London EC3V 4AN.

    d)  The Tenth Respondent shall forthwith execute by hand and deliver to the Applicant's solicitors a mandate for each of his email accounts in the form attached

in the Schedule to this Order authorising and directing Google (and associated companies) to provide Aon with access to and/or with copies of the Tenth Respondent's accounts and any emails, documents, other electronic data and metadata held on those accounts. The Tenth Respondent shall provide such further assistance and execute such further documents as may reasonably be required to give effect to the mandates.

7. As to the Part 71 Order:

   a) Without prejudice to any application to set aside or discharge the Part 71 Order, the examination directed under paragraph 1 of the Part 71 Order is adjourned with liberty to restore before Mrs Justice Knowles. A realistic and (if possible) agreed time estimate must be provided to the court in advance of any fixing of the hearing.

   b) By 4.00pm on 21 August 2020, the Tenth Respondent shall produce copies of all outstanding documents required to be provided under paragraph 2 of the Part 71 Order. The documents to be produced must include:

      i) copies of bank statements for all of the Tenth Respondent's accounts with Metro Bank covering the period 1 August 2018 to 31 December 2018;

      ii) copies of statements for the Tenth Respondent's accounts with Interactive Brokers covering the period from 6 April 2019 until the date on which those accounts were closed;

      iii) documents evidencing the current assets and liabilities of each company in which the judgment debtor is interested (including without limitation Borderedge Limited, SCI Villa Pomme de Pin, STE Capital Corporation SA and Khyshen Ltd) to include (a) bank statements for each company for the last 2 years, (b) accounts for each company for the last 2 years, (c) current management accounts for each company, and (d) bills or debts owed to or by each company;

      iv) trust deeds for all trusts in which the judgment debtor has any interest (including by virtue of falling within the class of discretionary beneficiaries), including the trust deeds for the Simul Trust, the Navy Blue Trust, the Genus Trust, the Arbaj Trust, the Longlaster Trust, the Ladybird Trust and the Carnation Trust.

8. As to expert evidence:

   a) The court is satisfied that expert evidence in the fields of (*a*) Russian law and (*b*) valuation of the Moscow Property is necessary to assist it to resolve the proceedings, and grants permission for such evidence under FPR r. 25.4.

   b) The parties shall jointly instruct an expert in each of those fields, in respect of which the following provisions shall apply:

      i) By 28 August 2020, the Applicant's solicitors shall provide the Tenth Respondent's solicitors with (a) a list of at least two appropriate experts in each of those fields together with the confirmations referred to in paragraph 8.1 of Practice Direction 25B (including for the purposes of paragraph 8.1(b)

a copy of the expert's Curriculum Vitae), and (b) a draft letter of instruction to the expert in each of the fields.

ii)  The Applicant and the Tenth Respondent shall endeavour to agree the identity of the joint expert in each field and the terms of the letter of instruction by 9 September 2020.

iii) If and to the extent that the Applicant and the Tenth Respondent are unable to reach agreement on any such matters, each of them shall provide brief written submissions to the court by 4pm on 11 September 2020 and the court will determine the disputed issues on paper during the week of 14 September 2020.

iv)  The letters of instruction (together with such documents as either party may identify as relevant) shall be sent to the joint experts by the Applicant's solicitors promptly after agreement or determined by the court.

v)   The reports shall be sent to the court (in both hardcopy and electronic format) and served on the parties simultaneously by a date to be agreed by the parties or determined by the court as set out in (iii) above in default of agreement.

vi)  The costs charged by the experts for preparing their reports shall be met by the Applicant and the Tenth Respondent equally in the first instance.

vii) Any questions shall be put to the expert by no later than 10 days after receipt of the report in accordance with FPR r. 25.10. The expert shall respond to those questions promptly and, in any event, within 14 days. The costs charged by the expert for answering those questions shall be met by the party raising them in the first instance.

viii) Save as is ordered by the court, the expert's written report shall be admissible without the attendance at court of the expert. However, the expert shall attend the final hearing to give oral evidence, unless otherwise ordered at the PTR. The method of attendance shall be determined at the PTR.

## Costs

9. The costs of the matters addressed in this order are costs in the cause as between the Applicant and the Tenth Respondent.

## Effectiveness of this order

10. **This order shall take immediate effect once approved by the Court notwithstanding that it does not bear the seal of the High Court.**

## Interpretation of this order

11. A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

12. A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

**Service of this order**

13. The Applicant will serve this order upon the Tenth Respondent as soon as practicable.

14. For the purposes of paragraph 13 above, service shall be made by email to the Tenth Respondent's solicitors Hughes Fowler Carruthers at m.harper@hfclaw.com and f.hughes@hfclaw.com.

15. For the purposes of enforcement of this order pursuant to FPR r.37.4, personal service of this order on the Tenth Respondent be dispensed with pursuant to FPR r.37.8 provided that the Tenth Respondent has been served or notified of this order in accordance with paragraph 14 above.

16. The Applicant is not required to serve this order on the First to Ninth Respondents.

**Communications with the court**

17. All communications to the court about this order should be sent to the Family Division of the High Court, 1st Mezzanine, Queen's Building, Royal Courts of Justice, Strand, London WC2A 2LL quoting the number in the top right hand corner of this form.

18. The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.


Dated: 10 August 2020

**<u>Schedule: form of mandate to be executed by the Tenth Respondent</u>**

**To whom it may concern**

I, Temur Akhmedov, am the owner of the account [insert email address and other identifying details for the relevant account].

I consent to the disclosure of all data contained on or relating to my account of whatever nature (including, but not limited to, emails and documents (including deleted items), account/subscriber information and metadata) being produced to Stroz Friedberg Limited of The Aon Centre, The Leadenhall Building, 122 Leadenhall Street, London, EC3V 4AN ("Aon"). You may take instructions in this regard from Amar Nankani of Aon, whose contact details are:

> E: amar.nankani@aon.co.uk
> T: +44 (0)207 086 5808
> M: +44 (0)7539 303633

I further instruct you to provide a copy of all data contained on or relating to my account of whatever nature to Aon as soon as possible, and to follow any and all further instructions received from Mr Nankani of Aon to provide access to or copies of data on or relating to my account.

I withdraw and waive any objection that I have made or could make to the production by Google of any data which is the subject of this consent and instruction pursuant to a subpoena or other court order in any jurisdiction, provided that the subpoena or other court order is consistent with this consent and instruction. I further confirm that I consent to the production of such data (including contents of communications) for the purposes of 18 U.S. Code §2702(b)(3) and (c)(2) pursuant to any subpoena or other court order which is consistent with this consent and instruction.

If you require any further information to verify my identity or my ownership of this account, please contact my solicitors using the following details: Messrs Hughes Fowler Carruther, Academy Court, 94 Chancery Lane, London WC2A 1DT; Tel: 020 74218383, Email: M.Harper@HFCLAW.com/ F.Hughes@HFCLAW.com

# EXHIBIT 8



**In the High Court of Justice**
**Family Division**

No: FD13D05340

**The Matrimonial Causes Act 1973**

**The Senior Courts Act 1981**

**The Marriage of Tatiana Mikhailovna Akhmedova and Farkhad Teimur Ogly Akhmedov**

**ORDER MADE BY THE HON. MRS JUSTICE GWYNNETH KNOWLES ON   [   ] 2020 ON THE PAPERS**

**The parties**

1. The Applicant is Tatiana Mikhailovna Akhmedova

   The First Respondent is Farkhad Teimur Ogly Akhmedov

   The Second Respondent is Woodblade Limited

   The Third Respondent is Cotor Investments SA

   The Fourth Respondent is Qubo 1 Establishment

   The Fifth Respondent is Qubo 2 Establishment

   The Sixth Respondent is Straight Establishment

   The Seventh Respondent is Avenger Assets Corporation

   The Eighth Respondent is Counselor Trust Reg in its capacity as trustee of the trusts set out in Part A of Schedule 1 to the Order of Mrs Justice Gwynneth Knowles dated 15 August 2019

   The Ninth Respondent is Sobaldo Establishment in its capacity as trustee of the trusts set out in Part B of Schedule 1 to the Order of Mrs Justice Gwynneth Knowles dated 15 August 2019

   The Tenth Respondent is Temur Akhmedov

**Recitals**

2. By order of Mrs Justice Knowles dated 19 June 2020 (the "19 June Order"), the Applicant and Tenth Respondent were ordered to simultaneously exchange signed statements of witness of fact by 21 August 2020.

1352549 v.1

3. By order of Mrs Justice Knowles dated 23 July 2020 (the "Forensic Examination Order"), the Tenth Respondent was ordered to deliver up his Electronic Devices and to provide access to his Cloud Accounts and Mobile Communication Services for the purposes of independent forensic examination, and forthwith to take such further steps as the independent expert, Stroz Friedberg Limited, an Aon Company ("**Aon**"), may require from time to time to obtain effective access to any Electronic Device, Cloud Account or Mobile Communication Service (including, without limitation, answering questions raised by Aon, and providing his authorisation to third party service providers).

4. By order of Mrs Justice Knowles dated 3 August 2020 made without notice (the "Part 71 Order"), the Tenth Respondent was ordered to produce documents.

5. By order of Mrs Justice Knowles dated 10 August 2020 (the "Other Matters Order"), the Tenth Respondent was ordered to produce copies of all outstanding documents required to be provided under paragraph 2 of the Part 71 Order by 4.00pm on 21 August 2020.

6. Upon consideration of the letter dated 24 August 2020 lodged by the Applicant,

**IT IS ORDERED THAT:**

7. The 19 June Order and the Other Matters Order shall be amended as follows:

   a) the date at paragraph 14(b) of the 19 June Order be amended to 28 August 2020; and

   b) the date at paragraph 7(b) of the Other Matters Order be amended to 28 August 2020.

8. By 4 pm on 26 August 2020, the Tenth Respondent shall:

   a) deliver to the Applicant's solicitors the Google mandates as set out in paragraph 6(d) of the Other Matters Order;

   b) provide complete answers to each of Aon's questions in its email to the parties dated 14 July 2020; and

   c) produce his unredacted UBS bank statements for January 2014 to 31 December 2018, pursuant to his obligations under paragraph 2 of the Part 71 Order, and paragraphs 10.b and 11.a.iii of the 19 June Order.

**Costs**

9. Costs reserved.

**Effectiveness of this order**

10. **This order shall take immediate effect once approved by the Court notwithstanding that it does not bear the seal of the High Court.**

Dated this [   ] day of [     ] 2020.

1352549 v.1

# EXHIBIT 9

| | |
|---|---|
| **From:** | Darren Mayhead |
| **To:** | Captain | M.Y. Luna; Scott Strand |
| **Cc:** | support; Chief Engineer | M.Y. Luna; AVIT | M.Y. Luna; Michal Werner | Bond IT |
| **Subject:** | RE: IT Support cancelation |
| **Date:** | Wednesday, March 20, 2019 3:41:24 PM |

Good evening Captain Gavin,

Many thanks for having GCS support Luna these past years, and do not hesitate to contact me should you need any additional information or assistance in the future.

Best regards,
Darren.

---

**From:** Captain | M.Y. Luna <master@my-luna.com>
**Sent:** Wednesday, March 20, 2019 2:54 AM
**To:** Darren Mayhead <darren@greatcirclesys.com>; Scott Strand <scotts@greatcirclesys.com>
**Cc:** support <support@greatcirclesys.com>; Chief Engineer | M.Y. Luna <chiefengineer@my-luna.com>; AVIT | M.Y. Luna <avit@my-luna.com>; Michal Werner | Bond IT <michal@bondtm.com>
**Subject:** RE: IT Support cancelation

Good Morning Darren & Scott,

  I hope this finds you well.  I am writing to say thank you and to inform you that we no longer need any more information from GCS.

  I would like to thank you for your years of service and request that you delete any information or data of LUNA's that you may still have on file including emails/ drawings licencing / drop box files and any other data that remains on your servers.  If you could also please send me and the ETO a confirmation once this has been done.

Thanks again and have a great day,

Kind Regards,
Gavin

**From:** Darren Mayhead [mailto:darren@greatcirclesys.com]
**Sent:** 07 March 2019 21:34
**To:** Captain | M.Y. Luna <master@my-luna.com>
**Cc:** support <support@greatcirclesys.com>; Chief Engineer | M.Y. Luna <chiefengineer@my-luna.com>; AVIT | M.Y. Luna <avit@my-luna.com>; Michal Werner | Bond IT <michal@bondtm.com>

**Subject:** RE: IT Support cancelation

Thanks Gavin.

Michael,
Might you confirm my comments below for Ruckus/VMware please?
Also, confirm perpetual licensing for Veeam. It covers 10 VM's, and Luna was at 11 so ETO decided one of the VM's was not required to be backed up as it was not critical, otherwise, they would have had to purchase new 'per vm' licenses as the perpetual is no longer an option.

Thanks.
Best,
Darren.

**From:** Captain | M.Y. Luna <master@my-luna.com>
**Sent:** Thursday, March 7, 2019 10:22 AM
**To:** Darren Mayhead <darren@greatcirclesys.com>
**Cc:** support <support@greatcirclesys.com>; Chief Engineer | M.Y. Luna <chiefengineer@my-luna.com>; AVIT | M.Y. Luna <avit@my-luna.com>; Michal Werner | Bond IT <michal@bondtm.com>
**Subject:** RE: IT Support cancelation

Hi Darren,

   Thank you so much for that and we are standing by, If you would please direct your questions to Michal, I am sure he can help with the expiration dates if you need them to help verify the licencing situation.

Kind Regards,
Gavin

**From:** Darren Mayhead [mailto:darren@greatcirclesys.com]
**Sent:** 07 March 2019 21:17
**To:** Captain | M.Y. Luna <master@my-luna.com>
**Cc:** support <support@greatcirclesys.com>; Chief Engineer | M.Y. Luna <chiefengineer@my-luna.com>; AVIT | M.Y. Luna <avit@my-luna.com>; Michal Werner | Bond IT <michal@bondtm.com>
**Subject:** RE: IT Support cancelation

Hi Gavin,
I'm currently in Seattle until Friday, but will get information to you over the next couple of days.

I can tell you that Veeam is a perpetual license, and offers were made to subscribe to VMWare

support, but as there had not been a need to engage VMWare support directly in many moons, nor was there an intent to bring Luna up to the latest versions owing to perceived value for money vs expense, has not been pursued. Similarly for Ruckus too.

I recollect KAV was upgraded some time recently, and I will find this information.

As we have no connection now to the Servers, we cant see the controllers and servers to confirm expiration dates.

Best regards,
Darren.

---

**From:** Captain | M.Y. Luna <master@my-luna.com>
**Sent:** Thursday, March 7, 2019 7:34 AM
**To:** Darren Mayhead <darren@greatcirclesys.com>; Scott Strand <scotts@greatcirclesys.com>
**Cc:** support <support@greatcirclesys.com>; accounting <accounting@greatcirclesys.com>; Chief Engineer | M.Y. Luna <chiefengineer@my-luna.com>; AVIT | M.Y. Luna <avit@my-luna.com>; Michal Werner | Bond IT <michal@bondtm.com>
**Subject:** RE: IT Support cancelation

Dear Darren and Scott,

Thank you for your effort over the last few days to close out the final items with regards to LUNA.

I must ask you some direct questions.  We are very much trying to finalize things on board and we do need the information Michal has requested.  Should you not be able to provide us with the licencing portals that we paid for when everything was set up back when GCS set everything up.  We will be forced to purchase these again and I would have to ask for reimbursement from GCS as these licences are property of LUNA and need to be provided.

We need to know today, definitively:

Do you still have the licensing data as requested?

Please work with Michal with regards, to the below requested, items, this is going on nearly a month now.

1. registration email
2. registration company
3. any other details used.
4. the current known status of last renewal
5. copy of invoices which are related to the products listed below as they might be requested during software audit

Currently we are aware of the following items which are missing the above information.

1. Vmware ESX
2. Veeam
3. Kaspersky
4. HP server care packs
5. Cisco Call Manager
6. Ruckus call manager

I stand by to hear from you,

Kind regards,
Gavin

**From:** Michal Werner | Bond IT [mailto:michal@bondtm.com]
**Sent:** 07 March 2019 15:59
**To:** Darren Mayhead <darren@greatcirclesys.com>
**Cc:** GCS Support <support@greatcirclesys.com>; accounting@greatcirclesys.com; Captain | M.Y. Luna <master@my-luna.com>; Chief Engineer | M.Y. Luna <chiefengineer@my-luna.com>; AVIT | M.Y. Luna <avit@my-luna.com>
**Subject:** Re: IT Support cancelation

Hello Darren,

Nathan and myself went through the Dropbox however unless we missed something there is no information about the below
besides the license files.

If we are to download updates or at least updates to the versions they have onboard we need the logins for the software provider portals
where the licenses are registered.

Can you please advise if you are able to provide these.

Thank you.

Best regards,

Michal

**Michal Werner**

**IT Division Supervisor | Bond IT**
michal@bondtm.com
Branch Office: +31 20 708 6220
Head Office:
www.bondtm.com

---

**From:** Captain | M.Y. Luna
**Sent:** Monday, February 25, 2019, 8:01 AM
**To:** Darren Mayhead
**Cc:** GCS Support; accounting@greatcirclesys.com; Chief Engineer | M.Y. Luna; AVIT | M.Y. Luna
**Subject:** FW: IT Support cancelation

Dear Darren,

I hope this email finds you well. It seems we are still waiting for you to handover important information and licences for the full transition of E-mail hosting and IT Support.
I kindly ask you to cooperate with the ship's AV/IT Engineer and Bond Tm for a smooth and immediate transfer of information. Please advise:

1. registration email
2. registration company
3. any other details used.
4. the current known status of last renewal
5. copy of invoices which are related to the products listed below as they might be requested during software audit

Currently we are aware of the following items which are missing the above information.

1. Vmware ESX
2. Veeam
3. Kaspersky
4. HP server care packs
5. Cisco Call Manager
6. Ruckus call manager


Great Circle Systems, Inc.
500 SE 17th Street, Suite 224
Fort Lauderdale, FL 33316
USA
www.greatcirclesys.com I LinkedIn I Facebook
Please CC all support requests to either support@greatcirclesys.com or tritonsupport@greatcirclesys.com (for Triton Administrator support) to ensure a prompt response from the on call support technician in the event I am unavailable.

Scanned by **Great Circle Systems' Secure Email Gateway.**

Great Circle Systems, Inc.
500 SE 17th Street, Suite 224
Fort Lauderdale, FL 33316
USA
www.greatcirclesys.com  I  LinkedIn  I  Facebook
Please CC all support requests to either support@greatcirclesys.com or
tritonsupport@greatcirclesys.com (for Triton Administrator support) to ensure a
prompt response from the on call support technician in the event I am unavailable.

Scanned by **Great Circle Systems' Secure Email Gateway.**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

IN RE APPLICATION OF
TATIANA AKHMEDOVA,

      Applicant,

Case No. SA20MC1099 JKP

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782.

## MEMORANDUM OF LAW IN SUPPORT OF
## TATIANA AKHMEDOVA'S *EX PARTE* APPLICATION FOR AN
## ORDER GRANTING DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Applicant, Tatiana Akhmedova, a resident of England and British citizen. ("Ms. Akhmedova" or "Applicant"), by and through its undersigned counsel, Holland & Knight LLP, and for its memorandum of law (this "Memorandum") in support of an application for discovery pursuant to 28 U.S.C. § 1782 from Rackspace US, Inc. d/b/a Rackspace Technology ("Rackspace"), states as follows:

## PRELIMINARY STATEMENT

This Memorandum is offered in support of Ms. Akhmedova's 1782 Application seeking discovery with respect to documents located in the United States and in this Judicial District for use in a foreign proceeding pending in the United Kingdom. Specifically, the pending litigation in the United Kingdom (High Court of Justice, Family Division, Case No. FD13D05340) (the "English Proceeding"), which is continuing as the judgment debt awarded in December 2016 (described further below) remains almost entirely unsatisfied. The English Proceeding now also concerns fraudulent transfers by judgment debtor Farkhad Akhmedov and his alter ego entities,

Cotor Investment, S.A., Qubo 1 Establishment, Qubo 2 Establishment, Straight Establishment, and Avenger Assets Corporation, including through the transfer of assets to Temur and a number of Liechtenstein trusts in the fraudulent evasion of the English Judgments entered in Applicant's favor. Ms Akhmedova has now brought claims within these proceedings against Temur and the Liechtenstein trustee entities Counselor Trust Reg ("Counselor") and Sobaldo Establishment ("Sobaldo") (which provide trust services to a number of trusts established in Liechtenstein in furtherance of Farkhad Akhmedov's scheme) to *inter alia* set aside transfers of assets made by Farkhad Akhmedov to those parties in furtherance of his scheme of evasion. Freezing injunctions were granted by the English court against the Liechtenstein trustees (who are also subject to criminal restraint orders in Liechtenstein in aid of a money laundering investigation) in August 2019. As of July 2020, freezing injunctions and ancillary orders for disclosure (including a turnover order) were also issued by the English Court against Temur. The discovery obtained here will be used to supplement discovery sought in the English Proceeding relating to Temur's role (and the role of the Liechtenstein trustees, with whom Temur communicated) in the ongoing fraud, as more information is gathered to demonstrate that Farkhad has continued to use various third parties to transfer, hide, secrete and otherwise violate numerous court orders including a disclosure order and turnover order issued by the High Court of England and Wales.

As set forth in the Application and the Declaration of Anthony J. Riem, dated September 1, 2020 ("Riem Decl."), in support thereof, this dispute originally arises out of two English Money Judgments which Applicant is seeking to enforce against her ex-husband and various alter ego entities which he has used to fraudulent transfer and conceal assets to avoid payment to Applicant. On December 15, 2016, following an eight-day financial remedy hearing between Applicant and ex-husband Farkhad to establish the value of the couple's assets and to decide how to divide that

value and provide maintenance for Ms. Akhmedova in a final distribution, the English Court awarded Ms. Akhmedova a cash award of GBP £350,000,000 (approximately US $466.6 million) (the "Cash Award"). The English Court has also declared that Applicant is the legal and beneficial owner of a megayacht, the M/Y Luna, and ordered Farkhad and Straight Establishment (the Vessel's registered-owner and alter ego of Farkhad) to transfer title to Ms. Akhmedova within seven days. The English Court ordered that if the title transfer was not effected within seven days, Straight Establishment would be liable to Ms. Akhmedova for a liquidated cash sum of $487,278,000 (the "Straight Money Judgment"). The English Court also extended a Freezing Order to apply to Straight Establishment and specifically applied to prohibit the "removal, disposal, charging and/or diminution in value" of the Vessel.

Following the issuance of the English Judgments as well as the Freezing Order directed at Farkhad with respect to the Vessel, Applicant has filed various foreign proceedings in her efforts to obtain recognition and enforcement of the English Judgments, including the English action against Temur Akhmedov, the judgment debtor's son, noted above. Under the circumstances, the following categories of evidence will be relevant, important and useful for Applicant to obtain for use in the foreign proceedings, all of which evidence is located in the United States:

    a)    All documents in the possession and control of Rackspace concerning cloud services and/or archiving of information provided with respect to email accounts maintained by the Vessel M/Y Luna, including but not limited to the following email accounts:

        i)    captain@my-luna.com

        ii)    chiefofficer@my-luna.com

        iii)    chiefengineer@my-luna.com

iv)    Any other email address containing "@my-luna.com"

b)    All documents in the possession or control of Rackspace concerning cloud services and/or archiving of information provided in connection with Great Circle Systems or Triton Technical with respect to the Vessel M/Y Luna;

c)    All documents in the possession or control of Rackspace concerning cloud services and/or archiving of information provided for any email accounts maintained by Farkhad Akhmedov and Temur Akhmedov, including but not limited to Farkhad@akhmedov.net, Temur@akhmedov.net and temur@stecapital.net.

Ms. Akhmedova's Application seeking discovery in aid of the foreign proceeding satisfies all of the requirements of § 1782 and the Supreme Court's discretionary factors. Under 28 U.S.C. § 1782, an applicant may be granted discovery in the United States in aid of a pending foreign proceeding if the applicant is an interested party to the proceeding and if the information sought is located within the district.

It is clear that discovery concerning U.S.-located Rackspace's storage of information as part of its cloud services concerning recent actions taken by Temur Akhmedov in transfer of assets as well as management of the Vessel is both relevant and crucial to Applicant in order for her to obtain relief in the foreign proceedings preventing Farkhad and his agents or representatives from violating the English freezing orders and fraudulently evading enforcement of the English Money Judgments.

## **JURISDICTION AND VENUE**

Jurisdiction is proper pursuant to Title 28 United States Code Section 1782 as this Application is for discovery involving documents located within the Western District of Texas, necessary to assist Applicant in its foreign court proceeding. At all times material herein,

4

Applicant is and was a resident of England and British citizen. Venue in the Westtern District of Texas is appropriate pursuant to Title 28 United States Code Section 1782 because the discovery is being sought from Rackspace, which is present within this Judicial District, along with the documents presently located in this jurisdiction in Rackspace's possession or control.

## III.   FACTUAL BACKGROUND

The facts giving rise to this Application are set forth in detail in the Riem Declaration, as well as the exhibits thereto. According to the declaration, the dispute and pending foreign litigations can be briefly summarized as follows:

## I.   The English Money Judgments and the Debtors' Fraudulent Transfer of Assets

Applicant has obtained two English money judgments rendered by English Court in favor of the Applicant. One against Farkhad, Cotor Investment, S.A. ("Cotor"), Qubo 1 Establishment ("Qubo 1"), Qubo 2 Establishment ("Qubo 2"), jointly and severally, in the amount of GBP 350,000,000 plus interest and certain running adjustments (the "Cash Award"), of which £224,430,508 was designated by the English court as maintenance (the remaining GBP £125,569,492 hereinafter referred to as the "Initial Money Judgment"); and the second against Straight Establishment in the amount of $478,278,000 plus interest and certain running adjustments (the "Straight Money Judgment"). The Cash Award (including the Initial Money Judgment) was awarded in December 2016 following an eight-day Financial Remedy Hearing conducted in the Family Division of the English High Court in connection with the divorce of Applicant Ms. Akhmedova and Farkhad Akhmedov. The Straight Money Judgment was awarded by the English Court in March 2018 following Ms Akhmedova's applications against Straight Establishment and Avenger Assets Corporation ("Avenger Assets").

5

Applicant issued a divorce petition in London on October 24, 2013. Ms. Akhmedova was granted a *decree nisi*, stating that the English Court saw no reason why the couple could not divorce, on December 2, 2015. The *decree nisi* was made absolute on December 15, 2016. An eight-day financial remedy hearing was heard in the Family Division of the English High Court in November and December 2016. The purpose of the Financial Remedy Hearing was to establish the value of the couple's assets and to decide how to divide that value and provide maintenance for Ms. Akhmedova in a final distribution.

However, on November 30, 2016 (the second day of the trial in England) a luxury yacht, the M/Y LUNA, beneficially owned by Farkhad via corporate shell (the "Vessel"), was transferred from its corporate owner, Avenger Assets, to another entity, Stern Management Corporation at the instruction of Farkhad and facilitated by his agents some of which are located in this District. One day later, on December 1, 2016, the Vessel was again transferred at the instruction of Farkhad from Stern Management Corporation to Qubo 2 with the assistance of Farkhad's agents located within this District. Later, Qubo 2 was found by the English Court to be the alter ego of Farkhad.

At the conclusion of the Financial Remedy Hearing on December 15, 2016, the English Court awarded Ms. Akhmedova an amount equal to £453,576,152 against Farkhad, including the Cash Award of GBP £350,000,000 (approximately US $466.6 million). Farkhad was ordered by the English Court to pay the Cash Award by January 6, 2017. Riem Decl. Exs. 1 & 2.

On December 20, 2016 the English Court also found that transfers of a 1) modern art collection and 2) the assets of Cotor,[1] to entities in Liechtenstein, including Qubo 1 and Qubo 2 "was simply the latest part of [Farkhad's] attempts to avoid his liabilities by purporting to transfer his assets to a new jurisdiction and thereby making enforcement more difficult." The English

---

[1] In 2012, Farkhad sold his interest in ZAO Northgas, a Russian oil company, for US $1.375 billion. Following the sale, Farkhad transferred the sale proceeds to Cotor. Ex. 1 ¶ 77.

Court set aside these transfers on the basis that Qubo 1 and Qubo 2 "are no more than ciphers and the alter ego of [Farkhad]" and made the Qubo entities liable for the judgment debt together with Farkhad. Riem Decl. Ex. 2 ¶¶ 11(g)-(h), 12.

Farkhad has not voluntarily satisfied any portion of the Judgment Debt or Cash Award, including the Initial Money Judgment, and is currently in contempt of Court for breaching the terms of the Freezing Order. He has instead continued to engage in a pattern of deception aimed at concealing his assets and frustrating Ms. Akhmedova in her efforts to enforce her rights as a UK judgment creditor.

On March 8, 2017, in disregard of the English Judgment (under which Qubo 2 was liable on the judgment debt together with Farkhad) and pending proceedings in the Liechtenstein Court, Qubo 2 transferred the Vessel to Straight Establishment. Straight Establishment is another Liechtenstein entity, which is operated from the same address as Qubo 2. Straight Establishment is the current registered owner of the LUNA and as of August 8, 2018 Straight Establishment and its agents have been permanently enjoined from further transferring ownership, control or possession of the LUNA by the High Court of the Marshall Islands.

On March 21, 2018, the English Court issued an order against Defendants Straight Establishment and Avenger Assets (the "March 21 Order"). The English Court found that Straight Establishment was an alter ego of Farkhad and served as his nominee. The English Court found that assets held and previously held in Straight Establishment's name, as well as assets held and previously held in Avenger Asset's name, beneficially belonged to Farkhad, including the Vessel which had been fraudulently transferred by Farkhad several times during the English proceedings.

Also on March 21, 2108, the English Court declared "with immediate effect that Applicant is the legal and beneficial owner of the Vessel," and ordered Farkhad and Straight Establishment

7

to transfer title to Ms. Akhmedova within seven days. The English Court ordered that if the title transfer was not effected within seven days, Straight Establishment would be concurrently liable to Ms. Akhmedova for a liquidated cash sum of $487,278,000 (the "Straight Money Judgment," attached hereto as Exhibit 3). The English Court also extended the Freezing Order to apply to Straight Establishment and Avenger Assets, and specifically applied to prohibit the "removal, disposal, charging and/or diminution in value" of the Vessel.

## II.    The English Proceedings Against Temur Akhmedov

On 15 November 2019, Applicant filed in the ongoing English Proceeding, an application seeking to add as an additional, tenth respondent, Temur Akhmedov to the English Proceeding. Temur was joined to the proceedings by the order of Mrs. Justice Knowles dated January 20, 2020.

By order of Justice Knowles dated June 19, 2020, as amended by consent (the "Disclosure Order"), Temur was required to provide standard disclosure and inspection of documents by July 17, 2020 and was also required to provide responses to Applicant's Request for Further Information ("RFI").

On July 17, 2020, the Applicant sought and obtained against an *ex parte* without notice Worldwide Freezing Order with ancillary asset disclosure against Temur (the "WFO"). Also on July 17, 2020, the Temur provided disclosure and responses to the RFI pursuant to the Disclosure Order. Inspection of a limited number of documents was provided on July 17, 2020, with inspection of the majority of documents being provided on July 20, 2020.

Temur's disclosure statement reveals that he has previously held a wide variety of relevant documents but (on his own case) has systematically destroyed his documents since January 2018. In fact, aside from his UBS bank statements, Temur had disclosed only two documents created between April 2016 and July 20, 2020. Although Temur seeks to justify this destruction as justified

8

by "security reasons", it appears likely that such destruction has in fact taken place in order to frustrate Tatiana's claims against him.

Based on Temur's acts, on July 20, 2020, Applicant applied for an order for delivery up of Temur's Electronic Devices, Mobile Communication Services and Cloud Accounts and for such Electronic Devices, Mobile Communication Services and Cloud Accounts to be imaged by an independent forensic IT expert with a view to such images being reviewed by Temur's solicitors for the purposes of verifying and, if appropriate, securing compliance with Temur's obligation to give disclosure in accordance with the Disclosure Order.  Riem Decl. Ex. 4.

As further set forth in the Riem Declaration, submitted herewith, Temur's disclosure gives rise to serious concerns that he has failed to comply with his disclosure obligations and/or has destroyed relevant documents in the English Proceedings.  Riem Decl. ¶¶ 22-41.

Based upon information obtained to-date from various third party sources obtained through subpoena and otherwise, it is believed that the discovery target here, Rackspace, is used by Temur, and for the hosting and/or archiving of his email accounts subject to the English Disclosure Order, including accounts related to the Vessel M/Y LUNA (which Temur assists his father, judgment debtor Farkhad Akhmedov in controlling and managing).  Riem Decl. ¶¶42-46.

## ARGUMENT

I. **28 U.S.C. § 1782 PROVIDES FOR DISCOVERY IN AID OF PENDING FOREIGN PROCEEDING**

The basis for this *ex parte* Application is 28 U.S.C. § 1782 ("Section 1782").  "First, it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*." *Gushlak v. Gushlak*, 486 Fed. Appx. 215, 217 (2d Cir. 2012).

Section 1782 authorizes a United States District Court, upon the application of an interested person, to order a person residing in the district to give testimony or produce documents for use in a foreign proceeding:

> The District Court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusations. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a); *see also In re Clerici*, 481 F.3d 1324, 1331-32 (11th Cir. 2007).

Whether to grant this Application for discovery pursuant to 28 U.S.C. § 1782 is within this Court's discretion. *In re Clerici*, 481 F.3d at 1331 ("Because Congress has given the district courts such broad discretion in granting judicial assistance to foreign countries, this court may overturn the district court's decision only for abuse of discretion") (internal citations omitted); *In re Application of Aldunate*, 3 F.3d 54, 62 (2d Cir. 1993), *cert. denied*, 510 U.S. 965 (1993).

## II.   MS. AKHMEDOVA SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782

The United States Supreme Court has interpreted Section 1782 as having a broad application. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004). In determining that Section 1782 authorizes a federal district court to provide discovery assistance, the Supreme Court specifically rejected the multiple limitations that Intel attempted to inject into the interpretation of the statute. *Intel*, 542 U.S. at 256. Instead, the Supreme Court adopted a broad and liberal interpretation of the Statute and provided guidelines for the future application of the statute by federal district courts. *Id.*

Ms. Akhmedova satisfies each of the requirements of 28 U.S.C. § 1782 and those set forth by the Second Circuit in *Aldunate*. *Id.*  In *Aldunate* the Second Circuit stated of Section 1782 that:

> [T]he statutory language is unambiguous in its requirements: (1) the person from whom discovery is sought must reside in or be found in the district of the district court to which the application is made, (2) the discovery must be "for use in a proceeding in a foreign or international tribunal," and (3) the application must be made "by a foreign or international tribunal" or by "any interested person.

3 F.3d at 58 (quoting 28 U.S.C. §1782).

Thus, the Court may enter an Order allowing discovery for use in the foreign proceeding. *See Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262 (11th Cir. 2014).  Specifically, Ms. Akhmedova is an interested person to the foreign proceeding; the entity with possession, custody and/or control of the discovery sought resides in or are found within this District; and the evidence is sought for use in the pending foreign proceeding, which are before a foreign tribunal in the United Kingdom.

## A.    Ms. Akhmedova, the Applicant, is an interested person to the foreign proceeding

Ms. Akhmedova, as a judgment creditor of Farkhad and his alter egos, is the petitioner in the foreign proceeding.  Accordingly, she is clearly an "interested person" as that term is used in 28 U.S.C. § 1782.  *See In re Application of Malev Hungarian Airlines*, 964 F.2d 97, 101 (2d Cir. 1992), *cert. denied*, 506 U.S. 861 (1992).

The Court's decision in *Intel* highlights the broad applicability of this standard.  The Supreme Court recognized the definition of an interested party to be any person who "possess[es] a reasonable interest in obtaining [judicial] assistance." *Intel*, 542 U.S. at 256.  *In re Req. for Assistance from Ministry of Legal Affairs of Trin. & Tobago*, 648 F. Supp. 464, 466 (S.D. Fla. 1986) ("An application may be made by any interested person. The legislative history supports this view"), *aff'd*, 848 F.2d 1151 (11th Cir. 1988), *abrogated in part on other grounds by Intel*,

11

542 U.S. 241 (2004).   Here, Ms. Akhmedova seeks to recover on the English Money Judgments, and is engaged in continued litigation to prevent Farkhad, his son Temur, and his alter egos' efforts to transfer, dissipate or conceal their assets from enforcement.   The English Court has ruled that she is entitled to a division of assets under English law, the place of residence of the couple during their 20-year marriage.   As such, Ms. Akhmedova clearly possesses a reasonable interest in obtaining the assistance requested.

**B.      The entity with possession, custody and/or control of the discovery sought resides in or is found within this District**

In addition, the discovery subject, Rackspace "resides" or is "found" in this Judicial District.   For purposes of 28 U.S.C. § 1782, a company is found where it is incorporated, headquartered or where it is engaged in "systematic and continuous activities." *In re Godfrey*, 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007) (citation omitted).   Ms. Akhmedova seeks the production of documents by Rackspace and its owners, managers and employees located at, or accessible from their San Antonio office.   This satisfies the statutory requirements of 28 U.S.C. § 1782.   Ms. Akhmedova anticipates serving Rackspace with a subpoena *duces tecum* in this District upon the issuance of an order by the Court authorizing the discovery assistance requested.

**C.      Discovery is sought for use in the pending foreign Actions, which are being held before one or more foreign tribunals in Dubai**

Ms. Akhmedova seeks discovery "for use in a proceeding in a foreign or international tribunal". *Aldunate*, 3 F.3d at 58 (quoting 28 U.S.C. §1782).   As the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) explained, the proceeding for which discovery is sought under §1782(a) may be within reasonable contemplation, pending or imminent. *Id* at 243.

*See Weber v. Finker*, 554 F.3d 1379, 1385 (11th Cir. 2009) ("Section 1782 does not require that every document discovered be actually used in the foreign proceeding.   Quite the opposite,

12

Section 1782 expressly provides that the district court should grant discovery under the Federal Rules of Civil Procedure... The Magistrate Judge did not err by granting discovery 'for context,' when such discovery is allowed under Rule 26(b)(1)"), *cert. denied*, 130 S.Ct. 59 (2009).   As Anthony J. Riem, English counsel to Ms. Akhmedova, explains in his accompanying declaration, Ms. Akhmedova is in need of the requested discovery to determine the actions taken by Farkhad and those on his behalf including his son, Temur Akhmedov, to assist with fraudulently transferring assets, thus preventing Applicant from recognizing and enforcing her foreign money judgments against him.

In *Intel*, the Supreme Court confirmed a low threshold for satisfying the "foreign or international tribunal" requirement by concluding that the Directorate General (i.e., a governmental investigative body and not a court) is a "tribunal" for the purposes of satisfying the requirements of § 1782. The Court also stated that "[t]he term 'tribunal'... includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts." *Intel*, 542 U.S. at 248.   In light of the expansive definition of the term "tribunal," the English Court proceeding clearly constitute "proceedings in a foreign or international tribunal."

### D.     No Other Factors Weigh Against Allowing Discovery

In addition to satisfying the requirements of *Aldunate*, 3 F.3d at 58, there are no factors which would argue against allowing the discovery. In *Malev*, the Second Circuit emphasized that the goals of Section 1782 should be considered in deciding motions brought under the statute. *Malev*, 964 F.2d at 100. These goals of Section 1782 are:

> [T]win aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign courts by example to provide similar means of assistance to our courts.

*Id.* Both these aims will be fulfilled by granting the requested discovery. The discovery sought will assist Ms. Akhmedova in the English proceeding. According to her English counsel, Anthony J. Riem, "there is no English rule of evidence that would prevent discovery obtained under 28 U.S.C. § 1782 being used in the English proceedings." Riem Decl. at ¶ 48.

Thus, the goals of the statute will be accomplished through granting this application. Given the holdings in *Aldunate* and *Malev*, it must be concluded that a Section 1782 application should be granted where, as here, an applicant has met the express requirements of the statute and where the discovery will achieve the goals set by the statute's enactment. *Aldunate*, 3 F.3d at 58; *Malev*, 964 F.2d at 100.

## III.   MS. AKHMEDOVA ALSO SATISFIES *INTEL'S* DISCRETIONARY FACTORS

In *Intel*, the Court identified four factors that bear consideration in ruling on a Section 1782 request. While the factors are not exhaustive, the Court stated that a court ruling on a Section 1782 request should consider: 1) whether the person from whom discovery is sought is a participant in the foreign proceeding; 2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government, court, or agency to federal-court judicial assistance; 3) whether the Section 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States; 4) whether the discovery requests are unduly intrusive or burdensome. *Intel*, 542 U.S. at 264-65; *In re Clerici*, 481 F.3d at 1334.

A District Court may grant an application without consulting the discretionary factors, but the discretionary factors should be considered if the statutory requirements are met. *See In re Xavier*, No. 05-12218, 2006 WL 858489, at *1 (11th Cir. Apr. 4, 2006) (*per curiam*) (holding that district court had the authority to grant the § 1782 application for assistance in obtaining discovery

from a bank in Miami as the statutory requirements were satisfied); *Chubbs Ins. Co. of Europe SE v. Zurich American Ins. Co.*, No. 1:09-mc-011, 2010 WL 411323 *6 (N.D. Ohio, Jan. 28, 2010).

Granting Ms. Akhmedova's request for relief is consistent with the guidance provided by the *Intel* court since neither of the discovery subjects will be parties to or participants in the foreign proceeding. *Compare In re Application Pursuant to 28 U.S.C. § 1782*, No. 1:14-mc-44, 2014 WL 4181618 at *4 (S.D. Ohio, Aug. 21, 2014) (holding that discretionary requirements not met because subjects would be participants in the foreign proceedings). As such, Ms. Akhmedova would be unable to obtain discovery from Rackspace in the United Kingdom. Although the documents were sought through disclosure by Temur in the English Proceeding, Temur has continually failed to cooperate with disclosure required by the English Court, including by the deletion of documents. However, it is believed that Rackspace maintains an archive of the requested information within this District.

The nature of the foreign proceeding does not implicate any factor or policy that would weigh against granting Ms. Akhmedova's request. Instead, the nature of the action – litigation against Temur Akhmedov in furtherance of the foreign country money judgments – weighs in favor of her request. The United States jurisdictions including Texas have confirmed their interest in facilitating enforcement and recognition of foreign money judgments by its own codification of the Uniform Money Judgment Recognition Act (*see* F.S. §§55.501-55.509). This is compounded by Farkhad and Temur's suspected wrongful use of companies located within this District to assist with evading enforcement of the English judgments against him.

Nor would granting the assistance requested by Ms. Akhmedova offend any foreign jurisdiction or constitute a circumvention of foreign proof-gathering rules. *See* Riem Decl. ¶ 48. Additionally, the discovery subject Rackspace is not a party in the English proceeding. *In re*

15

*Application Pursuant to 28 U.S.C. § 1782*, 2014 WL 4181618 at *4 (holding that application's circumvention of foreign proof-gathering restrictions was not clear because subjects were subject to the jurisdiction of the foreign court).

Finally, the requests are neither unduly intrusive nor burdensome. As discussed above, the key information relevant to the English proceeding is located in this District. This includes documentation in the possession or control of Rackspace. This information has not been made available to Applicant and is not available within the United Kingdom. Moreover, the documentation requested is needed to confirm whether acts believed to have been taken by Farkhad and/or Temur Akhmedov to fraudulently avoid enforcement of the English Judgments.

## IV.   THIS COURT MAY GRANT DISCOVERY RELIEF ON AN *EX PARTE* BASIS

It is well-settled law that § 1782 applications may, and in fact commonly are, granted *ex parte*. *See, e.g., Gushlack v. Gushlack*, 486 Fed. Appx. 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 ex parte."); *In re Letters Rogatory From Tokyo Dist.*, 539 F.2d 1216, 1219 (9th Cir. 1976) ("We do not find any of the other objections raised by the witnesses to be persuasive. Letters Rogatory [issued under § 1782] are customarily received and appropriate action taken with respect thereto ex parte."); *In re Ex Parte Application of Societe D'Etude De Realisation*, No. 13-mc-0266, 2013 WL 6164435, at *2 (E.D. Pa. Nov. 22, 2013) ("[A] survey of Intel's citing references reveals that the use of ex parte applications is widespread and, in many cases, unremarked upon (and thus approved of sub silento).") (collecting cases).

Section 1782 provides that "*[t]o the extent that the order does not prescribe otherwise*, the testimony or statement shall be taken, and the document or other thing produced, in accordance

16

with the Federal Rules of Civil Procedure." 28 U.S.C. § 1782 (emphasis added). Therefore, *unless the district court's authorizing order provides otherwise*, a party engaged in foreign litigation who serves a § 1782 subpoena *duces tecum* to obtain documents for use in the foreign litigation must first serve notice on all parties to the foreign proceedings pursuant to Fed. R. Civ. P. 45.

Under the express contemplation of the discovery statute, this Court is authorized to order an exception to the traditional rule providing for notice to the parties to the foreign action. Given Farkhad's documented history of thwarting Court orders and judgments, as well as Temur's history of spoliation of evidence through deletion of information and purportedly losing his electronic devices, a notice exception is appropriate and warranted here to prevent their intervention with the third-party discovery requested here. Applicant therefore respectfully requests that this Court delay notice until such time as Rackspace has complied with the subpoena (with a response time requested herein of fourteen days). Furthermore, Applicant requests that this Court direct Rackspace not to disclose the existence or contents of the discovery requests to be issued by Applicant until such time as their productions of documents are completed.

## CONCLUSION

Based on the foregoing, this Court should exercise its discretion to grant foreign discovery assistance. Under the circumstances, evidence that will be relevant to Ms. Akhmedova's entitlement to relief in the foreign proceeding is not available in the United Kingdom but is located in the United States in this District. As such, Ms. Akhmedova seeks discovery pursuant to 28 U.S.C. § 1782 to obtain discovery specified in the application and as set forth above. Obtaining this information will require a subpoena requiring production of documents and communications in the possession and control of Rackspace concerning (i) cloud services and/or archiving of information provided with respect to email accounts maintained by the Vessel M/Y Luna; (ii)

17

provided in connection with Great Circle Systems or Triton Technical with respect to the Vessel M/Y Luna; and (iii) provided for any email accounts maintained by Farkhad Akhmedov and Temur Akhmedov. All of these documents are believed to be located in the United States. Consistent with precedent cited above, the facts in the present matter clearly meet the requirements of 28 U.S.C. § 1782, and this 1782 application for discovery should be granted.

Dated: September 8, 2020

Respectfully submitted,

HOLLAND & KNIGHT LLP

Julia M. Haines
State Bar. No. 08710800
Fed ID No. 00765
1100 Louisiana Street, Suite 4300
Houston, Texas 77002
Telephone: (713) 821-7000
Email: julia.haines@hklaw.com

James H. Power (*pro hac vice* forthcoming)
State Bar No. 24026397
Fed ID No. 433050
31 West 52nd Street
New York, New York 10019
Telephone: (212) 513-3494
Facsimile: (212) 385-9010
Email: james.power@hklaw.com

*Attorneys for Tatiana Akhmedova*

18

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

IN RE APPLICATION OF
TATIANA AKHMEDOVA,

              Applicant,

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782.

SA20MC01099

Case No. _____

JKP

## ORDER GRANTING TATIANA AKHMEDOVA'S
## APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

This matter comes before the Court by an application for discovery pursuant to 28 U.S.C. § 1782 (the "Application") filed by Tatiana Akhmedova ("Applicant"). Having reviewed the Application and Applicant's supporting memorandum of law, the declaration of Anthony J. Riem dated September 1, 2020, as well as the exhibits thereto, the Court is satisfied that the production of documentation is warranted pursuant to 28 U.S.C. § 1782, and the Court hereby ORDERS as follows:

1)     The Application is GRANTED.

2)     Applicant is authorized to issue and serve subpoenas on Rackspace US, Inc. d/b/a Rackspace Technology ("Rackspace"), for the production of the following documents:

    a)     All documents in the possession and control of Rackspace concerning cloud services and/or archiving of information provided with respect to email accounts maintained by the Vessel M/Y Luna, including but not limited to the following email accounts:

   i)  captain@my-luna.com

   ii)  chiefofficer@my-luna.com

   iii)  chiefengineer@my-luna.com

   iv)  Any other email address containing "@my-luna.com"

  b) All documents in the possession or control of Rackspace concerning cloud services and/or archiving of information provided in connection with Great Circle Systems or Triton Technical with respect to the Vessel M/Y Luna;

  c) All documents in the possession or control of Rackspace concerning cloud services and/or archiving of information provided for any email accounts maintained by Farkhad Akhmedov or Temur Akhmedov, including but not limited to Farkhad@akhmedov.net, Temur@akhmedov.net and temur@stecapital.net.

3) Ordering Rackspace to produce the documents requested in the subpoena on an expedited basis, within fourteen (14) days of service of the subpoena;

4) Ordering Rackspace to preserve documents and evidence, electronic or otherwise, in its possession, custody or control that contain information potentially relevant to the subject matter of the Applicant's document request;

5) Ordering that Rackspace shall maintain the confidentiality of the fact and content of the Applicant's discovery efforts, except as necessary to seek advice of counsel, who are to be similarly restrained;

6) Providing that notice of the discovery authorized by this Order need not be provided to any of the individuals named as a party in the foreign proceedings until such time as the documents sought pursuant to this Court's order granting discovery is obtained by Applicant; and

7)   Retaining jurisdiction over the matter for the purpose of enforcement and assessing any

supplemental request for discovery assistance that may be requested by Applicant.

8)   A copy of this Order shall be served with each discovery demand.


SO ORDERED

Dated: San Antonio, Texas
       September ___, 2020


_____
UNITED STATES DISTRICT JUDGE

3